**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF MARYLAND**
**(Greenbelt Division)**

| | | |
|---|---|---|
| In re: | * | |
| | | |
| **NATIONAL ENERGY & GAS** | * | Case No.: 03-30459 (PM) and 03-30461 (PM) |
| **TRANSMISSION, INC. (f/k/a PG&E** | | through 03-30464 (PM) and 03-30686 (PM) |
| **NATIONAL ENERGY GROUP, INC.),** | * | through 03-30687 (PM) |
| *et al.* | | Chapter 11 |
| | * | |
| Debtors. | | (Jointly Administered under |
| | * | Case No.: 03-30459 (PM)) |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

**March 3, 2005**

**DISCLOSURE STATEMENT FOR FIRST AMENDED PLAN OF LIQUIDATION**
**FOR THE ENERGY TRADING DEBTORS AND THE QUANTUM DEBTORS**

---

**IMPORTANT DATES**

| | |
|---|---|
| Date by which Objections to Confirmation of the Plan Must Be Filed and Served: | April 5, 2005 at 4:00 p.m (EDT) |
| | |
| Date by which Ballots Must Be Received: | April 5, 2005 at 4:00 p.m. (EDT) |
| | |
| Hearing on Confirmation of the Plan: | April 13, 2005 at 10:30 a.m. (EDT) |

---

**WILLKIE FARR & GALLAGHER LLP**
**787 Seventh Avenue**
**New York, New York  10019-6099**
**(212) 728-8000**

**WHITEFORD, TAYLOR & PRESTON L.L.P.**
**Seven Saint Paul Street, Suite 1400**
**Baltimore, Maryland 21202**
**(410) 347-8700**

**Co-Counsel for the Debtors and Debtors in**
**Possession,**
**National Energy & Gas Transmission, Inc.** *et al.*

<u>**PRELIMINARY NOTES**</u>

**THIS DISCLOSURE STATEMENT ADDRESSES THE FIRST AMENDED PLAN OF LIQUIDATION OF THE ET DEBTORS AND THE QUANTUM DEBTORS (COLLECTIVELY, THE "DEBTORS").  THE ET DEBTORS CONSIST OF: (I) NEGT ENERGY TRADING HOLDINGS CORPORATION f/k/a PG&E ENERGY TRADING HOLDINGS CORPORATION; (II) NEGT ENERGY TRADING - GAS CORPORATION f/k/a PG&E ENERGY TRADING - GAS CORPORATION; (III) NEGT ET INVESTMENTS CORPORATION f/k/a PG&E ET INVESTMENTS CORPORATION; AND (IV) NEGT ENERGY TRADING - POWER, L.P. f/k/a PG&E ENERGY TRADING - POWER, L.P.  THE QUANTUM DEBTORS CONSIST OF: (I) ENERGY SERVICES VENTURES, INC. f/k/a PG&E ENERGY SERVICES VENTURES, INC.; AND (II) QUANTUM VENTURES.**

**ON JULY 8, 2003, THE ET DEBTORS AND THEIR PARENT, NATIONAL ENERGY & GAS TRANSMISSION, INC. f/k/a PG&E NATIONAL ENERGY GROUP, INC. ("NEGT"), FILED FOR CHAPTER 11 PROTECTION. ON THAT DATE, USGEN NEW ENGLAND, INC. ("USGEN NE"), A SUBSIDIARY OF NEGT, ALSO FILED FOR CHAPTER 11 PROTECTION AND IS SUBJECT TO A SEPARATELY ADMINISTERED CHAPTER 11 PROCEEDING.  ON JULY 29, 2003, THE QUANTUM DEBTORS, ALSO SUBSIDIARIES OF NEGT, FILED FOR CHAPTER 11 PROTECTION. ANNEXED AS APPENDIX 1 TO THE DISCLOSURE STATEMENT IS THE FIRST AMENDED PLAN OF LIQUIDATION FOR THE ET DEBTORS AND THE QUANTUM DEBTORS (THE "PLAN").  THE PLAN PROVIDES THE PROPOSED METHOD OF LIQUIDATION OF THE ASSETS OF THE DEBTORS AND THE DISTRIBUTIONS CREDITORS AND SHAREHOLDERS OF THE DEBTORS WOULD RECEIVE IN THE DEBTORS' CHAPTER 11 CASES.**

**PLEASE NOTE THAT THE PLAN ADDRESSES ONLY THE LIQUIDATION OF THE ASSETS OF THE ET DEBTORS AND THE QUANTUM DEBTORS.  THE PLAN DOES NOT ADDRESS THE REORGANIZATION OR LIQUIDATION OF NEGT OR USGEN NE.**

**PLEASE REFER TO THE PLAN (OR, WHERE INDICATED, CERTAIN MOTIONS FILED WITH THE BANKRUPTCY COURT) FOR DEFINITIONS OF THE CAPITALIZED TERMS USED IN THIS DISCLOSURE STATEMENT.**

**CREDITORS OF THE DEBTORS GENERALLY ARE ENTITLED TO VOTE ON THE PLAN.  THE DISCLOSURE STATEMENT IS BEING SENT TO YOU TO PROVIDE THE INFORMATION NECESSARY FOR YOU TO MAKE AN INFORMED VOTE ON WHETHER TO ACCEPT OR REJECT THE PLAN.  THE NEXT FEW PAGES OF THE DISCLOSURE STATEMENT INCLUDE A SUMMARY OF THE PLAN, INCLUDING PROPOSED**

DISTRIBUTIONS TO CREDITORS UNDER THE PLAN.  NONETHELESS, ALL CREDITORS ARE ENCOURAGED TO READ THE ENTIRE DISCLOSURE STATEMENT BEFORE VOTING TO ACCEPT OR REJECT THE PLAN.

THE DEBTORS AND THE ET COMMITTEE SUPPORT THE PLAN AND URGE ALL HOLDERS OF CLAIMS IN CLASSES 1, 3, 4, 5, 6, and 7 TO VOTE TO ACCEPT THE PLAN BY RETURNING THEIR BALLOTS SO THAT THEY ARE RECEIVED BY NEGT BALLOTING CENTER, c/o BANKRUPTCY SERVICES LLC, 757 THIRD AVENUE, NEW YORK, NEW YORK 10017, BY 4:00 P.M. (EASTERN DAYLIGHT TIME) ON APRIL 5, 2005.

THE DEBTORS BELIEVE THAT THE SUMMARIES CONTAINED IN THE DISCLOSURE STATEMENT ARE FAIR AND ACCURATE.  THE SUMMARIES OF THE FINANCIAL INFORMATION AND OF THE DOCUMENTS WHICH ARE ATTACHED HERETO (INCLUDING THE PLAN) OR INCORPORATED BY REFERENCE ARE QUALIFIED IN THEIR ENTIRETY BY REFERENCE TO THOSE DOCUMENTS.  IN THE EVENT OF ANY INCONSISTENCY OR DISCREPANCY BETWEEN A DESCRIPTION IN THE DISCLOSURE STATEMENT AND THE PLAN OR ANY DOCUMENTS ATTACHED HERETO OR INCORPORATED HEREIN BY REFERENCE, THE PLAN OR SUCH OTHER DOCUMENTS, AS THE CASE MAY BE, SHALL CONTROL.

THE DISCLOSURE STATEMENT CONTAINS THE ONLY INFORMATION AND REPRESENTATIONS APPROVED FOR USE IN SUCH SOLICITATION.  CREDITORS SHOULD NOT RELY ON ANY INFORMATION, REPRESENTATIONS OR INDUCEMENTS MADE TO OBTAIN ACCEPTANCE OF THE PLAN THAT ARE OTHER THAN, OR INCONSISTENT WITH, THE INFORMATION CONTAINED HEREIN AND IN THE PLAN.

THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT ARE MADE SOLELY AS OF THE DATE HEREOF.  DELIVERY OF THE DISCLOSURE STATEMENT DOES NOT IMPLY THAT THE INFORMATION CONTAINED HEREIN WILL BE CORRECT AT ANY SUBSEQUENT TIME.

THE BANKRUPTCY COURT'S APPROVAL OF THE DISCLOSURE STATEMENT CONSTITUTES NEITHER A GUARANTY OF THE ACCURACY OR COMPLETENESS OF THE INFORMATION CONTAINED HEREIN NOR AN ENDORSEMENT OF THE MERITS OF THE PLAN BY THE BANKRUPTCY COURT.

THE DISCLOSURE STATEMENT HAS BEEN PREPARED IN ACCORDANCE WITH SECTION 1125 OF THE BANKRUPTCY CODE, NOT FEDERAL OR STATE SECURITIES LAWS OR OTHER NONBANKRUPTCY LAW.  ENTITIES HOLDING, TRADING IN OR OTHERWISE PURCHASING,

**SELLING OR TRANSFERRING CLAIMS AGAINST THE DEBTORS SHOULD EVALUATE THE DISCLOSURE STATEMENT IN LIGHT OF THE PURPOSE FOR WHICH IT WAS PREPARED.  THE SECURITIES AND EXCHANGE COMMISSION HAS NOT APPROVED, DISAPPROVED OR PASSED UPON THE ACCURACY OR ADEQUACY OF THE STATEMENTS CONTAINED IN THE DISCLOSURE STATEMENT.**

**THE DISCLOSURE STATEMENT SHALL NOT BE CONSTRUED TO BE CONCLUSIVE ADVICE ON THE TAX, SECURITIES OR OTHER LEGAL EFFECTS OF THE PLAN UPON HOLDERS OF CLAIMS AGAINST THE DEBTORS.  THE DISCLOSURE STATEMENT SHALL BE CONSIDERED TO BE A SETTLEMENT DOCUMENT PURSUANT TO FEDERAL RULE OF EVIDENCE 408.  YOU MUST COMPLY WITH ALL LAWS AND REGULATIONS APPLICABLE TO YOU IN FORCE IN ANY JURISDICTION AND MUST OBTAIN ANY CONSENT, APPROVAL OR PERMISSION REQUIRED TO BE OBTAINED BY YOU UNDER THE LAWS AND REGULATIONS APPLICABLE TO YOU IN FORCE IN ANY JURISDICTION TO WHICH YOU ARE SUBJECT, AND THE DEBTORS, THEIR DIRECTORS AND THEIR ADVISORS SHALL NOT HAVE ANY RESPONSIBILITY THEREFOR.**

**TABLE OF CONTENTS**

ARTICLE I.   INTRODUCTION .................................................................2
   A.   Purpose of the Disclosure Statement...............................................2
   B.   Voting on the Plan...........................................................................3
      1.   Eligibility to Vote ...................................................................3
      2.   Voting Procedures ...................................................................4
      3.   Vote Solicitation .....................................................................4
      4.   Acceptance of Plan .................................................................4
      5.   Hearing on Confirmation of Plan ...........................................4
   C.   General Overview ...........................................................................5
   D.   Summary of Creditor Recoveries ...................................................6

ARTICLE II.   BACKGROUND ON CERTAIN EVENTS LEADING TO, AND
      CERTAIN KEY DEVELOPMENTS DURING, THE CHAPTER 11
      CASES ............................................................................................8
   A.   NEGT .............................................................................................8
   B.   The ET Debtors ..............................................................................9
   C.   The Quantum Debtors ...................................................................10
   D.   Summary of Prepetition Indebtedness...........................................12
   E.   Certain Events Leading to the Debtors' Chapter 11 Filings ...................12
   F.   The Debtors' Boards of Directors .................................................13
   G.   Overview of the Chapter 11 Cases ...............................................13
      1.   The ET Committee .................................................................13
      2.   First Day Pleadings and Orders .............................................14
      3.   Change of Name and Corporate Logo ...................................15
      4.   Key Employee Retention Plans .............................................15
      5.   Prepetition Tax Sharing Agreement with PG&E Corporation and
         Related Settlement Agreements...........................................16
      6.   Claims Resolution .................................................................19
      7.   The Settlement Protocol ........................................................20
      8.   Mediation Protocol ................................................................21
      9.   Tolling Agreement Disputes..................................................21
      10.  Employee Litigation .............................................................24
      11.  FERC Proceedings.................................................................25
      12.  California Actions..................................................................27

ARTICLE III. THE DEBTORS' PLAN OF LIQUIDATION .........................29
   A.   Classification and Treatment of Claims and Interests.............................29
      1.   Administrative Claims (Unclassified) .............................29
      2.   Fee Claims (Unclassified).....................................................30
      3.   Priority Tax Claims (Unclassified)........................................31
      4.   Class 1 - Secured Claims (Impaired)....................................31
      5.   Class 2 - Priority Claims (Unimpaired)................................32
      6.   Class 3 - General Unsecured Claims against ET Gas (Impaired for
         Voting Purposes) ...................................................32

   7.   Class 4 - General Unsecured Claims against ET Investments
        (Impaired for Voting Purposes) ......................................................33
   8.   Class 5 - General Unsecured Claims against ET Holdings (Impaired)33
   9.   Class 6 - General Unsecured Claims against ET Power (Impaired) . 34
   10.  Class 7 - General Unsecured Claims against ESV (Impaired) .........34
   11.  Class 8 - General Unsecured Claims against Quantum (Impaired) . . 34
   12.  Class 9 - Subordinated Claims (Impaired) ......................................34
   13.  Class 10 - Interests in ET Gas (Impaired) ......................................35
   14.  Class 11 - Interests in ET Investments (Impaired) ..........................35
   15.  Class 12 - Interests in ET Holdings, ET Power, ESV and Quantum
        (Impaired) ...................................................................................35
B. Means of Plan Implementation ..................................................................36
   1.   Dissolution of Quantum ..................................................................36
   2.   Funding ...........................................................................................36
   3.   Directors and Officers ....................................................................36
   4.   Post-Effective Date Management of the Liquidating Debtors. ........36
   5.   Quorum and Voting. ........................................................................36
   6.   Board Approval Required for Certain Transactions. ........................37
   7.   The Plan Administrator. ..................................................................37
   8.   Resignation, Death or Removal of Plan Administrator. ..................38
   9.   Retention and Enforcement of Causes of Action ............................38
   10.  Post-Confirmation Role of the ET Committee ................................39
   11.  Procedures for Distributions Under the Plan ..................................39
C. Certain Risk Factors ..................................................................................40
   1.   Parties-in-interest may object to the Debtors' classification of
        Claims. ...........................................................................................40
   2.   The Debtors may not be able to secure confirmation of the Plan.....40
   3.   Certain events may cause the dilution of distributions to holders of
        Allowed Claims in Classes 5, 6 and 7. ...........................................41
   4.   Certain events may cause delay in distributions to holders of
        Allowed Claims in Classes 5, 6 and 7. ...........................................41
D. Effect of Plan on Claims and Interests ......................................................41
   1.   Release of the Debtors, their Professionals and Certain of the
        Debtors' Directors and Officers ......................................................41
   2.   Survival of Certain Indemnification Obligations ............................43
   3.   Objections to Claims .......................................................................43
   4.   Limitations on Liability Regarding Chapter 11 Activities ...............43
E. Executory Contracts and Unexpired Leases ...............................................44
   1.   Rejection .........................................................................................44
   2.   Assumption .....................................................................................44
F. Conditions ................................................................................................45
   1.   Conditions to Confirmation ............................................................45
   2.   Conditions to Effective Date ...........................................................45
   3.   Effect of Nonoccurrence of the Conditions to Effective Date .........45
G. Administrative Provisions .........................................................................46
   1.   Retention of Jurisdiction .................................................................46

2. Plan Amendments...........................................................................46
3. Revocation of the Plan..................................................................46
4. Continuation of Injunctions and Stays.............................................46

ARTICLE IV. CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE
PLAN .............................................................................................46
A. Federal Income Tax Consequences to Holders of Claims and Interests ..47
B. Federal Income Tax Consequences to the Debtors ...................................48
C. Importance of Obtaining Professional Tax Assistance ...........................48

ARTICLE V. PLAN ACCEPTANCE AND CONFIRMATION....................................49
A. Confirmation of the Plan ..........................................................................49
B. Voting Requirements.................................................................................49
1. Acceptance.....................................................................................49
2. Deadline.........................................................................................50
3. Eligibility ......................................................................................50
4. Tabulation .....................................................................................51
5. Cramdown......................................................................................52
C. Best Interests Test ....................................................................................53
D. Feasibility Requirement ...........................................................................54
E. Alternatives to the Plan ............................................................................54
1. Alternative Plans............................................................................54
2. Liquidation.....................................................................................54

ARTICLE VI. CONCLUSION...........................................................................55

**APPENDICES TO DISCLOSURE STATEMENT**

**Appendix 1**      **First Amended Plan of Liquidation for the ET Debtors and the Quantum Debtors**

# ARTICLE I.

# INTRODUCTION

On July 8, 2003, NEGT Energy Trading Holdings Corporation f/k/a PG&E Energy Trading Holdings Corporation ("ET Holdings"), NEGT Energy Trading - Gas Corporation f/k/a PG&E Energy Trading - Gas Corporation ("ET Gas"), NEGT ET Investments Corporation f/k/a PG&E ET Investments Corporation ("ET Investments") and NEGT Energy Trading - Power, L.P. f/k/a PG&E Energy Trading - Power, L.P. ("ET Power," and collectively with ET Holdings, ET Gas and ET Investments, the "ET Debtors"), each filed a chapter 11 petition with the United States Bankruptcy Court for the District of Maryland, Greenbelt Division (the "Bankruptcy Court").  On July 8, 2003, National Energy & Gas Transmission, Inc. ("NEGT"), the ET Debtors' beneficial owner, also filed a chapter 11 petition with the Bankruptcy Court.[1]  On July 29, 2003, two other indirect NEGT subsidiaries, Energy Services Ventures, Inc. f/k/a PG&E Energy Services Ventures, Inc. ("ESV") and Quantum Ventures ("Quantum," and together with ESV, the "Quantum Debtors," and collectively with the ET Debtors, the "Debtors"),[2] each filed its own chapter 11 case in the Bankruptcy Court.  The chapter 11 cases of the ET Debtors, the Quantum Debtors and NEGT were consolidated for procedural purposes only and are being jointly administered.

The Bankruptcy Court confirmed NEGT's plan of reorganization on May 3, 2004, and such plan became effective on October 29, 2004.  The Debtors have worked with the Official Committee of Unsecured Creditors for the ET Debtors (the "ET Committee") to formulate the First Amended Plan of Liquidation for the ET Debtors and the Quantum Debtors (the "Plan"),[3] a copy of which is annexed hereto as Appendix 1.  Unless defined in the Disclosure Statement, each capitalized term used in the Disclosure Statement has the definition ascribed to such term in the Plan.  **PLEASE NOTE THAT THE PLAN DOES NOT ADDRESS THE REORGANIZATION OR LIQUIDATION OF NEGT OR USGEN NE.**

## A.     Purpose of the Disclosure Statement

The Disclosure Statement is intended to aid creditors in making an informed judgment regarding acceptance or rejection of the Plan.  If you have any questions regarding the Plan, the Debtors urge you to contact their counsel, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019-6099, (212) 728-8000 (Attn:  Steven Wilamowsky, Esq. or Jessica S. Etra, Esq.).

---

[1]     On July 8, 2003, US Gen New England, Inc. ("USGen NE") also filed a chapter 11 petition with the Bankruptcy Court and is the subject of a separately administered chapter 11 case in the Bankruptcy Court.

[2]     The Debtors and their estates from and after the Effective Date are sometimes referred to herein as the "Liquidating Debtors."

[3]     The ET Committee was not involved in the formulation of that portion of the Plan dealing with the Quantum Debtors.

While the Bankruptcy Court has approved the Disclosure Statement as containing "adequate information" to enable you to vote on the Plan, the Bankruptcy Court's approval of the Disclosure Statement does not constitute approval or disapproval of the Plan.  The Bankruptcy Court will consider approval of the Plan only after completion of voting on the Plan.

### B.    Voting on the Plan

**THE DEBTORS AND THE ET COMMITTEE SUPPORT THE PLAN AND URGE YOU TO VOTE TO ACCEPT THE PLAN.**

### 1.    Eligibility to Vote

The Plan classifies Claims and Interests in the following classes:

| Class | Description |
|-------|-------------|
| Class 1 | Secured Claims |
| Class 2 | Priority Claims |
| Class 3 | General Unsecured Claims Against ET Gas |
| Class 4 | General Unsecured Claims against ET Investments |
| Class 5 | General Unsecured Claims against ET Holdings |
| Class 6 | General Unsecured Claims against ET Power |
| Class 7 | General Unsecured Claims against ESV |
| Class 8 | General Unsecured Claims against Quantum |
| Class 9 | Subordinated Claims |
| Class 10 | Interests in ET Gas |
| Class 11 | Interests in ET Investments |
| Class 12 | Interests in ET Holdings, ET Power, ESV and Quantum |

Only Classes that are both impaired and eligible to receive a distribution are entitled to vote.  Voting instructions are described in Article V below.  Under the Plan, holders of Claims in Classes 1, 3, 4, 5, 6 and 7 are entitled to vote.[4]  Holders of

---

[4]    Claims in Classes 3 and 4 are treated as Impaired under the Plan and are being provided the opportunity to vote to accept or reject the Plan.  However, the Debtors believe that, under applicable law, Claims in Classes 3 and 4 likely are not Impaired under the Plan.  Accordingly, in the event that Class 3 or Class 4 votes to reject the Plan, the Debtors reserve the right to contend that such Class is Unimpaired and that, therefore, such Class should be deemed to have accepted the Plan.

Claims in Class 2 are conclusively presumed to have accepted the Plan because they are unimpaired.  Holders of Interests in Classes 10 and 11 are conclusively presumed to have accepted the Plan because ET Holdings, a Debtor and a proponent of the Plan, is the holder of all such Interests.  Holders of Claims in Classes 8 and 9 and of Interests in Class 12 are deemed to have rejected the Plan because they are not eligible to receive a distribution.

### 2.   Voting Procedures

Parties that are entitled to vote on the Plan will receive with the Disclosure Statement a Bankruptcy Court approved ballot (a "Ballot") and a notice setting forth, among other things, the time frame within which acceptances and rejections of the Plan must be received  (collectively, the "Solicitation Package").  If you believe you are entitled to vote, but did not receive a Solicitation Package, contact the Debtors' Balloting Agent, Bankruptcy Services, LLC, 757 Third Avenue, 3rd Floor, New York, NY 10150-5014, (646) 282-2500 (Attn:  Tirzah Gordon).

### 3.   Vote Solicitation

The process of soliciting votes on the Plan must be in accordance with the following restriction:

CREDITORS SHOULD NOT RELY ON ANY REPRESENTATIONS CONCERNING THE DEBTORS, THEIR ASSETS OR THEIR PAST AND FUTURE OPERATIONS, EXCEPT THOSE CONTAINED IN THE DISCLOSURE STATEMENT OR OTHERWISE AUTHORIZED BY THE BANKRUPTCY COURT.

If you believe your vote is being solicited outside the judicially approved and statutorily defined disclosure requirements and voting procedures, please immediately contact the Debtors' counsel, Willkie Farr & Gallagher LLP, 787 Seventh Avenue, New York, NY 10019-6099, (212) 728-8000 (Attn:  Steven Wilamowsky, Esq. or Jessica S. Etra, Esq.).

### 4.   Acceptance of Plan

Under the Bankruptcy Code, an impaired class of claims entitled to vote has accepted a plan if, of those voting, the holders of two-thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of claims accept.

### 5.   Hearing on Confirmation of Plan

The Bankruptcy Court has scheduled a hearing to consider confirmation (*i.e.*, approval) of the Plan on April 13, 2005 at 10:30 a.m. (Eastern Daylight Time), in Courtroom 3D of the United States Bankruptcy Court, 6500 Cherrywood Lane, Greenbelt, Maryland 20770.  The Confirmation Hearing may be adjourned from time to

time without further notice other than by announcement in the Bankruptcy Court on the scheduled hearing date.

      C.      **General Overview**

          **The Plan is a plan of liquidation that contemplates the complete liquidation of the assets of the Debtors and distribution of all proceeds.  The Debtors are in the process of winding down their operations and, to the extent possible, settling remaining claims and contracts.  Under the Plan, each of the existing boards of directors of the several Debtors will be reconstituted to be a two-person board comprised of one director appointed by the ET Committee and one director appointed by the ET Debtors' stockholder.[5]**

          **It should be noted that the formulae for calculating distributions to unsecured creditors vary as among the several Debtors.  Several factors account for these variances.   First, unlike the other ET Debtors, ET Power is not a corporation, but a limited partnership.  Accordingly, under applicable non-bankruptcy law, creditors of ET Power have recourse to the assets of ET Power's general partner, ET Holdings.  Thus, every claim asserted against ET Power, in effect, becomes a claim against ET Holdings as well.  In addition, under 11 U.S.C. § 1129(a)(7)(A)(ii), the Bankruptcy Court may confirm a plan only if each class of creditors will receive under the proposed plan an amount that is not less than such creditors would receive if the debtor were liquidated under a chapter 7 bankruptcy case.  For chapter 7 cases, 11 U.S.C. § 723(c) provides that, if both a limited partnership and its general partner have filed for bankruptcy protection, as is the case of ET Holdings and ET Power, then the trustee of the limited partnership would have a claim against the estate of the general partner for the full amount of all claims of the creditors of the limited partnership.  The Plan is structured to recognize such a claim and therefore comply with the confirmation requirements of the Bankruptcy Code, with the net effect of somewhat increasing percentage recoveries on Claims against ET Power, while concomitantly reducing percentage recoveries on Claims asserted solely against ET Holdings.**

          **Second, the Debtors believe that, as of the Effective Date, ET Gas and ET Investments will have sufficient funds to pay their respective general unsecured creditors in full.   Based on 11 U.S.C. § 1129(a)(7)(A)(ii), the Plan ensures that creditors of ET Gas and ET Investments will not receive less than such creditors would receive in a chapter 7 liquidation.  Pursuant to 11 U.S.C. § 726(a)(5), before any distribution can be made to equity holders, unsecured creditors are entitled to "payment of interest at the legal rate from the date of the filing of the petition."  11**

---

[5]      ET Power is a Delaware limited partnership rather than a corporation.  Accordingly, it does not have a Board of Directors and is controlled by its sole general partner, ET Holdings.  Likewise, after the Effective Date, ET Power will not have its own Board of Directors; all actions to be taken by the Plan Administrator on behalf of ET Power that otherwise would require board approval would need to be authorized by the Board of Directors of ET Holdings, acting as ET Power's sole general partner.

**U.S.C. § 726(a)(5).  Consistent with the terms of 11 U.S.C. § 726(a)(5) and the Debtors' analysis of relevant decisional authority, the Plan provides for payment in full of all Allowed General Unsecured Claims against ET Gas and ET Investments plus Pendency Interest at the Federal Judgment Rate.  Under the Plan, holders of Unsecured Claims against ET Power, ET Holdings, ESV and Quantum will <u>not</u> be paid in full and, accordingly, such holders will not receive Pendency Interest.**

**D.     Summary of Creditor Recoveries**

The following chart summarizes the proposed distributions under the Plan:

| <u>CLASS</u> | **TYPE OF CLAIM OR INTEREST** | **DEBTORS' ESTIMATES OF ALLOWED CLAIMS**[6] | **APPROXIMATE PERCENTAGE RECOVERY RANGES BASED ON THE DEBTORS' ESTIMATES OF ALLOWED CLAIMS** |
|---|---|---|---|
| Unclassified | Administrative Claims | $3,100,000 | 100% |
| Unclassified | Fee Claims | $2,400,000 | 100% |
| Unclassified | Priority Tax Claims | $150,000 | 100% |
| 1 | Secured Claims | $25,000,000 | 100% (reinstatement or pay in full) |
| 2 | Priority Claims | $0 | 100% |
| 3 | General Unsecured Claims against ET Gas | $90,000,000 | 100% of Allowed Claim plus Pendency Interest[7] |
| 4 | General Unsecured Claims against ET Investments | $1,000 | 100% of Allowed Claim plus Pendency Interest |

---

[6]     Generally, the aggregate Claims asserted against the Debtors exceed the total amount of Allowed Claims estimated by the Debtors because, among other things, certain Claims:  (a) were filed after the Bar Date; (b) were filed in duplicate; (c) were superseded by subsequent amendments to previously filed Claims; (d) may allege an obligation of an entity other than the Debtors; (e) may assert contingent Claims against the Debtors; (f) may include postpetition interest and other disallowed amounts; (g) may be invalid or subject to setoff or recoupment; or (h) are being resolved as part of settlement agreements that are in the process of being documented and presented to the Bankruptcy Court for approval.  **THEREFORE, THE ACTUAL AGGREGATE AMOUNT OF ALLOWED CLAIMS STILL MAY DIFFER SIGNIFICANTLY FROM THE DEBTORS' ESTIMATES.**

[7]     Pendency Interest is calculated at the federal judgment rate as of the Petition Date, 1.08%.

| CLASS | TYPE OF CLAIM OR INTEREST | DEBTORS' ESTIMATES OF ALLOWED CLAIMS[6] | APPROXIMATE PERCENTAGE RECOVERY RANGES BASED ON THE DEBTORS' ESTIMATES OF ALLOWED CLAIMS |
|---|---|---|---|
| 5 | General Unsecured Claims against ET Holdings | See section II.G.9.c | See section II.G.9.c |
| 6 | General Unsecured Claims against ET Power | See section II.G.9.c | See section II.G.9.c |
| 7 | General Unsecured Claims against ESV | $20,000,000 | 9% |
| 8 | General Unsecured Claims against Quantum | $2,500,000 | None |
| 9 | Subordinated Claims | $0 | None |
| 10 | Interests in ET Gas | N/A | N/A |
| 11 | Interests in ET Investments | N/A | N/A |
| 12 | Interests in ET Holdings, ET Power, ESV and Quantum | N/A | N/A |

The outcome of the Tolling Arbitrations (defined in section II.G.9.c hereof) likely will be the single most decisive factor in determining the percentage recoveries to creditors of ET Power (Class 6) and ET Holdings (Class 5).  If the Debtors prevail entirely in the Tolling Arbitrations, then the percentage recovery for holders of Allowed Class 5 Claims likely will range from 90% to 100% and the percentage recovery for holders of Allowed Class 6 Claims also likely will range from 90% to 100%. Conversely, if the Debtors are entirely unsuccessful in the Tolling Arbitrations, then the percentage recovery for holders of Allowed Class 5 Claims likely will range from 25% to 30% and the percentage recovery for holders of Allowed Class 6 Claims likely will range from 35% to 45%.  For a more complete discussion of the Tolling Arbitrations, please refer to section II.G.9.c hereof.

## ARTICLE II.

## BACKGROUND ON CERTAIN EVENTS LEADING TO, AND CERTAIN KEY DEVELOPMENTS DURING, THE CHAPTER 11 CASES

### A.    NEGT

The Debtors are beneficially owned by NEGT.  NEGT was incorporated on December 18, 1998 as a wholly owned subsidiary of PG&E Corporation.  As a result of NEGT's emergence from bankruptcy and the cancellation of its common stock, PG&E Corporation is no longer NEGT's parent corporation.  NEGT is a holding company, and has operated its businesses only through its wholly owned subsidiaries.  Prior to the Petition Date, NEGT's principal lines of business were gas transmission, power generation and wholesale energy marketing and trading.

In its gas transmission business segment, NEGT owned, operated and developed natural gas pipeline facilities.  On February 24, 2004, NEGT and certain of its non-debtor subsidiaries entered into a stock purchase agreement with TransCanada Corporation, TransCanada Pipeline USA Ltd. and TransCanada American Investments Ltd. (collectively, "TransCanada"), whereby the parties agreed that all of the issued and outstanding shares of Gas Transmission Northwest Corporation would be sold to TransCanada American Investments Ltd. for a total consideration of approximately $1.7 billion.  By order dated May 13, 2004, the Bankruptcy Court approved the sale of NEGT's interests in its gas transmission business to TransCanada.  The sale was consummated on November 1, 2004.

In addition, in November 2003, NEGT initiated a competitive sale process for its portfolio of ownership interests in certain electric generation assets and operations[8] (the "IPP Portfolio Sale").  By order dated August 10, 2004, the Bankruptcy Court approved the procedures governing the sale process.  An auction was held on September 14, 2004 pursuant to the approved bidding procedures, and GS Power Holding II LLC emerged as the winning bidder.  In an order dated September 23, 2004, the Bankruptcy Court approved the IPP Portfolio Sale to GS Power Holding II LLC, a wholly owned subsidiary of The Goldman Sachs Group, Inc., for aggregate consideration of $656 million, subject to certain post-closing adjustments.  The IPP Portfolio Sale was consummated on January 31, 2005.

---

[8]    National Energy Power Company, LLC, f/k/a PG&E Generating Power Group, LLC ("NEGT Power") and National Energy Generating Company, LLC are direct wholly owned subsidiaries of NEGT Energy Company, LLC, f/k/a PG&E Generating Company, LLC.  Plains End, LLC ("Plains End") is an indirect wholly owned subsidiary of NEGT Energy.  Madison Windpower LLC ("Madison"), is an indirect wholly owned subsidiary of NEGT Energy.  All of the issued and outstanding equity interests of each of NEGT Power, Plains End and Madison comprise the "IPP Portfolio" referred to herein.

By order dated May 3, 2004, the Bankruptcy Court approved NEGT's third amended plan of reorganization (the "NEGT Plan"). The NEGT Plan became effective on October 29, 2004.

### B.     The ET Debtors

The ET Debtors' Businesses

For a period of time ending prior to the Petition Date, the ET Debtors engaged in the marketing and trading of electrical energy, capacity and ancillary services, fuel and fuel services (such as gas pipeline transportation and storage), emission credits and other energy related products through various markets across North America, including the over-the-counter and futures markets. The ET Debtors' energy marketing and trading operations managed the supply of fuel for, and the sale of electric output from, NEGT-owned and controlled merchant generating facilities, in addition to engaging in trading for its own account. The ET Debtors also evaluated and implemented structured transactions, including management of third party energy assets, tolling arrangements, management of the requirements of aggregated customer load through full requirement contracts, restructured independent power producer contracts, and the purchase and sale of gas transportation. In the second half of 2002, NEGT elected to wind down its energy trading and marketing operations. In mid-2003, certain of the trading related services that were provided in support of NEGT's independent power producers and its merchant facilities were moved outside the ET Holdings company structure and placed directly in the power generation business segment. Since that time, the activities of the ET Debtors have been limited to those necessary to complete the wind-down of their operations, including termination of energy trading contracts and other agreements, reconciliation of claims, and liquidation of their assets. Certain claims running between the ET Debtors and USGen NE have been settled as part of a Mutual Release agreement approved by the Bankruptcy Court. See section II.G.6 hereof.

Tolling Contracts

Prior to the Petition Date, the ET Debtors entered into various tolling contracts (the "Tolling Agreements"). Pursuant to the Tolling Agreements, the ET Debtors have the right, but not the obligation, to provide fuel to a generating facility and then to take the electricity generated thereby. In exchange for the right to use the facility to convert its fuel into electricity, the ET Debtors paid the facility owner a predetermined fee – a tolling fee – on a periodic basis. The ET Debtors were therefore able to: (i) operate the facility using their own fuel; and (ii) control the related electricity generation output without incurring the capital expense of owning the generating facility.

Trading Contracts

In the ordinary course of business, the ET Debtors also entered into various physical commodity forward contracts and derivative contracts (collectively, the "Trading Contracts"). The physical commodity contracts provided for the delivery or

receipt of energy commodities.  As a general matter, derivative contracts are financial
contracts whose values are based on, or "derived" from, the price of a traditional security
such as a stock or bond, an asset such as a commodity, an interest rate, or a market index.
In the case of energy derivatives, the financial contracts typically are based on an index
price of an energy commodity or the comparative difference between two indices based
on energy commodities.  The ET Debtors' businesses were, by their nature, sensitive to
fluctuations in energy and energy-related commodities prices, interest rates and foreign
currency exchange rates.  The ET Debtors entered into derivative contracts to reduce the
risks associated with such fluctuations.  Derivative contracts can take a number of
different forms, including futures contracts, swap contracts, option contracts or
combinations of the foregoing.

       In certain circumstances, the ET Debtors' counterparties to the Trading
Contracts required that the ET Debtors' performance obligations under the Trading
Contracts be secured by NEGT guarantees, cash collateral, letters of credit or pledges of
certain of the ET Debtors' assets to the counterparty where the Debtors' obligations to the
counterparty under outstanding Trading Contracts exceeded a predetermined threshold.

## C.    The Quantum Debtors

Quantum

       Quantum was incorporated on March 21, 1994 and is now a wholly owned
indirect subsidiary of NEGT.  Quantum is a holding company, which owns and manages
two subsidiaries: (i) ESV; and (ii) Barakat & Chamberlain, Inc.  Quantum has few
creditors and no significant assets, other than its interest in its subsidiaries, which, as of
June 30, 2003, had a negative value.  In connection with the Quantum Debtors' chapter
11 filing, the Company (defined below) determined that it would be best to liquidate
Quantum's business through a chapter 11 filing.  Pursuant to the Plan, Quantum will be
dissolved as of the Effective Date.

ESV

       ESV was formed in April of 2000[9] to manage the residual assets and
liabilities remaining after Quantum Ventures, ESV's current parent, agreed to sell the
stock of PG&E Energy Services Corporation ("Energy Services"), and much of Energy
Services's business (principally that portion involving retail gas and electricity
commodities) to Enron Energy Marketing Corp. ("Enron").  An additional part of the
Energy Services business (principally its "value added" business, which focused on the
construction and maintenance of energy-related equipment) was subsequently sold to
Chevron USA, Inc. (together with the sale to Enron, the "Energy Services Sales").
Specifically, ESV was formed to assume the remaining contracts (the "Remaining
Contracts") not conveyed in the Energy Services Sales and to provide transition services
related to the Energy Services Sales.  Upon information and belief, Chevron originally

_____

[9]    ESV was then known as PG&E Energy Services, LLC, and became PG&E Energy Services, Inc.
in July 2000.  On October 2, 2003, its name was changed to Energy Services Ventures, Inc.

was prepared to purchase the Remaining Contracts as part of the Energy Services Sales, but then changed its mind at a point when it was already too late for Energy Services to sell them to Enron.  ESV was therefore left with the Remaining Contracts, but no other business.

The Remaining Contracts consisted of contracts with two wineries in California, the Robert Mondavi Corporation ("Mondavi") and Canandaigua Wine Company, Inc. f/k/a Canandaigua West, Inc. ("Canandaigua").  These contracts provided that ESV was to construct, operate, maintain and supply power to the substations for the wineries.  The substations reduced incoming voltage to a lower voltage usable by the wineries.  This process allowed Mondavi and Canandaigua to benefit from the lower prices charged for higher-voltage deliveries.

In mid-2002, as a result of the California energy crisis and the resultant spike in electricity prices, the Remaining Contracts, which required ESV to provide electricity to its counterparties at what were now substantially below-market prices, became highly unprofitable.  Moreover, because ESV had, through the Energy Services Sales, divested itself of all its other commodity contracts, it had no other gas or electricity contracts that could act as a "hedge" and counterbalance the steep losses ESV suddenly was suffering.  Accordingly, ESV had no choice but to seek relief in the Bankruptcy Court to take advantage of the Bankruptcy Code's contract rejection provisions.  On July 29, 2003, ESV filed a motion to reject the Remaining Contracts, which motion was approved by the Bankruptcy Court at the August 27, 2004 omnibus hearing.

Section 3(b) of ESV's Statement of Financial Affairs discloses transfers in the approximate amount of $4.5 million during the 12 months preceding the Petition Date.  Chevron has raised the question as to whether these transfers are avoidable under chapter 5 of the Bankruptcy Code.  The Debtors and the ET Committee have agreed to fully cooperate with Chevron in the exchange of documents and information in connection with the matter.  In addition, the Debtors and the ET Committee have agreed to provide Chevron with their respective positions regarding such transfers and the underlying analyses in support thereof.  Following the exchange of this information, the Debtors, the ET Committee and Chevron agree to negotiate in good faith about what, if any, further action may be appropriate.

<u>Barakat & Chamberlain, Inc.</u>

In June 1997, Energy Services acquired Barakat and Chamberlain, Inc. ("BCI"), a consulting firm (the "BCI Purchase").  BCI, a non-debtor subsidiary of Quantum, is currently inactive.  In connection with the BCI Purchase, BCI issued certain promissory notes to BCI's former shareholders (the "BCI Notes") and agreed to pay interest on deferred compensation obligations every month through May 2007.  The BCI Notes and deferred compensation obligations are to be paid in full in June 2007.  BCI's rights and obligations under the BCI Notes and deferred compensation agreements were

assigned to ESV.[10]  ESV defaulted on the BCI Notes.  Claims against ESV relating to the BCI Notes total $2,946,206.80.

### D.    Summary of Prepetition Indebtedness

Certain of the ET Debtors are parties to a letter of credit agreement, dated as of November 13, 1998, with JP Morgan Chase Bank f/k/a The Chase Manhattan Bank (the "JP Morgan Chase Facility"), in the face amount of $35 million.[11]  Additionally, certain of the ET Debtors are parties to a letter of credit agreement, dated as of November 13, 1998, with the Bank of Montreal (the "Bank of Montreal Facility"), in the face amount of $19 million.[12]

The Debtors are not party to any bank credit facilities and are not borrowers or guarantors under any bond or note issuances.

### E.    Certain Events Leading to the Debtors' Chapter 11 Filings

In 2002, energy markets experienced several significant adverse changes, including:

- Contractions and instability of energy markets;

- A significant decline in generation margins (or "spark spreads") caused by excess supply and reduced demand in most regions of the United States;

- Loss of confidence in energy companies due to increased scrutiny by regulators, elected officials and investors as a result of a number of financial scandals unrelated to the ET Debtors; and

- Significant financial distress and liquidity problems among market participants.

NEGT and its subsidiaries (collectively, the "Company") were significantly impacted by these adverse changes in 2002.  By the second half of 2002, most of the Company's debt instruments, which had carried investment grade credit ratings, were downgraded to below investment grade rating. The downgrade had an immediate adverse affect on the ET Debtors.  As a direct consequence of the downgrade, many contract counterparties demanded cash collateral to secure the ET Debtors' contingent obligations thereunder.  Meanwhile, the downgrade also limited the ET Debtors' access to the cash necessary to meet those collateral calls.  Moreover, the

---

[10]    PG&E Corporation guaranteed these obligations.

[11]    Currently, the total amount outstanding under the JP Morgan Chase Facility is $9.4 million.

[12]    The total amount outstanding under the Bank of Montreal Facility remains at $19 million.

widespread and well-publicized collapse of the energy trading industry eliminated any real hope that the ET Debtors' trading operations would become profitable in the foreseeable future.

Beginning in 2002, the Company attempted to restructure its debt obligations and other commitments. The Company sought to sell or transfer certain assets, and to reduce significantly energy trading operations in an ongoing effort to raise cash and reduce debt.

### F.      The Debtors' Boards of Directors

The following individuals currently sit on each of the ET Debtors' Boards of Directors: (i) Robert W. Barron, President of each of the ET Debtors; and (ii) Sanford L. Hartman, Vice President, General Counsel and Assistant Secretary of each of the ET Debtors.[13]  The following individuals currently sit on Quantum's Board of Directors: (i) P. Chrisman Iribe, President of Quantum; and (ii) Sanford L. Hartman, Vice President and Assistant Secretary of Quantum.  The following individuals currently sit on ESV's Board of Directors: (i) P. Chrisman Iribe, President of ESV; (ii) John C. Barpoulis, Vice President and Treasurer of ESV; and (iii) Sanford L. Hartman, Vice President and Assistant Secretary of ESV.

### G.      Overview of the Chapter 11 Cases

On July 8, 2003, NEGT and each of the ET Debtors filed a voluntary chapter 11 petition with the Bankruptcy Court.  The Quantum Debtors each filed a chapter 11 petition in the Bankruptcy Court on July 29, 2003.  The chapter 11 cases of NEGT, the ET Debtors and the Quantum Debtors were consolidated for procedural purposes only and are being jointly administered.  The Debtors have continued in possession of their properties and in the management of their businesses as debtors in possession.

### 1.      The ET Committee

On July 17, 2003, the United States Trustee for Region Four (Greenbelt Office) (the "United States Trustee") appointed an interim official committee of unsecured creditors in the ET Debtors' cases.[14]  The ET Committee is comprised of the following members: (i) CL Power Sales Ten, LLC, a counterparty to a Trading Contract; (ii) Ira Block, a former ET employee; and (iii) Southaven Power, LLC, a counterparty to a Tolling Agreement.  Pursuant to a letter agreement dated December 10, 2003, counsel to the ET Committee agreed to not disclose to the ET Committee any material identified

---

[13]      Although ET Power does not have its own officers and directors, all actions are taken through its sole general partner, ET Holdings.

[14]      On the same date, separate official creditors' committees were appointed: (a) for NEGT; and (b) in the separately administered chapter 11 case of USGen NE.  On August 4, 2003, the United States Trustee, in accordance with the Bankruptcy Court's directive, also appointed an official noteholders' committee in the NEGT case.

by the ET Debtors as "sensitive settlement information" without prior approval from the ET Debtors.  In addition, counsel to the ET Committee agreed not to share confidential information with a specific member of the ET Committee when the information in question relates to an asserted or unasserted claim by or against such member.

### 2.  First Day Pleadings and Orders

The Debtors obtained critical "first day" relief to allow the Debtors' businesses to continue to the extent necessary to liquidate their assets efficiently. Motions, applications and other pleadings filed by the Debtors in furtherance of this goal and approved by the Bankruptcy Court included the following:[15]

First Day Affidavit.  The Debtors filed an affidavit of John C. Barpoulis, the Vice President and Treasurer of NEGT and the ET Debtors, that summarized the Debtors' history, the circumstances that precipitated the chapter 11 filings and the justification for the relief sought in the other first-day pleadings.

Cash Management Motion.  In the absence of special relief from the Bankruptcy Court, under applicable provisions of the bankruptcy laws, the Debtors would have been required to transfer all of their cash to new bank accounts that the Debtors would have been required to establish, and mark all checks sent by the Debtors with the legend "debtor-in-possession."  In addition, the Debtors would have been required to maintain their liquid assets only in accounts supported by a bond, or backed by the full faith and credit of the United States.  In large chapter 11 cases, compliance with these rules generally is expensive and/or impracticable, and does not advance each respective rule's underlying purpose.  Accordingly, the Debtors obtained the Bankruptcy Court's authorization to maintain the Debtors' pre-bankruptcy cash management practices and investment policy, subject to the Debtors' obligation to strictly delineate between pre- and post-Petition Date transactions and obligations.

Employee Motion.  In order to maintain the uninterrupted operation of their businesses, minimize administrative expenses and maintain employee morale, the Debtors obtained authority from the Bankruptcy Court to continue, uninterrupted, their pre-petition personnel policies and payroll procedures, pursuant to which the Debtors pay various employer-affiliates for the services provided by such affiliates' employees.

Retention Applications.  The Debtors obtained orders of the Bankruptcy Court authorizing them to retain attorneys, accountants and financial advisors.

Ordinary Course Professionals Motion.  In addition to the professionals referred to above, the Debtors have other professionals to perform discrete functions not directly related to the chapter 11 cases and/or for relatively *de minimis* fees ("Ordinary Course Professionals").  Rather than burden the Bankruptcy Court and the Ordinary

---

[15] Although the "first day" papers were filed prior to the filing of the Quantum Debtors' chapter 11 petitions, by order dated August 7, 2003, the Bankruptcy Court made certain "first day" papers applicable to the Quantum Debtors.

Course Professionals by requiring full-scale retention applications, the Debtors obtained approval of a streamlined procedure that is commonly employed in the Bankruptcy Court with respect to Ordinary Course Professionals.

    <u>Interim Compensation Motion.</u>  Consistent with local procedure, the Debtors obtained approval of interim compensation procedures for professionals which, in general, allow professionals to bill and receive payment on a monthly basis, subject to a "holdback" that is not released to the professionals until the approval of interim fee applications, which are filed with the Bankruptcy Court three times per calendar year.

    <u>Retention of Bankruptcy Services, LLC.</u>  In cases the size of the Debtors', the Bankruptcy Court generally will require the Debtors to retain an outside claims agent to administer and process the filing of claims against the Debtors.  Often, the same claims agent also assists in the transmission of notices to creditors and other parties in interest. Accordingly, the Debtors received authority to retain Bankruptcy Services, LLC as their claims and notice agent.

    **3.**  **Change of Name and Corporate Logo**

    Prior to and in anticipation of the commencement of their respective chapter 11 cases, the Company began a process of complete separation from PG&E Corporation.  As part of this separation process, some of the Debtors sought to remove references to "PG&E" from their names and make certain other modifications to their names in connection therewith.[16]  The name changes signified the beginning of a new stage for the Company and its employees and became an important step in announcing the Company's intention to separate formally and legally from PG&E Corporation.  After the approval of each of the Debtors' respective boards of directors, the Debtors filed a motion, pursuant to section 105(a) of the Bankruptcy Code, seeking an order from the Bankruptcy Court authorizing the Debtors to change their respective names and logotypes, and modify case captions accordingly.  On October 2, 2003, the motion was granted.

    **4.**  **Key Employee Retention Plans**

    On or about August 19, 2003, the ET Debtors and USGen NE filed a motion to approve an amended and restated retention plan (the "Initial Retention Plan") to provide a retention bonus for eligible employees performing services for the ET Debtors, NEGT or USGen NE if they remain employed throughout the restructuring of the respective Debtor, NEGT or USGen NE, as applicable.  The Court approved the Initial Retention Plan on September 25, 2003.

    Pursuant to the Initial Retention Plan, eligible employees are entitled to receive a bonus ("Bonus"), and an additional 15% or 25% of the Bonus depending on when the effective date of the chapter 11 plan for the entity for which the employee

---

[16]  Quantum Ventures does not have "PG&E" in its name and therefore did not make any changes thereto.

provides services occurs, provided that his/her employment continues through certain specified payment dates.  Assuming all eligible employees are terminated, the ET Debtors' maximum liability will be approximately $1,500,000.

In June 2004, the Company determined that additional retention incentives were needed to retain and motivate key employees (*i.e.*, employees who are crucial to the wind down and sale of the Company's business lines).  Accordingly, the Company created the NEGT Services Company, LLC Key Employee Retention Plan (the "NEGT Services Retention Plan"), which applies to, among others, six key employees of NEGT Services Company, LLC ("NEGT Services") who are critical to the successful liquidation of the ET Debtors.  The NEGT Services Retention Plan provides for both guaranteed and discretionary bonuses for such employees.  In an order dated July 23, 2004, this Court authorized the ET Debtors to reimburse NEGT Services for payments made on behalf of the ET Debtors pursuant to the NEGT Services Retention Plan.[17]  Assuming all eligible employees remain until their expected termination dates, the ET Debtors' maximum liability under the NEGT Services Retention Plan is approximately $550,000.

**5.    Prepetition Tax Sharing Agreement with PG&E Corporation and Related Settlement Agreements**

Since its formation in 1998, NEGT and its subsidiaries, including the Debtors (other than ET Power, which is not a taxpayer), have been included in the consolidated tax return of PG&E Corporation.  For certain of the years before 2001, PG&E Corporation made payments to NEGT commensurate with the tax savings achieved through the incorporation of NEGT's losses and tax credits in PG&E Corporation's consolidated federal tax return for those years.  In tax year 2001, NEGT paid to PG&E Corporation the amount of its federal tax liability.

NEGT contended that the foregoing arrangements and the documentation pursuant to which they were implemented gave rise to an enforceable tax sharing agreement between PG&E Corporation and NEGT giving rise to significant claims against PG&E Corporation.  PG&E Corporation vigorously disputed NEGT's allegations.  On November 12, 2002, PG&E Corporation notified NEGT of PG&E Corporation's position that to the extent that a tax sharing agreement existed and had not been terminated previously, it was terminated effective immediately.  On December 24, 2002, NEGT sent a letter to PG&E Corporation reserving all rights against PG&E Corporation with respect to such tax sharing agreement.

In August 2003, NEGT commenced Adversary Proceeding No. 03-1249 (the "Tax Litigation") against PG&E Corporation.  On April 22, 2004, the United States District Court for the District of Maryland (the "District Court") withdrew the reference of the Tax Litigation.  On August 30, 2004, NEGT filed a motion to approve a settlement

---

[17]    On July 15, 2004, NEGT also filed a motion to approve its Phase II Key Employee Retention Plan, which provides for bonuses for employees who are assisting with the wind down and sale of the gas pipelines and the independent power producers.  The motion was granted by the Bankruptcy Court on September 7, 2004.

agreement with PG&E Corporation respecting, among other things, the Tax Litigation (the "NEGT/PG&E Corporation Settlement"). In an order dated September 23, 2004, the Bankruptcy Court approved the NEGT/PG&E Corporation Settlement.

In connection with the NEGT/PG&E Corporation Settlement, the Debtors and NEGT entered into a settlement agreement regarding various tax matters and claims related thereto (the "Liquidating Debtors/NEGT Settlement"). In an order dated October 8, 2004, the Bankruptcy Court approved the Liquidating Debtors/NEGT Settlement. A summary of the key terms of the Liquidating Debtors/NEGT Settlement is as follows:

- From and after the Effective Date of the NEGT Plan, the Debtors (other than ET Power) will be a part of NEGT's consolidated tax group;

- In settlement of all claims between and among the Debtors and NEGT arising prior to the Petition Date, and related to the recognition of tax benefits or burdens generated by, or the use of tax attributes of, the Debtors, the respective Debtors and NEGT shall recognize the claims in the amounts set forth in the Liquidating Debtors/NEGT Settlement, and subject to any rights of recoupment or offset, such claims shall be allowed as general unsecured claims in the applicable Debtor's chapter 11 case;[18]

- For all periods beginning on and following the Petition Date, the Debtors shall have no claims against NEGT related to the recognition of tax benefits or burdens generated by, or the use of tax attributes of, the Debtors;

- For all periods beginning on and following the Petition Date, NEGT shall have no claims against the Debtors related to the recognition of tax benefits or burdens generated by, or the use of tax attributes of, the Debtors;

- The Debtors shall each be separately liable for any and all income taxes that are due and payable: (i) separately by any such entity and for which tax returns are filed in the name of such entity; and (ii) by any unitary or other combined group which consists solely of some or all of the Debtors;

- The Debtors will execute the mutual release with PG&E Corporation;

- NEGT is entitled to retain all amounts recovered from PG&E Corporation in connection with the NEGT/PG&E Corporation Settlement for the benefit of NEGT's creditors;

- NEGT shall satisfy that certain note (the "Hold Co. Note") dated September 30, 2001 by and between NEGT and NEGT Energy Company,

---

[18]  The settlement of claims under the Liquidating Debtors/NEGT Settlement was incorporated into a subsequent intercompany settlement agreement. See section II.G.6.

LLC ("NEGT Energy") in the form of an equity contribution to NEGT Energy and NEGT will waive all rights of recovery with respect to such note;

- Neither Enterprises nor NEGT shall challenge the amount, validity or priority of that certain note by and between PG&E Enterprises, Inc. n/k/a NEGT Enterprises, Inc. and USGen Power Services, L.P. n/k/a NEGT Energy Trading - Power, L.P., and Enterprises confirms its existing payment obligation under, and the continued enforceability of, the Enterprise Note;

- NEGT shall have an allowed general unsecured claim against ET Gas in the amount of $37,541,293.09[19] on account of claims arising under certain letters of credit issued for the benefit of ET Gas by JP Morgan Chase Bank ("Chase") pursuant to that certain Amended and Restated Credit Agreement dated August 22, 2001; provided, however, that NEGT shall not recover more from ET Gas than any amount actually paid to Chase (or any party succeeding to Chase's claim) in connection with such letters of credit;

- NEGT shall have an allowed general unsecured claim against ET Power in the amount of $34,784,535[20] on account of claims arising under certain letters of credit issued for the benefit of ET Power by Chase pursuant to that certain Amended and Restated Credit Agreement dated August 22, 2001 between NEGT and Chase; provided, however, that NEGT shall not recover more from ET Power than any amount actually paid to Chase (or any party succeeding to Chase's claim) in connection with such letters of credit; and

- NEGT shall have an allowed general unsecured claim against each of the ET Debtors, other than ET Investments, in the amount of any actual payment made by NEGT to Chase (or any party succeeding to Chase's claim) in connection with that certain $35,000,000 credit agreement, dated as of November 13, 1998, among NEGT Energy Trading - Gas Corporation, NEGT Energy Trading, Canada Corporation, NEGT Energy Trading Power Holdings Corporation, NEGT Energy Trading - Power, L.P. and The Chase Manhattan Bank (now known as JPMorgan Chase Bank), as amended, modified or supplemented; provided, however, that NEGT shall not recover more, in the aggregate, from whatever source,

---

[19] This amount was initially listed as $38,779,751 in the Liquidating Debtors/NEGT Settlement, however, a revised number of $37,541,293.09 was ultimately incorporated into the subsequent intercompany settlement agreement.

[20] This amount was initially listed as $34,777,854 in the Liquidating Debtors/NEGT Settlement, however, a revised number of $34,784,535 was ultimately incorporated into the subsequent intercompany settlement agreement.

than any amount actually paid by NEGT to Chase (or any party succeeding to Chase's claim).

6.      **Claims Resolution**

The Bankruptcy Court fixed January 9, 2004 as the last date for filing claims against the Debtors (the "Bar Date"). The total amount of timely filed asserted claims against the ET Debtors, excluding claims, if any, by certain insiders and certain intercompany claimants not required to file claims on or before the Bar Date, is approximately $1,150,389,760. The total amount of timely filed asserted claims against the Quantum Debtors, excluding claims, if any, by certain insiders and certain intercompany claimants not required to file claims on or before the Bar Date, is approximately $18,505,377.45. The Debtors are in the process of reviewing and objecting to various claims. In July 2004, the Debtors filed their first set of omnibus objections pursuant to which they have objected to: (i) late-filed claims; (ii) unsupported claims; (iii) duplicative claims; and (iv) claims filed against the wrong legal entity. Pursuant to various orders dated October 27, 2004, this Court expunged 19 claims filed against the Debtors. In addition, the Debtors have filed various individual objections to claims filed in these cases. Certain of those objections have been sustained, while others have been consensually resolved or remain pending. The Debtors continue to review claims filed in these cases and will file additional objections at such time as they deem appropriate.

Intercompany Claims

The Debtors, NEGT, USGen NE (collectively, the "Affiliated Debtors"), and NEGT's non-Debtor subsidiaries that were not required to file proofs of claim in advance of the Bar Date (the "Controlled Subs") have a number of intercompany claims running between and among them which in the aggregate totals hundreds of millions of dollars. In order to resolve prepetition obligations between the Controlled Subs, the Affiliated Debtors filed a motion, pursuant to Bankruptcy Code sections 502 and 363 and Bankruptcy Rule 9019, which: (i) proposed a settlement for the majority of intercompany claims; and (ii) requested that a bar date be set for the filing of certain intercompany claims (the "Original 9019 Motion"). By order dated June 18, 2004, the intercompany bar date was set at July 27, 2004 and the settlement portion of the motion was adjourned until a later hearing date. In light of various developments in these cases, the Debtors determined that the settlements set forth in the Original 9019 Motion needed to be substantially modified. Accordingly, the Affiliated Debtors withdrew the Original 9019 Motion. The Debtors and NEGT subsequently filed a motion to approve a revised settlement respecting intercompany claims (the "Revised 9019 Motion") which did not cover claims filed by or against USGen NE. The revised settlement incorporated the claims allowed under prior settlements, including the Liquidating Debtors/NEGT Settlement. By Order dated December 20, 2004, the Bankruptcy Court approved the Revised 9019 Motion.

One of the intercompany claims allowed under the order approving the Revised 9019 Motion is a claim for $175,458,921 by ET Holdings against ET Power (the

"Holdings Claim").  As discussed in section I.C, ET Power's creditors have claims
against ET Holdings equal to the amount of claims against ET Power by virtue of ET
Holdings's status as general partner of ET Power (the "Partnership Claim").  The Debtors
and the ET Committee have agreed that the Holdings Claim and the Partnership Claim
should be offset against each other in determining the gross amount of the claim to be
asserted against ET Holdings on behalf of the creditors of ET Power.  This offset
accounts for the deduction of $175,458,921 contained in the definition of "Pro Rata" in
section 1.60 of the Plan.

On July 3, 2003, USGen NE and ET Power entered into a mutual release
agreement (the "Mutual Release"), pursuant to which the respective claims of USGen NE
and ET Power under: (i) the master electric agreement between USGen NE and ET
Power; and (ii) the series of master contracts pursuant to which USGen NE and ET
Power would buy and sell various commodities, were netted out and reduced to a sum
certain.  By order dated May 13, 2004, the Bankruptcy Court approved the Mutual
Release and granted ET Power a general unsecured claim against USGen NE in the
amount of $81,886,746.

### 7. The Settlement Protocol

Recognizing the unique status of certain Trading Contracts in the financial
and commodity markets (collectively, "Safe Harbor Contracts"), the Bankruptcy Code
now contains certain so-called "safe harbor" provisions (contained in sections 555, 556,
559 and 560 thereof) regarding such Trading Contracts to which a debtor in possession is
a party.  These provisions generally permit non-debtor counterparties to Safe Harbor
Contracts to exercise certain rights and remedies not generally available to other contract
counterparties in a bankruptcy case.  Among the "safe harbor" rights and protections
under the Bankruptcy Code are provisions that: (a) allow the non-debtor party to
terminate, liquidate and apply collateral held under a Safe Harbor Contract upon a
bankruptcy of the other party, notwithstanding section 365(e)(1) of the Bankruptcy Code;
(b) protect prepetition payments made under a Safe Harbor Contract by the debtor to the
non-debtor party from the avoidance powers of a trustee or debtor in possession except in
particular cases of actual intent to defraud other creditors; and (c) permit the non-debtor
party to set off mutual debts and claims against the debtor under a Safe Harbor Contract
without the need to obtain relief from the automatic stay, so long as such Safe Harbor
Contracts allow for such setoff.[21]

By order dated November 17, 2003, the Bankruptcy Court authorized and
approved specified procedures for the settlement of Trading Contract termination claims
(the "Settlement Protocol").  Pursuant to the Settlement Protocol, the ET Debtors advise
the ET Committee of potential settlement agreements with counterparties relating to
termination payments owed under Trading Contracts.  The Settlement Protocol requires
that, prior to entering into any such settlement agreement, the ET Debtors submit such

---

[21]     These provisions are contained in sections 362(b)(6), (7) and (17); 546(e), (f) and (g);
         548(d)(2)(B),(C), and (D); 553(e)(1); 555, 556, 559 and 560 of the Bankruptcy Code.

proposed settlement agreement to the ET Committee.[22]  The ET Committee has ten (10) business days to approve or disapprove the settlement.

If the ET Committee approves a particular proposed settlement or does not disapprove it in writing during the ten-business-day period, the ET Debtors file a notice of the settlement with the Court (the "Settlement Notice").  If a net payment is due *to* the ET Debtors under a particular proposed settlement, such payment is collected by the ET Debtors and the appropriate releases are entered into among the ET Debtors and the counterparty.  If a net payment is due *from* the ET Debtors, no payment is made immediately (exclusive of any portion of such claim that first arose postpetition), but the counterparty may have a liquidated claim in the actual amount of any such net payment payable to such counterparty.

8.      **Mediation Protocol**

On December 3, 2003, the ET Debtors filed a motion to approve procedures (the "Mediation Protocol") for the mediation of disputes arising under, among other things, the Trading Contracts and the Tolling Agreements (collectively, the "ET Agreements").  The Mediation Protocol was approved by Order dated January 7, 2004. Under the Mediation Protocol, objections to claims and adversary proceedings (*i.e.*, lawsuits filed in the Bankruptcy Court) arising under the ET Agreements are stayed for a period of time so that the parties may attempt to consensually resolve their disputes with the aid of a court-approved mediator.  To the extent NEGT has exposure with respect to any trading guarantees, it may participate in the Mediation Protocol.

9.      **Tolling Agreement Disputes**

As of the Petition Date, ET Power was the non-owner party to three separate Tolling Agreements (see Article II.B above) with the following parties: (i) Liberty Electric Power, LLC ("Liberty"); (ii) Southaven Power, LLC ("Southaven"); and (iii) Caledonia Generating, LLC ("Caledonia").  These Tolling Agreements were long-term contracts, with terms varying from approximately 15 to 25 years.  The tolling fee paid by ET Power to each plant owner was fixed and specified by contract, subject to an escalation clause tied in part to inflation.  Given the expected growth in demand for electricity in the long term, the Tolling Agreements were projected to be profitable for the ET Debtors in later years.  In the short term, however, a decline in electricity demand and prices, coupled with an increase in fuel prices, made the Tolling Agreements unprofitable or otherwise not useful to ET Power.  The monthly payments under the Tolling Agreements represented an enormous drain on the cash flow of the ET Debtors. On the Petition Date, the Debtors filed a motion to reject the Tolling Agreements, which motion was approved by the Bankruptcy Court by orders dated August 4, 2003 and August 6, 2003.

---

[22]      If NEGT has exposure under a Trading Contract (*i.e.*, a guaranty or other obligation), the ET Debtors also submit the proposed settlement to the official committee in the NEGT case as well.

a.      **Liberty**

ET Power and Liberty entered into a Tolling Agreement (the "Liberty Agreement") on or about April 14, 2000.  Under the Liberty Agreement, ET Power had the right but not the obligation to call on the use of the generating facility (*i.e.*, provide fuel to the plant and take the resultant electricity and capacity).  In exchange, ET Power was obligated under the Liberty Agreement to make monthly payments, or tolling fees, based on a contractually-based pricing formula.  By guarantee dated February 6, 2001, Gas Transmission Northwest Corporation ("GTNC"), one of NEGT's non-debtor subsidiaries, guaranteed ET Power's obligations under the Liberty Agreement.  In addition, by guarantee dated February 6, 2001, NEGT also guaranteed ET Power's obligations under the Liberty Agreement.  As noted above, the Bankruptcy Court approved the Debtors' motion to reject the Liberty Agreement.

In a letter dated July 30, 2003, Liberty stated that ET Power owed Liberty $176,770,704 for the forward value of the Liberty Agreement, plus certain additional amounts, as a termination payment for the rejection of the Liberty Agreement.  In addition, on September 11, 2003, Liberty filed two suits against GTNC in the United States District Court in Texas.  In the first suit, Liberty seeks GTNC's payment of $140 million under the guarantee associated with Liberty's purported rejection damages.  In the second suit, Liberty seeks $5.4 million from GTNC under the Liberty guarantee related to tolling payments that ET Power allegedly failed to make prior to ET Power's bankruptcy filing.

On September 23, 2003, ET Power provided Liberty with its calculation of the termination payment.  Also on September 23, 2003, ET Power, NEGT and GTNC filed an adversary proceeding (the "Adversary Proceeding") against Liberty, seeking declaratory relief, injunctive relief and damages from Liberty for failure to make payments under the Liberty Agreement.

The Bankruptcy Court subsequently ruled that: (i) it would refer the Adversary Proceeding to mandatory mediation, and that during such mediation period the Adversary Proceeding would be stayed; *but* (ii) if the mediation failed, the dispute would proceed to arbitration pursuant to the terms of the Liberty Agreement.  The parties did not reach a settlement during the mediation and currently are arbitrating the dispute.

On October 15, 2004, the parties submitted their "baseball arbitration" offers.[23]  Liberty's baseball arbitration offer was $167.4 million and ET Power's baseball arbitration offer was $78 million.  The hearings took place in November and December 2004.  Revised offers were submitted to the arbitration panel at the close of the hearings.  Liberty's revised baseball arbitration offer was approximately $145 million and ET Power's revised baseball arbitration offer was approximately $95 million.  The parties expect that the dispute will be resolved sometime during the first quarter of 2005.

---

[23]      In a baseball arbitration, each party, prior to the arbitration, submits a proposed award amount to the arbitrator.  The arbitrator must then choose one of the proposed offers as the final award.

b.      **Southaven/Caledonia**

ET Power entered into separate Tolling Agreements (collectively, the "Agreements") with Southaven and Caledonia, dated as of June 1, 2000 and September 20, 2000, respectively. Pursuant to the Agreements, Southaven and Caledonia were to deliver and sell to ET Power, and ET Power was to purchase, all of the electrical capacity, ancillary services, fuel conversion services and various other products from electric generating facilities in Mississippi. NEGT guaranteed ET Power's obligations under the Agreements.

On November 12, 2002, ET Power notified Southaven and Caledonia of an event of default as a result of their failure to meet certain requirements respecting the ability of the facility to inject output into the applicable control area. ET Power contended that Southaven and Caledonia were not able to cure their defaults within the period specified in the Agreements and, accordingly, on February 4, 2003, ET Power provided notice to Southaven and Caledonia of its termination of the Agreements.

On February 7, 2003, Southaven and Caledonia filed emergency petitions against ET Power in the Circuit Court for Montgomery County, Maryland (the "State Court Action") to compel arbitration or, in the alternative, for a temporary restraining order. On March 3, 2003, Southaven and Caledonia obtained an order requiring ET Power to continue to perform its obligations under the Agreements. ET Power filed an appeal and, on March 24, 2003, ET Power commenced arbitration proceedings against Southaven and Caledonia. The arbitration and the State Court Action were stayed as of the Petition Date.

The Agreements provide for damages in the event of material breach (*i.e.*, a termination payment), subject to a $500 million cap. Determination of the termination payment is based on a formula that takes into account a number of factors, including such market conditions as the price of power and the price of fuel. Because of changes in market conditions over time, it is difficult to precisely quantify the amount of any potential termination payment.

On August 26, 2004, ET Power and NEGT filed a motion to approve a stipulation with Southaven and Caledonia (the "Tolling Stipulation"), pursuant to which the parties agreed to proceed to arbitration in order to resolve the tolling disputes. In an order dated September 27, 2004, the Bankruptcy Court approved the Tolling Stipulation. Arbitrators have been selected, and the initial pre-hearing conference took place on February 22, 2005. The arbitration hearings have been scheduled for October 2005.

c.      **Impact on Creditor Recoveries**

The outcome of the arbitrations against Liberty, Southaven and Caledonia (collectively, the "Tolling Arbitrations") likely will be the single most decisive factor in determining the percentage recoveries to creditors of ET Power (Class 6) and ET Holdings (Class 5). As noted above, the Liberty arbitrator will select one of the parties' baseball arbitration offers. The Southaven and Caledonia arbitrations will not be

structured as baseball arbitrations and, accordingly, the arbitrators will be free to make their own determinations as to the amount of damages. Southaven filed a proof of claim against ET Power in the amount of $500 million. Caledonia filed an unliquidated proof of claim against ET Power. The Debtors vigorously contest these claims and believe that they do not owe any damages to Southaven or Caledonia. Among other things, the Debtors believe that Southaven and Caledonia breached the agreements well before the commencement of the Chapter 11 Cases and, therefore, the agreements were validly terminated by ET Power prior to the Petition Date. Due to the sensitive nature of the ongoing litigation and the importance of maintaining confidentiality of the Debtors' internal litigation analyses, the Debtors cannot provide any prediction regarding the likely outcomes of the arbitrations with Southaven and Caledonia.

If the Debtors prevail entirely in the Tolling Arbitrations (*i.e.*, ET Power's baseball arbitration offer is selected and the Southaven/Caledonia arbitrators determine that Southaven and Caledonia are not entitled to damages), then the percentage recovery for holders of Allowed Class 5 Claims likely will range from 90% to 100% and the percentage recovery for holders of Allowed Class 6 Claims likely will range from 90% to 100%. Conversely, if the Debtors are entirely unsuccessful in the Tolling Arbitrations (*i.e.*, Liberty's baseball arbitration offer is selected and the Southaven/Caledonia arbitrators determine that ET Power must satisfy the asserted claims[24] in full), then the percentage recovery for holders of Allowed Class 5 Claims likely will range from 25% to 30% and the percentage recovery for holders of Allowed Class 6 Claims likely will range from 35% to 45%.

### 10.    Employee Litigation

Six former employees of ET Holdings have contested claims pending against ET Holdings for bonus payments allegedly due them. These six employees are: Judith Tanselle, Matthew Vincent, Matthew Schweider, Adam Hoffman, Adam Mirick and Benoit Vallieres. In each case, ET Holdings has denied that the former employees are entitled to any additional bonus payments. Four of the former employees (Tanselle, Hoffman, Mirick and Vallieres) also have made claims for deferred compensation. The underlying deferred compensation claims are not contested, but entitlement to any additional damages under the Maryland Wage Payment Act is contested.

Three of the six former employees, Tanselle, Vincent and Schwieder, are pursuing their claims as part of a single case in the Circuit Court for Montgomery County, Maryland. *Tanselle v. PG&E Energy Trading Holdings, Corp. et al.*, Civil Docket No. 242876-V (the "State Court Action"). This case had been removed to the United States Bankruptcy Court for the District of Maryland, but was remanded to state court in February 2004. The other three former employees, Hoffman, Mirick and Vallieres, filed separate proofs of claim in the Maryland bankruptcy court after that court

---

[24]    As noted above, Caledonia filed an unliquidated claim. For purposes of this discussion, the Debtors assumed that Caledonia's asserted claim is $500 million (the amount of the cap under the agreement).

stayed their state court claims.  *In re: National Energy & Gas Transmission, Inc. (f/k/a PG&E National Energy Group, Inc.), et al.*, jointly administered under Docket No. 03-30459 (PM) (the "Bankruptcy Court Action").[25]

The three former employees' claims proceeding in the State Court Action, and Hoffman's claim proceeding in the Bankruptcy Court Action are in the midst of discovery.  Mirick's and Vallieres' claims were recently consolidated with Hoffman's claim, yet no additional discovery on their respective claims has yet begun.

11.     **FERC Proceedings**

On July 25, 2001, the Federal Energy Regulatory Commission ("FERC") ordered that refunds may be due from sellers, including ET Power, who engaged in sales transactions of power in the California spot markets between October 2, 2000 and June 20, 2001 (the "Refund Period").  *San Diego Gas & Electric Co. v. Sellers of Energy and Ancillary Services into Markets Operated by the California Independent System Operator and the California Power Exchange, et al*., Docket No. EL00-95 (the "California Refund Proceeding").  In the proceeding, FERC established a methodology based on mitigated market clearing prices to determine what refunds and payments were due for the Refund Period resulting from power sales at market prices that exceed prices determined by FERC in the California Refund Proceeding.

A FERC Administrative Law Judge ("ALJ") held hearings and, on December 12, 2002, issued proposed findings regarding refunds.  The ALJ's proposed findings suggested that ET Power owed net refunds to the California Independent System Operator Corporation (the "ISO") of $9,558,304 (excluding interest) but is owed $6,042,977 net (excluding interest) by the California Power Exchange Corporation (the "PX").

On March 26, 2003, FERC adopted the ALJ's proposed findings of fact in large part.  FERC largely affirmed the ALJ's decision (including allowing parties to offset amounts due to and due from each of the ISO and PX), with one notable exception: FERC adopted its staff's recommendation on the appropriate natural gas price element of the market mitigation methodology used in part to determine just and reasonable power prices, which generally decreases the mitigated market prices that the ALJ determined. Therefore, refunds owed by ET Power for power sales to the ISO and PX likely will increase.  FERC deferred determining the final amounts owed and owing until after it made its final decisions on requests for rehearing of its March 26, 2003 order.

On October 16, 2003, FERC issued an order on rehearing affirming the March 26, 2003 order in large part and directing the ISO and the PX to re-run the settlements and submit the results to FERC within five months.  The October 16, 2003 and subsequent orders reiterated that sellers will have an opportunity to demonstrate that

---

[25]     A seventh former employee recently filed a late amendment to a proof of claim against ET Holdings in which he asserts that he, too, is entitled to additional bonus payments.  ET Holdings intends to object to this claim on numerous grounds.

their overall costs would not be recovered using the market mitigated prices and that the revised refund therefore would result in losing money on their sales to the ISO/PX. The ISO has since advised FERC that the filing on who owes what to whom will not be provided until February 2005. A joint motion was filed on October 21, 2004 requesting an expedited schedule for clarification of the cost filing issue. Parties, including ET Power, have filed comments on the proper cost recovery methodology. Multiple parties have filed petitions for review of orders issued in this proceeding in the Ninth Circuit Court of Appeals, which currently are pending.

A separate (but similar) proceeding relating to potential refund liability for spot power sales in the Pacific Northwest during the period December 25, 2000 through June 25, 2001 also was brought at FERC (the "Pacific Northwest Refund Proceeding"). *Puget Sound Energy, Inc. v. All Jurisdictional Sellers*, Docket No. EL01-10. ET Power engaged in some sales covered by the proceeding, but on June 25, 2003, FERC issued an order denying refunds and terminating the matter without further proceedings. Multiple parties have filed petitions for review of orders issued in this proceeding in the Ninth Circuit Court of Appeals, which currently are pending.

The Ninth Circuit Court of Appeals also recently addressed the appeal of FERC's decision not to impose refunds for the pre-Refund Period (January 1, 2000 to June 20, 2001) based on certain parties' alleged failure to file transaction-specific data for power sales to the ISO, PX, and CDWR/CERS. *State of California ex rel. Bill Lockyer*, Docket No. EL02-71. In its order issued September 9, 2004, the Ninth Circuit did not order refunds, but remanded the case to FERC for a refund proceeding to consider remedial options. Multiple parties have petitioned for reconsideration of the order by the Ninth Circuit panel and for rehearing of the order by the Ninth Circuit *en banc*. Those petitions are pending. ET Power made power sales to the ISO, PX and CDWR/CERS during the referenced time period.

FERC Investigations

On February 13, 2002, FERC directed its staff to conduct an investigation to determine whether any entity manipulated short-term prices for electric energy or natural gas in the West, or otherwise influenced wholesale electric prices in the West. *Fact Finding Investigation of Potential Manipulation of Electric and Natural Gas Prices,* Docket No. PA02-2. FERC staff issued numerous data requests relating to various power trading strategies, including activities engaged in by Enron entities alleged to have constituted manipulative behavior. ET Power timely responded to FERC's data requests.

In addition, on November 20, 2002, FERC authorized wholesale sellers of electricity in California and in the Pacific Northwest to conduct additional discovery into alleged market manipulation by sellers during the western power crisis of 2000 and 2001. The massive discovery which ensued became known as the "100 Days of Discovery." The discovery period ended on February 28, 2003. ET Power received and responded to discovery requests. Certain parties filed supplemental alleged evidence of market manipulation on March 3, 2003. ET Power and others filed responses on March 20,

2003.  FERC indicated in its March 26, 2003 Order that review of the additional allegations was ongoing, and that depending on the outcome of FERC's review, FERC might initiate additional enforcement actions against entities found to have engaged in market manipulation.  FERC initiated a series of show cause proceedings, including *American Electric Power Serv. Corp.*, 103 FERC ¶61,345 (2003), and *Enron Power Marketing, Inc.*, 103 FERC ¶61, 346 (2003).  Multiple parties appealed those orders to the D.C. Circuit Court of Appeals, but they have since been transferred to the Ninth Circuit Court of Appeals.

### 12.    California Actions

<u>Snohomish</u>

On July 15, 2002, ET Holdings was named (and later served) in an action filed by the Public Utility District No. 1 of Snohomish County ("Snohomish").  *Pub. Util. Dist. No. 1 of Snohomish County v. Dynegy Power Marketing, et al.*, U.S. District Court for the Central District of California, Case No. 02-5553.  Snohomish alleged that the defendants (numerous sellers of electricity) manipulated the deregulated California electricity market.  Snohomish sought, based on various legal theories (<u>e.g.</u>, state antitrust, and unfair and fraudulent business practices), among other remedies, disgorgement, restitution, injunctive relief, and treble damages.  Snohomish also claimed that defendants failed to file their rates in advance with FERC, which failure was allegedly a violation of the Federal Power Act.

On August 28, 2002, the Judicial Panel on Multidistrict Litigation entered a conditional order transferring the Snohomish case to the Southern District of California before Judge Whaley.  The panel determined that the Snohomish case involved common questions of law and fact with the actions currently captioned as *In Re California Wholesale Electricity Antitrust Litigation,* MDL 1405.  On September 12, 2002, all defendants except one filed a motion to dismiss Snohomish's complaint based on the filed-rate doctrine and federal preemption, and the other defendant filed a separate motion to dismiss and to strike the complaint.  On October 11, 2002, the Judicial Panel entered a final order transferring the Snohomish case to the Southern District of California before Judge Whaley.  On January 7, 2003, Judge Whaley granted the defendants' motion to dismiss in the entirety.  Snohomish appealed to the Ninth Circuit Court of Appeals.  On September 10, 2004, the Ninth Circuit Court of Appeals affirmed the dismissal on the grounds that FERC has exclusive jurisdiction over interstate sales of wholesale electricity and continues to engage in regulatory activity.  *Pub. Util. Dist. No. 1 of Snohomish County v. Dynegy Power Mkts., Inc.*, No. 03-55191, 2004 WL 2021424 (9th Cir. Sept. 10, 2004).  Snohomish has petitioned the United States Supreme Court to review the Ninth Circuit order.  The Supreme Court has directed the Solicitor General of the United States to file a brief with the Supreme Court stating the federal government's position.

<u>Millar</u>

ET Power was named, along with multiple other defendants, in a proceeding brought by James A. Millar, individually and on behalf of the general public and as a representative taxpayer against energy suppliers and other unnamed sellers of electricity in the California markets.  Millar filed the complaint, *Millar v. Allegheny Energy Supply, LLC,* Case No. 407 867 in San Francisco Superior Court on May 13, 2002.  In his complaint, Millar asserts that the defendants violated state laws against unfair and fraudulent business practices by entering into certain long-term energy contracts with the California Department of Water Resources.  Millar claims that the contracts were made under circumstances that resulted in excessively high and unfair prices and, as a result, refunds should be made to the extent that the prices in the contracts were excessive.  In addition, Millar seeks, among other remedies, an order enjoining enforcement of the allegedly unfair terms and conditions of the long-term contracts, declaratory relief, and attorneys' fees.  The litigation has recently been remanded to state court and is still at the pre-trial stage.

FERC previously dismissed the complaints involving the long-term contracts that comprise the subject matter of Millar's Complaint.  *Public Util. Comm'n v. Allegheny Energy Supply Co., LLC, et al.*, Docket No. EL02-60-000 and *California Elec. Oversight Board v. Sellers of Energy and Capacity Under Long-Term Contracts with the Calif. Dep't of Water Resources*, Docket No. EL02-62-000.  Appeals of the orders currently are pending in the Ninth Circuit Court of Appeals.

<u>California Wholesale Electricity Antitrust Litigation, MDL 1405</u>

ET Power, and one or more of its affiliates, have been named, along with multiple other defendants, in four putative class action lawsuits against generators, marketers and other unnamed sellers of electricity in California markets.  These cases are: (1) *Pier 23 Restaurant v. PG& Energy Trading Holdings Corp., et al.*, removed on February 26, 2001 to the United States District Court, Northern District of California; (2) *Hendricks v. Dynegy Power Marketing, Inc., PG&E Energy Trading Holding Corp., et al.*, removed on December 20, 2000 , to the United States District Court, Southern District of California; (3) *Sweetwater Authority v. Dynegy Inc., PG&E Energy Trading Holdings Corp., et al.*, removed on March 5, 2001, to the United States District Court, Southern District of California; and (4) *People of the State of California ex rel. Herrera v. Dynegy Power Marketing, Inc., PG&E Energy Trading Holdings Corp., et al.*, removed on February 21, 2001, to the United States District Court, Northern District of California.  The suits allege violation by the defendants of state antitrust laws and state laws against unfair and unlawful business practices.  They seek, among other remedies, disgorgement of alleged unlawful profits for sales of electricity beginning around 1999 or 2000, restitution, injunctive relief, and attorneys' fees.  The cases were originally brought in California state courts located in San Diego and San Francisco and following a series of procedural rulings by various state and federal courts, they were assigned to Judge Sammartino of the San Diego Superior Court.

In May, 2002, a number of other parties were named as cross-defendants in this proceeding by a number of the defendants.  One of these cross-defendants, British Columbia Hydro, removed these actions to the federal district court for the Southern District of California (Docket Nos. 02 CV 0990-RHW; 02 CV 10001-RHW) on May 21, 2002.  In September, the Court granted plaintiffs' motion to remand as well as the cross-defendants' motion to dismiss the cross-complaint.  Various of the defendants have appealed the remand and dismissal orders in the federal courts.  The actions have not yet been returned to Judge Sammartino in state court.

The Debtors generally are confident in the merit of their defenses in the various pending California and FERC proceedings described above.  To the extent that the Debtors are found liable for substantial sums in connection with those proceedings, recoveries of general unsecured creditors of ET Power and ET Holdings may be reduced by several percentage points.

## ARTICLE III.

## THE DEBTORS' PLAN OF LIQUIDATION

THE FOLLOWING IS A SUMMARY OF CERTAIN PROVISIONS OF THE PLAN AND IS QUALIFIED IN ITS ENTIRETY BY REFERENCE TO THE PLAN, A COPY OF WHICH IS ANNEXED TO THE DISCLOSURE STATEMENT AS APPENDIX 1. IN CERTAIN RESPECTS, THE PLAN DEALS WITH SOPHISTICATED LEGAL CONCEPTS.  THEREFORE, YOU MAY WISH TO CONSULT WITH COUNSEL BEFORE VOTING ON THE PLAN.

### A.      Classification and Treatment of Claims and Interests

Under the Plan, Claims are classified and treated as discussed below.  For ease of reference, estimates assume an Effective Date for the Plan of January 1, 2005. The actual Effective Date may vary from that date.

### 1.      Administrative Claims (Unclassified)

Description.  Administrative Claims are Claims that arose after the Petition Date and were incurred during the Debtors' chapter 11 proceedings.  The Debtors estimate that on the Effective Date, Administrative Claims will aggregate approximately $3,100,000, consisting primarily of approximately $550,000 for employee retention payments, approximately $450,000 for severance payments, and approximately $2,100,000 for other administrative claims.  Additionally, the Debtors will remain obligated to pay postpetition Claims incurred by the Debtors in the ordinary course of its business.

Treatment.  Each holder of an Allowed Administrative Claim shall receive: (i) to the extent not already paid, Cash not later of the Effective Date and the first Business Day after the date that is thirty (30) calendar days after the date on which such Administrative Claim becomes an Allowed Administrative Claim in the full amount of such Allowed Administrative Claim; (ii) to the extent not yet due and payable,

payment in accordance with the terms and conditions of the particular transaction giving rise to the Administrative Claim; (iii) to the extent such Claims are Administrative Claims of the United States Trustee for fees pursuant to 28 U.S.C. § 1930(a)(6), Cash in accordance with the applicable schedule for payment of such fees; or (iv) treatment on such other terms as may be mutually agreed upon in writing between the holder of such Allowed Administrative Claim and the relevant Debtor, prior to the Effective Date, or the Plan Administrator, on or after the Effective Date; *provided, however*, that interim and/or final payment of Allowed Administrative Claims approved by the Bankruptcy Court shall be paid at the time of and in accordance with such Bankruptcy Court approval.

       Administrative Bar Date.  Under the Plan, requests for payment of Administrative Claims that have arisen or will arise in the period from the Petition Date through the Effective Date, inclusive, must be filed and served pursuant to the procedures set forth in the Confirmation Order and/or notice of entry of the Confirmation Order, no later than forty-five (45) days after the Effective Date (unless an earlier date is set by the Bankruptcy Court).  No Administrative Claim request need be filed for the allowance of any: (a) Fee Claims; or (b) fees of the United States Trustee arising under 28 U.S.C. § 1930.  Any Entities that are required to but fail to file such an Administrative Claim request on or before the Administrative Bar Date shall be forever barred from asserting such Administrative Claim against the Debtors, the Liquidating Debtors, or the Plan Administrator or any of their respective property, officers, or directors and the holder thereof shall be enjoined from commencing or continuing any action, employment of process or act to collect, offset or recover such Administrative Claim.

      **2.**      **Fee Claims (Unclassified)**

       Description.  A Fee Claim is any Claim against the Debtors of a professional person employed under section 327 or 1103 of the Bankruptcy Code or of an indenture trustee seeking compensation or reimbursement of expenses by the Bankruptcy Court in accordance with sections 328, 330 and/or 331 of the Bankruptcy Code, and/or which is entitled to priority pursuant to section 503(b)(2), 503(b)(3)(F), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.  The Debtors estimate that on the Effective Date, Fee Claims will aggregate approximately $2,400,000.

       Treatment.  Each holder of an Allowed Fee Claim shall receive, in Cash, to the extent not already paid, the amounts allowed by the Bankruptcy Court: (a) on or as soon as practicable following the date upon which the Bankruptcy Court order allowing such Allowed Fee Claim is issued; or (b) upon such other terms as may be mutually agreed upon between the holder of such Allowed Fee Claim on one hand, and the relevant Debtors on the other hand.  Any and all parties requesting allowance and/or payment of a Fee Claim for any period ending on or before the Effective Date must file and serve final applications therefor no later than forty-five (45) days after the Effective Date.

**3.**     **Priority Tax Claims (Unclassified)**

_Description._   A Priority Tax Claim is any unsecured Claim, to the extent entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.  The Debtors project that the Priority Tax Claims will approximate $150,000.

_Treatment._   On the later of the Effective Date or as soon as reasonably practicable thereafter and thirty (30) Business Days after the date on which a Priority Tax Claim becomes an Allowed Claim, such Claim shall be paid in full, in Cash; _provided, however_, that each Debtor shall have the option, exercisable upon written notice to the relevant Priority Tax Claim holder sent prior to the Effective Date, to pay any Priority Tax Claim over a period not longer than six (6) years from the date of assessment of the applicable tax, with interest on the unpaid portion payable annually in arrears at the rate of interest ordered by the Bankruptcy Court (or agreed to by the holder of the Claim and the relevant Debtor).

**4.**     **Class 1 - Secured Claims (Impaired)**

_Description._   A Secured Claim is any Claim, or portion thereof, asserted against any of the  Debtors to the extent such claim constitutes a secured Claim pursuant to sections 506 or 1111(b) of the Bankruptcy Code.  Class 1 consists of all Secured Claims, with each such Claim secured by different collateral to be a separate subclass for voting and distribution purposes.  The Debtors project that the Secured Claims will approximate $25,000,000.

_Voting._   Class 1 Claims are Impaired under the Plan and entitled to vote to accept or reject the Plan.

_Treatment._   At the election of the Debtors or the Plan Administrator, as applicable, on or before the later of the Effective Date or as soon as reasonably practicable thereafter and thirty (30) Business Days after the date on which a Class 1 Claim becomes an Allowed Claim, such Claim shall be satisfied in full by either:

> (i)     reinstating the Claim, that is, leaving unaltered the legal, equitable, and contractual rights respecting such Claim in accordance with section 1124 of the Bankruptcy Code, including:  (A) curing all pre- and post-petition defaults other than defaults relating to the insolvency or financial condition of the Debtors or its status as a debtor under the Bankruptcy Code; and (B) reinstating the maturity date of the Claim;

> (ii)    paying such Claim in full, in Cash, in an amount equal to such Allowed Class 1 Claim on the Effective Date or as soon as reasonably practicable thereafter; or

> (iii)   transferring title to the property securing such Allowed Class 1 Claim to the holder of such Claim.  Within thirty (30) days after mailing by the Plan Administrator of notice of the election of this

option (iii), the holder of an Allowed Class 1 Claim shall be entitled to amend in writing or file a proof of claim for any unsecured deficiency Claim respecting such Claim (to the extent such holder has recourse to a Debtor respecting such Class 1 Claim, and provided the holder has timely filed a proof of claim respecting such Class 1 Claim or whose Class 1 Claim was listed in the Schedules as nondisputed, noncontingent, and liquidated). To the extent, if any, allowed, such deficiency claim shall be treated in Class 3, Class 4, Class 5, Class 6 or Class 7, as appropriate.

5.      **Class 2 - Priority Claims (Unimpaired)**

Description.  A Priority Claim is any Claim to the extent entitled to priority in payment pursuant to section 507(a)(8) of the Bankruptcy Code, other than an Administrative Claim, a Fee Claim, or a Priority Tax Claim.  Class 2 consists of Priority Claims against the Debtors.  Class 2 is not Impaired.  The Debtors estimate that Allowed Class 2 Claims will aggregate $0.

Voting.  Class 2 Claims are Unimpaired and conclusively presumed to accept the Plan.  For this reason, Class 2 Claims are not entitled to vote on the Plan.

Treatment.  On the later of the Effective Date or as soon as reasonably practicable thereafter and thirty (30) days after the date on which a Class 2 Claim becomes an Allowed Claim, such Claim shall be paid in full in Cash.

6.      **Class 3 - General Unsecured Claims against ET Gas (Impaired for Voting Purposes)**

Description.  A General Unsecured Claim is any Claim against the Debtors, other than a Secured Claim, Administrative Claim, Fee Claim, Priority Claim, Priority Tax Claim or Subordinated Claim.  Class 3 contains all General Unsecured Claims against ET Gas.  Class 3 is Impaired.  The Debtors estimate that aggregate Allowed Class 3 Claims will aggregate approximately $90,000,000.

Voting.  Class 3 Claims are treated as Impaired under the Plan and are being provided the opportunity to vote to accept or reject the Plan.  However, the Debtors believe that, under applicable law, Class 3 Claims likely are not Impaired under the Plan. Accordingly, in the event that Class 3 votes to reject the Plan, the Debtors reserve the right to contend that such Class is Unimpaired and that, therefore, Class 3 should be deemed to have accepted the Plan.

Treatment.  On the later of the Effective Date or as soon as reasonably practicable thereafter and thirty (30) Business Days after the date on which a Class 3 Claim becomes an Allowed Class 3 Claim, in full settlement, satisfaction, and payment of all Allowed Class 3 Claims, each holder of an Allowed Class 3 Claim shall receive Cash in an amount equal to one hundred (100) percent of its Allowed Class 3 Claim plus

Pendency Interest (1.08% *per annum*, running between the Petition Date and the Effective Date).

7.    **Class 4 - General Unsecured Claims against ET Investments (Impaired for Voting Purposes)**

Description.  Class 4 contains all General Unsecured Claims against ET Investments.  Class 4 is Impaired.  The Debtors estimate that aggregate Allowed Class 4 Claims will aggregate approximately $1,000.

Voting.  Class 4 Claims are treated as Impaired under the Plan and are being provided the opportunity to vote to accept or reject the Plan.  However, the Debtors believe that, under applicable law, Class 4 Claims likely are not Impaired under the Plan.  Accordingly, in the event that Class 4 votes to reject the Plan, the Debtors reserve the right to contend that such Class is Unimpaired and that, therefore, Class 4 should be deemed to have accepted the Plan.

Treatment.  On the later of the Effective Date or as soon as reasonably practicable thereafter and thirty (30) Business Days after the date on which a Class 4 Claim becomes an Allowed Class 4 Claim, in full settlement, satisfaction, and payment of all Allowed Class 4 Claims, each holder of an Allowed Class 4 Claim shall receive Cash in an amount equal to one hundred (100) percent of its Allowed Class 4 Claim plus Pendency Interest (1.08% *per annum*, running between the Petition Date and the Effective Date).

8.    **Class 5 - General Unsecured Claims against ET Holdings (Impaired)**

Description.  Class 5 contains all General Unsecured Claims against ET Holdings.  Class 5 is Impaired.  The Debtors estimate that aggregate Allowed Class 5 Claims will aggregate approximately $350,000,000, exclusive of claims arising as a result of ET Holdings's status as a general partner of ET Power, or on account of any Claims arising from guaranties by ET Holdings of obligations of ET Power.[26]

Voting.  Class 5 Claims are Impaired under the Plan and entitled to vote to accept or reject the Plan.

Treatment.  On the later of each Distribution Date or as soon as reasonably practicable thereafter and thirty (30) Business Days after the date on which a Class 5 Claim becomes an Allowed Class 5 Claim, in full settlement, satisfaction, and payment of all Allowed Class 5 General Unsecured Claims, each holder of an Allowed Class 5 Claim shall receive its Pro Rata share of Class 5 Available Cash.

---

[26]    Claims against ET Holdings arising from ET Holdings's status as general partner of ET Power are estimated at approximately $345,000,000.  See section III.A.9 (General Unsecured Claims against ET Power).  Claims against ET Holdings arising from guarantees by ET Holdings of obligations of ET Power are estimated to be approximately $20,000,000.

9.      **Class 6 - General Unsecured Claims against ET Power (Impaired)**

Description.  Class 6 contains all General Unsecured Claims against ET Power.  Class 6 is Impaired.  The Debtors estimate that aggregate Allowed Class 6 Claims will aggregate approximately $345,000,000, exclusive of any claims for damages under the Tolling Agreements. See section II.G.9.c.

Voting.  Class 6 Claims are Impaired under the Plan and entitled to vote to accept or reject the Plan.

Treatment.  On the later of each Distribution Date or as soon as reasonably practicable thereafter and thirty (30) Business Days after the date on which a Class 6 Claim becomes an Allowed Class 6 Claim, in full settlement, satisfaction, and payment of all Allowed Class 6 General Unsecured Claims, each holder of an Allowed Class 6 Claim shall receive its Pro Rata share of Class 6 Available Cash, as well as its corresponding ratable share of the Remaining Available Class 5 Cash.

10.      **Class 7 - General Unsecured Claims against ESV (Impaired)**

Description.  Class 7 contains all General Unsecured Claims against ESV. Class 7 is Impaired.  The Debtors estimate that aggregate Allowed Class 7 Claims will aggregate approximately $20,000,000.

Voting.  Class 7 Claims are Impaired under the Plan and entitled to vote to accept or reject the Plan.

Treatment.  On the later of each Distribution Date or as soon as reasonably practicable thereafter and thirty (30) Business Days after the date on which a Class 7 Claim becomes an Allowed Class 7 Claim, in full settlement, satisfaction, and payment of all Allowed Class 7 General Unsecured Claims, each holder of an Allowed Class 7 Claim shall receive its Pro Rata share of Class 7 Available Cash.

11.      **Class 8 - General Unsecured Claims against Quantum (Impaired)**

Description.  Class 8 contains all General Unsecured Claims against Quantum.  Class 8 is Impaired.  The Debtors estimate that aggregate Allowed Class 8 Claims will aggregate $2,500,000.

Voting.  Class 8 Claims are Impaired under the Plan and deemed to reject the Plan.  For this reason, holders of Class 8 Claims are not entitled to vote on the Plan.

Treatment.  Holders of Class 8 Claims shall receive no distribution under the Plan.

12.      **Class 9 - Subordinated Claims (Impaired)**

Description.  A Subordinated Claim is a Claim asserted against any of the Debtors subject to subordination pursuant to section 510 of the Bankruptcy Code.  The Debtors estimate that Allowed Class 9 Claims will aggregate $0.

Voting.  Class 9 Claims are Impaired under the Plan and deemed to reject the Plan.  For this reason, holders of Class 9 Claims are not entitled to vote on the Plan.

Treatment.  Holders of Class 9 Claims shall receive no distribution under the Plan.

13.     **Class 10 - Interests in ET Gas (Impaired)**

Description.  Class 10 consists of all Interests in ET Gas.

Voting.  As ET Holdings, a Debtor and a proponent of the Plan, is the holder of all Interests in ET Gas, Class 10 is deemed to accept the Plan.

Treatment.  Holders of Class 10 Interests shall receive all Class 3 Available Cash remaining after all Class 3 Allowed Claims have been paid in full with Pendency Interest under the Plan and all Disputed Claims in Class 3 have been reserved for.  Such Interests shall be retained until the dissolution of the respective Liquidating Debtors in accordance with the terms of the Plan, upon which dissolution the respective Interests shall be deemed canceled.

14.     **Class 11 - Interests in ET Investments (Impaired)**

Description.  Class 11 consists of all Interests in ET Investments.

Voting.  As ET Holdings, a Debtor and a proponent of the Plan, is the holder of all Interests in ET Investments, Class 11 is deemed to accept the Plan.

Treatment.  Holders of Class 11 Interests shall receive all Class 4 Available Cash remaining after all Class 4 Allowed Claims have been paid in full with Pendency Interest under the Plan and all Disputed Claims in Class 4 have been reserved for.  Such Interests shall be retained until the dissolution of the respective Liquidating Debtors in accordance with the terms of the Plan, upon which dissolution the respective Interests shall be deemed canceled.

15.     **Class 12 - Interests in ET Holdings, ET Power, ESV and Quantum (Impaired)**

Description.  Class 12 consists of Interests in ET Holdings, ET Power, Quantum, and ESV.

Voting.  Class 12 Claims are Impaired and deemed to have rejected the Plan.  For this reason, holders of Class 12 Interests are not entitled to vote on the Plan

Treatment. Subject to section 8.5 of the Plan, holders of Class 12 Interests shall receive no distribution under the Plan. Such Interests shall be retained until the dissolution of the respective Liquidating Debtors in accordance with the terms of the Plan, upon which dissolution the respective Interests will be canceled.

### B.   Means of Plan Implementation

### 1.   Dissolution of Quantum.

Prior to the Effective Date, Quantum shall file appropriate certificates of dissolution with the appropriate governmental authorities under applicable law. Any assets of Quantum in existence as of the Effective Date shall be distributed in accordance with the rules of absolute priority.

### 2.   Funding

The funds to be distributed pursuant to the Plan and the Debtors' ongoing capital expenditure and working capital needs will come from the Debtors' existing cash reserves. As of November 30, 2004, the cash balances for each of the Debtors were as follows: (i) $207,715,000 for ET Holdings; (ii) $62,908,000 for ET Gas;[27] (iii) $82,966,000 for ET Power; (iv) $31,000 for ET Investments; (v) $0 for Quantum; and (vi) $1,883,484.22 for ESV.

### 3.   Directors and Officers

Immediately prior to the Effective Date, the authority, power and incumbency of the persons then acting as directors and officers of the Debtors shall be terminated and such directors and officers shall be deemed to have resigned.

### 4.   Post-Effective Date Management of the Liquidating Debtors.

On the Effective Date, each of the Boards of Directors will be comprised of: (i) the ET Director; and (ii) the Committee Director. The ET Director and the Committee Director may be removed from office by and in the sole and absolute discretion of the stockholders of the respective ET Debtors (in the case of the ET Director) or the ET Committee (in the case of the Committee Director). A resulting vacancy shall be filled by a replacement director elected by the stockholders of the respective ET Debtors (in the case of the ET Director) or by the ET Committee (in the case of the Committee Director).

### 5.   Quorum and Voting.

The presence of both the ET Director and the Committee Director shall constitute a quorum for the transaction of business and any action by any of the Boards of

---

[27]   ET Gas's current cash balance is less than the amount required to fulfill its payment obligations under the Plan. However, ET Gas also has an Allowed Claim against ET Holdings that will result in a cash recovery to ET Gas sufficient to make up that shortfall. See Plan Section 8.1.

Directors shall require the unanimous vote or consent of both directors. In the event that the ET Director and the Committee Director are unable to agree upon and approve a particular action, they shall attempt to resolve the deadlock in the following manner: (i) the two directors shall use all reasonable, good faith efforts to select, as expeditiously as possible, a Third-Party Expert; and (ii) the Third-Party Expert shall, at the expense of the Liquidating Debtors, take such time and make such efforts as are necessary and appropriate in his or her judgment to understand the proposed action under consideration and make a recommendation in resolution of the deadlock. Any such recommendation shall be made in writing and shall set forth the reasons therefor. Each of the directors shall vote for or against the proposed action based on such recommendation, except that: (x) the applicable Board of Directors, by the unanimous vote or consent of the ET Director and the Committee Director, may decide against taking the proposed action, notwithstanding such recommendation by the Third-Party Expert; and (y) the ET Director or the Committee Director shall not be required to provide any such vote if such director believes, after consultation with counsel, that such vote could authorize actions not consistent with applicable law or could constitute a violation of the fiduciary duties of such director. In such event, the ET Director or the Committee Director, as the case may be, may decide against authorizing the proposed action. The Third-Party Expert shall not under any circumstances be deemed to be a director of the Liquidating Debtors but, for purposes of assisting in the resolution of the deadlock, shall make a recommendation that he or she believes to be in the best interests of the Liquidating Debtors and appropriate for action by the applicable Board of Directors, taking into account the provisions of the Plan and applicable law.

6.       **Board Approval Required for Certain Transactions.**

Unless otherwise ordered by the Bankruptcy Court, the Liquidating Debtors shall not satisfy, settle or consent to the allowance of any Designated Disputed Claim by a creditor against a Liquidating Debtor unless the satisfaction, settlement or allowance of such Designated Disputed Claim shall have been approved by the applicable Board of Directors.

7.       **The Plan Administrator**

The Plan Administrator shall at all times serve at the direction of the Boards of Directors and in accordance with the terms of the Plan. Without limiting the foregoing, the Plan Administrator shall have the primary duties of:

(i)       negotiating settlements with creditors;

(ii)      compromising or settling all Claims;

(iii)     making all Distributions of Cash pursuant to the Plan to holders of Allowed Claims entitled to receive Cash under the Plan, subject to approval of the applicable Board of Directors;

(iv)     objecting to Claims;

(v)      investing cash in a reasonable and prudent manner;

(vi)    entering into any agreement or executing any document required by or consistent with the Plan and perform all of the Liquidating Debtors' obligations thereunder;

(vii)    purchasing or creating and carrying all insurance policies and paying all insurance premiums and costs it deems necessary or advisable;

(viii)    prosecuting Avoidance Actions;

(ix)    implementing and/or enforcing all provisions of the Plan;

(x)    converting any remaining non-cash assets into cash in a manner consistent with the Plan and applicable law;

(xi)    at a time to be determined by the Boards of Directors, causing the dissolution of the Liquidating Debtors and seeking entry of a final decree of the Bankruptcy Court closing the Chapter 11 Cases;

(xii)    advising the Boards of Directors with regard to the foregoing; and

(xiii)    taking and performing such other actions and duties as are necessary or appropriate to implement the Plan pursuant to its terms and the terms of the Confirmation Order.

**8.**    **Resignation, Death or Removal of Plan Administrator.**

The Plan Administrator may resign at any time subject to the terms and conditions of the Plan Administrator Agreement. The initial Plan Administrator shall serve for the term indicated in the Plan Administrator Agreement. The Plan Administrator may be removed from office with or without cause by the Boards of Directors, subject to the terms of the Plan Administrator Agreement. Following completion of the initial Plan Administrator's term, or in the event of the death, resignation, or removal of the Plan Administrator that occurs prior to the dissolution of the Liquidating Debtors pursuant to the Plan, the Boards of Directors shall appoint a new Plan Administrator. The appointment of the successor Plan Administrator (or any successor thereto) shall be subject to approval of the Bankruptcy Court, and shall be on terms and conditions to be approved by the Bankruptcy Court. No successor Plan Administrator hereunder shall in any event have any liability or responsibility for the acts or omissions of any of his or her predecessors.

**9.**    **Retention and Enforcement of Causes of Action**

Except as expressly provided in the Plan, on the Effective Date, the Debtors' rights in respect of existing and potential Avoidance Actions shall be preserved and become property of the Liquidating Debtors. On the Effective Date, the Liquidating Debtors shall be authorized and empowered to commence and prosecute any and all causes of action that could have been asserted by the Debtors. **All Avoidance Actions shall survive confirmation and the commencement or prosecution of avoidance actions shall not be barred or limited by any estoppel, whether judicial, equitable, or otherwise.**

No later than twenty (20) days before the commencement of the Confirmation Hearing, the Debtors will file with the Bankruptcy Court a schedule of potential parties that may be subject to Avoidance Actions, specifically excluding parties already subject to such actions as of such date.

**10.    Post-Confirmation Role of the ET Committee**

As of the Effective Date, the duties of the ET Committee shall terminate except as to: (i) any appeal or motion for reconsideration of the Confirmation Order; (ii) objections to Fee Claims; and (iii) the removal of the Committee Director and the appointment of a replacement Committee Director.

The ET Committees' professionals shall receive from the ET Debtors reasonable compensation for their services.  Post-Effective Date fees and expenses of the ET Committees' professionals (reasonably incurred in connection with the ET Committees' limited post-Effective Date functions described in the immediately preceding paragraph) shall be paid by the ET Debtors and need not be approved by the Bankruptcy Court unless objected to by the ET Debtors.

**11.    Procedures for Distributions Under the Plan**

All distributions of Cash pursuant to the Plan shall be made by the Plan Administrator or a duly appointed disbursing agent to the holders of Allowed Claims entitled to receive Cash under the Plan.  All distributions of Cash under the Plan may be made either by check or by wire transfer, at the option of the Plan Administrator or, if applicable, the disbursing agent.  Except as otherwise provided in the Plan, all distributions of Cash shall be made on the later of the Effective Date (or, in the case of Available Cash, on the Initial Distribution Date and each subsequent Distribution Date) or the Business Day which is thirty (30) days after the date upon which such Claim becomes an Allowed Claim, or as soon thereafter as practicable.

All distributions of Cash pursuant to the Plan shall be made by the Plan Administrator or a duly appointed disbursing agent to the holders of Allowed Claims entitled to receive Cash under the Plan.  All distributions of Cash under the Plan may be made either by check or by wire transfer, at the option of the Plan Administrator or, if applicable, the disbursing agent.  Except as otherwise provided in the Plan, all distributions of Cash shall be made on the later of the Effective Date (or, in the case of Available Cash, on the Initial Distribution Date and each subsequent Distribution Date) or the Business Day which is thirty (30) days after the date upon which such Claim becomes an Allowed Claim, or as soon thereafter as practicable.

The Plan Administrator shall hold in reserve for the benefit of each holder of a Disputed Claim, Cash in an amount required by order of the Bankruptcy Court (including, with limitation, any Claims Estimation Order) or, in the absence of such order, Cash equal to the Distributions which would have been made to the holder of such Disputed Claim, as if its Claim were an Allowed Claim in the liquidated amount, if any, asserted on the Effective Date.  Once a Disputed Claim has become an Allowed Claim,

the holder thereof shall receive the applicable Distribution on the later of the next Distribution Date or the Business Day which is thirty (30) days after the date upon which such Claim becomes an Allowed Claim, or as soon thereafter as practicable.

    <u>Delivery of Distributions.</u>  Subject to Bankruptcy Rule 9010, all distributions to any holder of an Allowed Claim shall be made at the address set forth on the Schedules filed with the Bankruptcy Court or on the books and records of the Liquidating Debtors or their agents, unless the Debtors or the Plan Administrator, as applicable, have been notified in writing of a change of address, including, without limitation, by the filing of a proof of claim or Administrative Claim request that contains an address for a holder of a Claim different from the address reflected on such Schedule(s) for such holder.

## C.  Certain Risk Factors

### 1.  Parties-in-interest may object to the Debtors' classification of Claims.

    Section 1122 of the Bankruptcy Code provides that a plan may place a claim or an interest in a particular class only if such claim or interest is substantially similar to the other claims or interests of such class.  The Debtors believe that the classification of claims and interests under the Plan complies with the requirements set forth in the Bankruptcy Code.  However, it cannot be assured that the Bankruptcy Court will reach the same conclusion.

### 2.  The Debtors may not be able to secure confirmation of the Plan.

    It cannot be assured that the Debtors will be able to obtain the requisite acceptances to confirm the Plan.  Even if the requisite acceptances are received, the Bankruptcy Court may not confirm the Plan.  A non-accepting creditor of the Debtors might challenge the balloting procedures and results as not being in compliance with the Bankruptcy Code or Bankruptcy Rules.  Even if the Bankruptcy Court determined that the Disclosure Statement and the balloting procedures and results were appropriate, the Bankruptcy Court could still decline to confirm the Plan if it found that any of the statutory requirements for confirmation had not been met.  Section 1129 of the Bankruptcy Code sets forth the requirements for confirmation and requires, among other things, a finding by the Bankruptcy Court that: (i) the confirmation of the Plan is not likely to be followed by a liquidation or a need for further financial reorganization; and (ii) the value of distributions to non-accepting holders of claims and interests within a particular class under the Plan will not be less than the value of distributions such holders would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code.  While it cannot be assured that the Bankruptcy Court will conclude that these requirements have been met, the Debtors believe that the Plan will not be followed by a need for further liquidation (inasmuch as the plan already contemplates a liquidation) and that non-accepting holders within each class under the Plan will receive distributions at least as great as they would have received following a liquidation under chapter 7 of the Bankruptcy Code when taking into consideration all administrative claims and the costs and uncertainty associated with any such chapter 7 case.

If the Plan is not confirmed, it is unclear whether a liquidation of the Debtors could be implemented through chapter 11 and what distribution holders of Claims ultimately would receive with respect to their Claims.  If an alternative liquidation under chapter 11 could not be agreed to, it is likely that the Debtors would have to liquidate their assets under chapter 7, in which case it is likely that holders of Claims would receive substantially less favorable treatment than they would receive under the Plan due, among other things, to the substantial overlay of administrative and other expenses associated with the appointment of a chapter 7 trustee.

    **3.**        **Certain events may cause the dilution of distributions to holders of Allowed Claims in Classes 5, 6 and 7.**

Distributions to be made to holders of Allowed Claims in Classes 5, 6 and 7 may be diluted as the projected creditor recovery analysis does not include estimates for any contingent, disputed and/or unliquidated claims in such Classes (to the extent any such claims become Allowed Claims, the total aggregate amount of Allowed Claims in Classes 5, 6 and 7 will be increased while the total Cash or other property to be distributed to such Classes will remain the same).  Additionally, certain unresolved matters may have a substantial impact on distributions to Classes 5 and 6.  Of significance, the disputes regarding the Tolling Agreements are currently being arbitrated.  The outcome of the arbitrations of the Tolling Agreement disputes have the potential to significantly dilute the recoveries of holders of Allowed Claims in Classes 5 and 6.  See section II.G.9.c.

    **4.**        **Certain events may cause delay in distributions to holders of Allowed Claims in Classes 5, 6 and 7.**

Distributions to be made to holders of Allowed Claims in Classes 5, 6 and 7, including the final distribution under the Plan, may be delayed pending resolution of Disputed Claims which may be substantial and/or complicated.  In addition, any distribution made in respect of holders of Allowed Claims in Classes 5, 6 and 7 on the Initial Distribution Date may be significantly less than the final distribution to be received by the holders of such Allowed Claims in Classes 5, 6 and 7 over the periodic distribution dates and the Final Distribution Date.

    **D.**        **Effect of Plan on Claims and Interests**

    **1.**        **Release of the Debtors, their Professionals and Certain of the Debtors' Directors and Officers**

AS OF THE CONFIRMATION DATE, BUT SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, NONE OF:  (i) THE PLAN ADMINISTRATOR, THE DEBTORS, THE LIQUIDATING DEBTORS, THEIR SUCCESSORS AND ASSIGNS; (ii) PRESENT DIRECTORS AND OFFICERS; (iii) FORMER DIRECTORS AND OFFICERS WHO HELD SUCH POSITION WITH THE DEBTORS AS OF OR SINCE THE PETITION DATE; AND (iv) AGENTS, ATTORNEYS, ADVISORS, FINANCIAL ADVISORS, INVESTMENT BANKERS

AND EMPLOYEES OF THE DEBTORS, SHALL HAVE OR INCUR ANY
LIABILITY TO ANY ENTITY FOR ANY CLAIM, OBLIGATION, RIGHT, CAUSE
OF ACTION OR LIABILITY (INCLUDING, BUT NOT LIMITED TO, ANY CLAIMS
ARISING OUT OF ANY ALLEGED FIDUCIARY OR OTHER DUTY AND THE
AVOIDANCE OF PREFERENCES OR FRAUDULENT CONVEYANCES),
WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING
OR HEREAFTER ARISING, BASED IN WHOLE OR IN PART ON ANY ACT OR
OMISSION, TRANSACTION OR OCCURRENCE FROM THE BEGINNING OF
TIME THROUGH THE EFFECTIVE DATE IN ANY WAY RELATING TO THE
DEBTORS; AND ALL CLAIMS BASED UPON OR ARISING OUT OF SUCH
ACTIONS OR OMISSIONS SHALL BE FOREVER WAIVED AND RELEASED
(OTHER THAN THE RIGHT TO ENFORCE THE DEBTORS' OR THE
LIQUIDATING DEBTORS' OBLIGATIONS UNDER THE PLAN); *provided, however,*
THAT THIS SECTION SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY
ENTITY THAT OTHERWISE WOULD RESULT FROM ANY ACTION OR
OMISSION TO THE EXTENT THAT SUCH ACTION OR OMISSION IS
DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED WILLFUL
MISCONDUCT.

THE RELEASE DESCRIBED ABOVE SHALL BE ENFORCEABLE
AS A MATTER OF CONTRACT AGAINST ANY HOLDER OF A CLAIM TIMELY
NOTIFIED OF THE PROVISIONS OF THE PLAN.  CLAIMANTS OF THE
DEBTORS SHALL BE ENJOINED FROM COMMENCING OR CONTINUING ANY
ACTION, EMPLOYMENT OF PROCESS OR ACT TO COLLECT, OFFSET OR
RECOVER ANY CLAIM THAT IS RELEASED AS PROVIDED HEREIN.

The Debtors believe that the releases described above provided to third
parties under the Plan are necessary, appropriate and in compliance with applicable
bankruptcy law.  The release provision protects those officers, directors and employees of
the Debtors and the professionals retained by them who elected to continue to serve the
Debtors and their creditors during these chapter 11 cases with protection from specious
lawsuits.  These officers, directors and employees have made a substantial contribution to
these chapter 11 cases by steering the Debtors towards a reorganization supported by the
ET Committee.  The releases and exculpation are particularly important because the Plan
provides for the assumption of indemnification obligations by the Liquidating Debtors to
further protect these persons.  Failing to grant the releases or exculpation would be
inconsistent with the goals of maximizing value and equality of treatment for all similarly
situated creditors.

For clarity, the releases only apply to officers, directors and employees of
the Debtors in their capacity as an officer, director or employee of the Debtors.  For
instance, an officer of one of the Debtors who is also an officer of NEGT and USGen NE
is not being released from any action taken in his capacity as an officer of NEGT or
USGen NE, as applicable.  Nothing in the Plan releases or limits claims of NEGT,
USGen NE, or any of the Debtors' non-Debtor subsidiaries or affiliates has against their
respective officers, directors, agents or employees.

### 2.   Survival of Certain Indemnification Obligations

The obligations of the Debtors to indemnify individuals who serve or served after the Petition Date as the Debtors' respective directors, officers, agents, employees, representatives, and others, including (without limitation) professional persons retained by the Debtors, pursuant to the Debtors' respective certificates of incorporation, by-laws, applicable statutes and preconfirmation agreements in respect of all present and future actions, suits and proceedings against any of such officers, directors, agents, employees, representatives, and others, including (without limitation) professional persons retained by the Debtors, based upon any act or omission related to service with, for or on behalf of the Debtors on or before the Effective Date as such obligations were in effect at the time of any such act or omission, shall not be discharged or impaired by confirmation or consummation of this Plan, but shall survive unaffected by the releases contemplated by this Plan and shall be performed and honored by the Plan Administrator regardless of such confirmation and consummation.

### 3.   Objections to Claims

The Bankruptcy Court fixed January 9, 2004, as the last date for filing Claims against the Debtors; *provided, however,* that holders of non-ordinary course Administrative Claims that have arisen or will arise in the period from July 8, 2003 through the Effective Date shall have forty-five (45) days after the Effective Date to file their Claims.  Unless otherwise ordered by the Bankruptcy Court or provided in the Plan, all objections to Claims must be filed with the Bankruptcy Court and served on the applicable claimant on or before one and twenty (120) days after the later of the Effective Date and the date a Claim is filed.

### 4.   Limitations on Liability Regarding Chapter 11 Activities

NONE OF THE DEBTORS, THE LIQUIDATING DEBTORS, THE PLAN ADMINISTRATOR, THE ET COMMITTEE, OR THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS, EMPLOYEES, MEMBERS OR AGENTS (EACH ACTING IN SUCH CAPACITY), OR ANY PROFESSIONAL PERSONS EMPLOYED BY ANY OF THEM WILL HAVE OR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY ACTION TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH OR RELATED TO THE FORMULATION, PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION, OR CONSUMMATION OF THE PLAN, THE DISCLOSURE STATEMENT, ANY CONTRACT, RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO, OR ANY OTHER ACTION TAKEN OR OMITTED TO BE TAKEN IN CONNECTION WITH THE PLAN OR THE CHAPTER 11 CASES, AND ALL CLAIMS BASED UPON OR ARISING OUT OF SUCH ACTIONS OR OMISSIONS WILL BE FOREVER WAIVED AND RELEASED; *provided, however,* THAT NOTHING HEREIN SHALL AFFECT THE LIABILITY OF ANY ENTITY THAT OTHERWISE WOULD RESULT FROM ANY ACTION OR OMISSION TO THE EXTENT THAT SUCH ACTION OR OMISSION IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED WILLFUL MISCONDUCT.

E.      **Executory Contracts and Unexpired Leases**

1.      **Rejection**

Leases and Contracts to be Rejected.  On the Confirmation Date, but subject to the occurrence of the Effective Date, the Debtors, pursuant to section 365 of the Bankruptcy Code, shall reject all of their executory contracts and unexpired leases except those that: (i) are the subject of motions to assume or reject pending on the Confirmation Date; (ii) were assumed or rejected before the Confirmation Date; (iii) are listed on Schedule 6.2 annexed to the Plan; or (iv) become the subject of a dispute over the amount or manner of cure and for which the Debtors make a motion, at any time, to reject such contract or lease based upon the existence of such dispute; *provided, however*, that the Debtors shall not be required to assume or reject any executory contract or unexpired lease with any party that is a debtor under the Bankruptcy Code unless and until such contract or lease has been assumed or rejected by such other party.  The entry by the Bankruptcy Court on or after the Confirmation Date of an order authorizing the rejection of an executory contract or unexpired lease shall result in such rejection being a prepetition breach, as of the Petition Date, under sections 365(g) and 502(g) of the Bankruptcy Code.

Deadline to File Rejection Damage Claims.  Each Entity who is a party to a contract or lease rejected under the Plan must file with the Bankruptcy Court and serve on the Liquidating Debtors, not later than thirty (30) days after the Effective Date, a proof of claim for damages alleged to arise from the rejection of the applicable contract or lease or be forever barred from filing a Claim, or sharing in distributions under the Plan, related to such alleged rejection damages.

2.      **Assumption**

Leases and Contracts to be Assumed.  Annexed to the Plan as Schedule 6.2 is a list of the Executory Contracts deemed to be assumed by the Debtors under the Plan as of the Confirmation Date, but subject to the occurrence of the Effective Date, pursuant to section 365 of the Bankruptcy Code, and the cure amounts necessary for such assumptions.

Deadline to Object to Cure Amounts.  If prior to the Confirmation Hearing or such other date as the Bankruptcy Court may fix, a party to such an executory contract or unexpired lease listed on Schedule 6.2 to the Plan fails to file with the Bankruptcy Court and serve upon the attorneys for the Debtors an objection to the applicable cure amount listed on such Schedule, then such party shall be forever barred from asserting any additional or other amounts against the Debtors respecting such cure amount.

Method of Cure.  At the election of the Liquidating Debtors, any monetary defaults under each executory contract and unexpired lease to be assumed under the Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code, in one of the following ways: (a) by payment of the default amount in Cash within forty-five (45) days after the Effective Date or such longer period ordered by the Bankruptcy Court; or (b) on

such other terms as may be agreed to by the parties to such executory contract or unexpired lease.  If a dispute occurs regarding: (x) the cure amount; (y) the ability of the Liquidating Debtors to provide adequate assurance of future performance under the contract or lease to be assumed; or (z) any other matter pertaining to assumption, then the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption. Notwithstanding anything herein to the contrary, the Debtors shall retain their right to reject any executory contract or unexpired lease that is subject to a dispute concerning amounts necessary to cure any defaults, until thirty (30) days following entry of a Final Order establishing the cure amount.

     **F.**    **Conditions**

     **1.**    **Conditions to Confirmation**

     The following is a condition precedent to confirmation of the Plan:

     a.    The Bankruptcy Court shall have entered the Confirmation Order.

     **2.**    **Conditions to Effective Date**

     The Plan may not be consummated unless each of the conditions set forth below has been satisfied:

     a.    The Confirmation Order shall have been entered and not be the subject of any judicial stay.

     b.    The Debtors shall have sufficient funds on hand to satisfy due and outstanding Administrative Claims, Fee Claims, Priority Tax Claims and Priority Claims.

     **3.**    **Effect of Nonoccurrence of the Conditions to Effective Date**

     If each of the conditions to the occurrence of the Effective Date has not been satisfied on or before the first Business Day that is more than 179 days after the Confirmation Date (or by such later date as the Debtors propose and the Bankruptcy Court approves, after notice and a hearing), upon motion by any party in interest, the Confirmation Order may be vacated by the Bankruptcy Court; provided, however, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to this section, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall: (a) constitute a waiver or release of any Claims against, liens on property of the Debtors; or (b) prejudice in any manner the rights of the Debtors, including (without limitation) the right to seek further extensions of the exclusivity periods under section 1121(d) of the Bankruptcy Code, which exclusivity periods shall be deemed to have been extended to the date twenty (20) days after the date

of entry of any order vacating the Confirmation Order, subject to the rights of any party to seek to shorten the exclusivity periods after notice and hearing.

**G.     Administrative Provisions**

**1.     Retention of Jurisdiction**

Notwithstanding confirmation of the Plan or occurrence of the Effective Date, the Bankruptcy Court will retain jurisdiction over the Liquidating Debtors after the Effective Date as and to the extent specified in the Plan.

**2.     Plan Amendments**

The Debtors may make any non-material modifications to the Plan at any time prior to the Effective Date.  After the Effective Date, the Plan Administrator may institute proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, or to address such matters as may be necessary to carry out the purposes and effects of the Plan.

**3.     Revocation of the Plan**

The Debtors reserve the right to revoke or withdraw the Plan prior to the Confirmation Date.

**4.     Continuation of Injunctions and Stays**

Unless otherwise provided in the Plan, the Confirmation Order, or any other order of the Bankruptcy Court, all injunctions or stays ordered in the Debtors' chapter 11 cases, pursuant to section 105 of the Bankruptcy Code or otherwise, and extant on the Confirmation Date, will remain in full force and effect unless or until subsequently modified or terminated.

## ARTICLE IV.

## CERTAIN U.S. FEDERAL INCOME TAX CONSEQUENCES OF THE PLAN

The following discussion summarizes certain U.S. federal income tax consequences of the implementation of the Plan to the Debtors and holders of Allowed Claims in Classes 3, 4, 5, 6, and 7.  The following summary does not address the U.S. federal income tax consequences to holders of any type of Claim or Interest other than Allowed Claims in Classes 3, 4, 5, 6, and 7.

This summary is based upon the Internal Revenue Code of 1986, as amended (the "Tax Code"), existing and proposed regulations thereunder, current administrative rulings, and judicial decisions as in effect on the date hereof, all of which are subject to change, possibly retroactively.  No rulings or determinations by the Internal Revenue Service have been obtained or sought by the Debtors with respect to the Plan.

This discussion does not purport to address the federal income tax consequences of the Plan to particular classes of taxpayers (such as foreign persons, S corporations, mutual funds, small business investment companies, regulated investment companies, broker-dealers, insurance companies, tax-exempt organizations and financial institutions) or the state, local or foreign income and other tax consequences of the Plan.

NO REPRESENTATIONS ARE MADE REGARDING THE PARTICULAR TAX CONSEQUENCES OF THE PLAN TO ANY HOLDER OF A CLAIM OR INTEREST.  EACH HOLDER OF A CLAIM OR INTEREST IS STRONGLY URGED TO CONSULT A TAX ADVISOR REGARDING THE FEDERAL, STATE, LOCAL AND FOREIGN TAX CONSEQUENCES OF THE TRANSACTIONS DESCRIBED HEREIN AND IN THE PLAN.

### A.      Federal Income Tax Consequences to Holders of Claims and Interests

Holders of Allowed Claims in Classes 3, 4, 5, 6, and 7 will generally recognize ordinary income to the extent that the amount of Cash received (or to be received) under the Plan is attributable to interest that accrued on a Claim but was not previously paid by the Debtors or included in income by holders of the Allowed Claims in Classes 3, 4, 5, 6, or 7, as applicable.  Holders previously required to include in their gross income any accrued but unpaid interest on a Allowed Claims in Classes 3, 4, 5, 6, and 7 may be entitled to recognize a deductible loss to the extent such interest is not satisfied under the Plan.  Holders of Allowed Claims in Classes 3, 4, 5, 6, and 7 will generally recognize gain or loss equal to the difference between the holder's adjusted basis in its Claim and the amount realized by the holder pursuant to the Plan that is not attributable to accrued but unpaid interest.  The amount realized will equal the Cash received (or to be received).

The character of any gain or loss that is recognized will depend upon a number of factors, including the status of the holder, the nature of the Claim in its hands, whether the Claim was purchased at a discount, whether and to what extent the Creditor has previously claimed a bad debt deduction with respect to the Claim, and the Creditor's holding period of the Claim.  If the Claim in the Creditor's hands is a capital asset, the gain or loss realized will generally be characterized as a capital gain or loss.  If the Creditor is a non-corporate taxpayer, such gain or loss will constitute long-term capital gain or loss if the Creditor held such Claim for longer than one year or short-term capital gain or loss if the Creditor held such Claim for less than one year.

A holder of an Allowed Claim who receives, in respect of its Claim, an amount that is less than its tax basis in such Claim may be entitled to a bad debt deduction if either: (a) the holder is a corporation; or (b) the Claim constituted (i) a debt created or acquired (as the case may be) in connection with a trade or business of the holder or (ii) a debt the loss from the worthlessness of which is incurred in the holder's trade or business.  A holder that has previously recognized a loss or deduction in respect of its Claim may be required to include in its gross income (as ordinary income) any amounts received under the Plan to the extent such amounts exceed the holder's adjusted basis in such Claim.

A holder of an Allowed Claim may be subject to backup withholding with respect to payments made pursuant to the Plan unless such holder: (a) is a corporation or is otherwise exempt from backup withholding and, when required, demonstrates this fact; or (b) provides a correct taxpayer identification number and certifies under penalty of perjury that the taxpayer identification number is correct and that the holder is not subject to backup withholding because of failure to report all dividend and interest income. Any amount withheld under these rules will be credited against the holder's federal income tax liability. Holders of Claims may be required to establish an exemption from backup withholding or to make arrangements with regard to payment thereof.

**B.      Federal Income Tax Consequences to the Debtors**

Under the Tax Code, a taxpayer generally must include in gross income the amount of any cancellation of debt income ("COD income") realized during the taxable year. There is an exception to this general rule, however, if the cancellation occurs in a case under the Bankruptcy Code, but only if the taxpayer is under the jurisdiction of the Bankruptcy Court and the cancellation is granted by the court or is pursuant to a plan approved by the court. Also, no COD income is realized from the discharge of indebtedness to the extent that payment of the liability would have given rise to a deduction.

Section 108 of the Tax Code requires the amount of COD income so excluded from gross income to be applied to reduce certain tax attributes of the taxpayer. The tax attributes that may be subject to reduction include the taxpayer's net operating losses and net operating loss carryovers (collectively, "NOLs"), certain tax credits and most tax credit carryovers, capital losses and capital loss carryovers, tax basis in assets, and foreign tax credit carryovers. Attribute reduction is calculated only after the tax for the year of discharge has been determined.

Some of the Debtors will recognize COD income. Under the rules described above, such income will be excluded from income because the cancellation will occur in a bankruptcy case. Accordingly, under the rules described above some of the tax attributes of the Debtors may be reduced.

The Debtors have agreed pursuant to the Liquidating Debtors/NEGT Settlement to join the consolidated federal income tax group of which NEGT is the common parent. If the Debtors generate net taxable income, such income will be included on the federal income tax return filed by the NEGT group, and the Debtors will not be required to make any payments to the NEGT group in respect of such income. Similarly, if the Debtors generate taxable losses, such losses will be included on the NEGT group's federal income tax return, and the Debtors will not be reimbursed for the use of such losses.

**C.      Importance of Obtaining Professional Tax Assistance**

The foregoing is intended to be only a summary of certain of the United States federal income tax consequences of the Plan and is not a substitute for careful tax

planning with a tax professional.  Holders of Claims are strongly urged to consult with their own tax advisors regarding the federal, state, local and foreign income and other tax consequences of the Plan.

**THE FOREGOING DISCUSSION OF CERTAIN FEDERAL INCOME TAX CONSEQUENCES IS FOR INFORMATIONAL PURPOSES ONLY AND IS NOT TAX ADVICE.  ACCORDINGLY, HOLDERS OF CLAIMS SHOULD CONSULT THEIR TAX ADVISORS WITH RESPECT TO THE TAX CONSEQUENCES OF THE PLAN, INCLUDING THE APPLICABILITY AND EFFECT OF FEDERAL, STATE, LOCAL, FOREIGN AND OTHER TAX LAWS.**

### ARTICLE V.

### PLAN ACCEPTANCE AND CONFIRMATION

**A.     Confirmation of the Plan**

Confirmation of the Plan requires satisfaction of section 1129 of the Bankruptcy Code.  Among other things, section 1129 requires that: (1) each class of impaired Claims accepts the Plan or be subject to a "cramdown"; (2) the Plan be in the "best interests" of any dissenting creditor or equity holder; and (3) the Plan be feasible. Each of these requirements is addressed below.

**B.     Voting Requirements**

**1.     Acceptance**

Each impaired class of Claims must accept the Plan or be subject to a "cramdown."  A class is impaired under a plan unless, under the plan: (a) the applicable creditor's legal, equitable, and contractual rights are left unaltered and there has been no default respecting the applicable claim or interest (other than under a bankruptcy or financial condition clause); or (b) all defaults are cured, maturity dates are reinstated, the party is compensated for damages caused by the default (such as by paying reasonable attorneys' fees and collection costs) and the party's legal, equitable and contractual rights are left unaltered.

An unimpaired class is conclusively presumed to have accepted the Plan. The unimpaired class under the Plan is Class 2.  In addition, as ET Holdings, a Debtor and a proponent of the Plan, is the holder of all Interests in ET Gas and ET Investments, Classes 10 and 11 are deemed to have accepted the Plan.

An impaired class that receives no distribution is automatically deemed to have rejected the Plan.  Classes 8, 9 and 12 shall receive no distributions under the Plan and, accordingly, shall be deemed to have rejected the Plan.

Votes on the Plan, therefore, are being solicited only from impaired classes that would receive or retain distributions or property under the Plan.  Classes 1, 3, 4, 5, 6 and 7 are the only such impaired Classes.[28]

An impaired class of Claims has accepted a plan if, of those voting, the holders of two thirds (2/3) in dollar amount, and more than one-half (1/2) in number, of Claims authorized to vote accept.  The Debtors and the ET Committee each believe the Plan to be in the best interest of holders of General Unsecured Claims and therefore recommend that holders of Claims in Classes 1, 3, 4, 5, 6 and 7 vote to accept the Plan.

### 2.  Deadline

To be counted, your Ballot must be received by BSI no later than 4:00 p.m. (Eastern Daylight Time) on April 5, 2005, at the address set forth on the enclosed self-addressed envelope.

### 3.  Eligibility

If you filed multiple claims against the Debtors, you may receive more than one Ballot.  The delivery of Ballots does not constitute an admission by the Debtors that the recipients of such Ballots hold Claims that have been allowed for distribution or voting purposes.  In addition, the fact that a party does not receive a Ballot is no indication as to whether or not that party does or does not have valid claims against NEGT or USGen NE, who are not included in the Plan.  The Debtors reserve their right to object to any Claim.

Pursuant to an order, dated _____, the Bankruptcy Court established the following rules for allowance of Claims for purposes of voting on the Plan:

  a. To the extent a proof of claim has been timely filed as a liquidated, non-contingent Claim in an amount greater than zero dollars, then the holder thereof shall be entitled to vote in the amount specified in such Claim (regardless of the scheduled amount of such Claim or whether such Claim is scheduled as contingent or unliquidated) unless such Claim is the subject of a pending objection filed no later than twenty (20) days prior to the Voting Deadline in which case such Claim shall be treated as a Disputed Claim for voting purposes, unless otherwise ordered by the Bankruptcy Court.

  b. If a Claim for which a proof of claim has been timely filed is, by its terms, wholly contingent or unliquidated, such holder shall be

---

[28] Claims in Classes 3 and 4 are treated as Impaired under the Plan and are being provided the opportunity to vote to accept or reject the Plan.  However, the Debtors believe that, under applicable law, Claims in Classes 3 and 4 likely are not Impaired under the Plan.  Accordingly, in the event that Class 3 or Class 4 votes to reject the Plan, the Debtors reserve the right to contend that such Class is Unimpaired and that, therefore, such Class should be deemed to have accepted the Plan.

entitled, solely for voting purposes, to vote such Claim in an amount equal to one dollar, subject to the filing of an objection by such holder, as discussed more fully below. If a claim for which a proof of claim has been timely filed is marked as partially contingent or unliquidated, that portion that is liquidated and not contingent may be voted in the amount asserted.

c.      If a Claim is listed on the Schedules as a non-contingent, liquidated Claim in an amount greater than zero dollars and a proof of claim was not: (i) timely filed; or (ii) deemed timely filed by an order of the Bankruptcy Court prior to the Voting Deadline, then the holder of such Claim is entitled to vote in the amounts set forth in the Schedules, subject to any applicable limitations set forth below.

d.      If a Claim is listed on the Schedules as contingent, unliquidated, and/or disputed and a proof of claim was not: (i) timely filed; or (ii) deemed timely filed by an order of this Court prior to the Voting Deadline, unless the Liquidating Debtors have consented in writing, such Claim is disallowed for purposes of receiving notices regarding the Plan or voting on the Plan.

e.      In the event a Claim is a Disputed Claim for which there has been no ruling by the Bankruptcy Court as of the Voting Deadline, the disputed portion of such Claim shall not be counted for voting purposes and the related ballot, if any, shall not be counted, except to the extent and in the manner indicated in the Debtor's objection or unless otherwise ordered by the Bankruptcy Court.

f.      If a Claim has been estimated or otherwise allowed for voting purposes by order of the Bankruptcy Court, such Claim shall be temporarily allowed in the amount so estimated or allowed pursuant to such order for voting purposes only.

g.      If a Claim has been deemed Allowed (i.e., for distribution purposes) by a Final Order, then such Claim is allowed for voting purposes in the deemed allowed amount.

**4.      Tabulation**

The Bankruptcy Court also established the following rules and standards for the tabulation of Ballots of creditors:

a.      Any ballot which is properly completed, executed, and timely returned to the Balloting Agent that does not indicate an acceptance or rejection of the Plan, or indicates both an acceptance and rejection of the Plan, will not be counted.

b.      Any ballot which is returned to the Balloting Agent indicating acceptance or rejection of the Plan, but which is unsigned or does not contain an original signature, will not be counted.

c.      Any ballot postmarked prior to the deadline for submission of ballots, but received afterward, will not be counted, unless otherwise ordered by the Bankruptcy Court.

d.      Whenever a holder of a Claim submits more than one ballot voting the same Claim prior to the deadline for receipt of ballots, except as otherwise directed by the Bankruptcy Court, the last such properly completed ballot sent and received prior to the voting deadline will be deemed to reflect the voter's intent and thus to supersede any prior ballots.

e.      A holder of a Claim that is entitled to vote must vote all of such Claim under the Plan either to accept or reject the Plan and may not split its vote with respect to such Claim.  Accordingly, a ballot with respect to a Claim that partially rejects and partially accepts the Plan, or that indicates both a vote for and against the Plan, will not be counted.

f.      If a creditor simultaneously casts inconsistent duplicate ballots, with respect to the same Claim, such ballots will not be counted.

g.      Each creditor shall be deemed to have voted the full amount of its Claim.

h.      Any ballot received by the Balloting Agent by fax, e-mail or other electronic communication will not be counted.

i.      Unless otherwise ordered by the Bankruptcy Court, questions as to the validity, form, eligibility (including time of receipt), acceptance, and revocation or withdrawal of ballots shall be determined by the Balloting Agent and the Liquidating Debtors in their sole discretion, which determination will be final and binding.

**5.      Cramdown**

If one class of impaired claims (without counting insiders' votes) accepts a plan or if all classes of claims are unimpaired, then the Bankruptcy Court may confirm a plan in the absence of acceptances by each class.  The procedure used to confirm a plan despite the dissent of a class, commonly known as a "cramdown," is set forth in section 1129(b) of the Bankruptcy Code.  A plan may be confirmed under the cramdown provisions if, in addition to satisfying the requirements of section 1129(a) of the Bankruptcy Code other than acceptance by all classes, the plan:  "does not discriminate unfairly"; and is "fair and equitable" with respect to each class of claims or interests that is impaired under, and has not accepted, the plan.

As used by the Bankruptcy Code, the phrases "discriminate unfairly" and "fair and equitable" have narrow and specific meanings unique to bankruptcy law. A plan does not discriminate unfairly if claims or interests in different classes but with similar priorities and characteristics receive or retain property of similar value under a plan. By establishing separate classes for the holders of each type of claim and by treating each holder of a claim in each class identically, the Plan has been structured so as to meet the "unfair discrimination" test of section 1129(b) of the Bankruptcy Code.

The Bankruptcy Code sets forth different standards for establishing that a plan is "fair and equitable" with respect to a dissenting class, depending on whether the class is comprised of secured or unsecured claims or interests. In general, section 1129(b) of the Bankruptcy Code permits confirmation notwithstanding non-acceptance by an impaired class if: (i) the plan provides for each holder of a claim in such impaired class to receive a distribution on the effective date that has a value that is equal to or greater than the allowed amount of its claim; or (ii) such impaired class and all junior classes are treated in accordance with the "absolute priority" rule, which requires that the dissenting class be paid in full before a junior class may receive anything under the plan. In addition, case law surrounding section 1129(b) requires that no class senior to a non-accepting impaired class receives more than payment in full on its claims.

The Plan meets the foregoing requirements. The Plan does not discriminate between similarly situated Claims. Moreover, the Plan abides by the "absolute priority rule," in that no classes junior in priority to Classes 5, 6 and 7 (whose Claims are not being satisfied in full) is to receive any Distribution, while creditors in Classes 3 and 4 are to receive Cash on the Effective Date equal to the allowed amount of their Claims, plus Pendency Interest. Accordingly, the Debtors intend to seek to "cram down" the Plan against Classes 8, 9 and 12, which classes are deemed to have rejected the Plan.

## C.     Best Interests Test

To confirm the Plan, the Bankruptcy Court must determine that the Plan is in the best interests of all individual dissenting creditors in each impaired class. The "best interests" test requires that the Plan provide each such holder with a recovery having a value at least equal to the value of the distribution each such holder would receive if the Debtors were liquidated under chapter 7 of the Bankruptcy Code. This test is based on liquidation values.

In these cases, the Debtors have liquidated, or are in the process of liquidating, substantially all of their assets. If these cases were to be converted to Chapter 7 cases, the Debtors' estates would incur the costs of payment of a statutorily allowed commission to the Chapter 7 trustee, as well as the costs of counsel and other professionals retained by the trustee. The Debtors believe such amount would exceed the amount of expenses that will be incurred in implementing the Plan and winding up the affairs of the Debtors. The estates would also be obligated to pay all unpaid expenses incurred by the Debtors during these cases (such as compensation for professionals) which are allowed in the Chapter 7 cases. In addition, there would be no certainty that

the settlements described herein would be received.  Accordingly, the Debtors believe that holders of Allowed Claims would receive substantially less than anticipated under the Plan if the Chapter 11 Cases were converted to Chapter 7 cases.

### D.     Feasibility Requirement

Under section 1129(a)(11) of the Bankruptcy Code, the Debtors must show that confirmation of the Plan is not likely to be followed by the liquidation, or the need for further financial reorganization, of the Debtors or any successor to the Debtors (unless such liquidation or reorganization is proposed in the Plan).  The Plan complies with this requirement because all of the Debtors' remaining assets will be distributed to creditors pursuant to the terms of the Plan and, provided the Plan is confirmed and consummated, the estates will no longer exist to be subject to future reorganization or liquidation.

### E.     Alternatives to the Plan

The Debtors believe that the Plan is the best alternative available to the Debtors' creditors, providing such creditors with the earliest and greatest possible values that can be realized on their respective Claims.  The alternatives to confirmation are: (i) confirmation of an alternative plan or plans of liquidation; or (ii) liquidation of the Debtors' assets under chapter 7 of the Bankruptcy Code.

#### 1.     Alternative Plans

As the Debtors structured the Plan to maximize values, any alternative plan likely would result in reduced distributions to certain creditors.  In addition, due to the time required to negotiate, draft and obtain approval of an alternative plan, alternatives to the Plan would lead to delayed distributions to creditors.

#### 2.     Liquidation

The Debtors believe that the value of distributions under the Plan will equal or exceed the value of distributions that would be available after liquidation of the Debtors under chapter 7 of the Bankruptcy Code.  A liquidation under chapter 7 would require the Bankruptcy Court to appoint a trustee to conduct the liquidation of the Debtors.  Such a trustee would have limited historical experience or knowledge of these chapter 11 cases or of the Debtors' records, assets or businesses.  The fees charged by a chapter 7 trustee and any professionals hired by the chapter 7 trustee could impose substantial administrative costs on the Debtors' estates that would not be incurred under the Plan.   Further, there is no assurance as to when distributions would occur in a chapter 7 liquidation.

Thus, the Debtors believe that confirmation of the Plan is preferable to the alternatives because the Plan should maximize value, ensure an expeditious resolution of these chapter 11 cases and provide for equitable distributions to the Debtors' creditors.

## ARTICLE VI.

## CONCLUSION

THE DEBTORS AND THE ET COMMITTEE URGE ALL HOLDERS OF CLAIMS IN CLASSES 1, 3, 4, 5, 6, and 7 TO VOTE TO ACCEPT THE PLAN BY RETURNING THEIR BALLOTS SO THAT THEY ARE <u>RECEIVED</u> BY NEGT BALLOTING CENTER, c/o BANKRUPTCY SERVICES LLC, 757 THIRD AVENUE, NEW YORK, NEW YORK 10017, BY 4:00 P.M. (EASTERN DAYLIGHT TIME) ON APRIL 5, 2005.

Respectfully submitted,

NEGT Energy Trading Holdings Corporation

By: _R. W. Barron_____
    President

NEGT Energy Trading - Gas Corporation

By: _R. W. Barron_____
    President

NEGT Energy Trading – Power, L.P.

By: NEGT Energy Trading Holdings Corporation,
    its sole general partner

By: _R. W. Barron_____
    President

NEGT ET Investments Corporation

By: _R. W. Barron_____
    President

Quantum Ventures

By: _____
    President

Energy Services Ventures, Inc.

By: _____
    President

-56-

Respectfully submitted,

NEGT Energy Trading Holdings Corporation

By: _____
   President

NEGT Energy Trading - Gas Corporation

By: _____
   President

NEGT Energy Trading – Power, L.P.

By:  NEGT Energy Trading Holdings Corporation,
     its sole general partner

By: _____
   President

NEGT ET Investments Corporation

By: _____
   President

Quantum Ventures

By: *P. Chapman Hube*
   President

Energy Services Ventures, Inc.

By: *P. Chapman Hube*
   President

# **Appendix 1**

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)**

| | |
|---|---|
| **In re:** | * |
| | |
| **NATIONAL ENERGY & GAS** | *   Case No.: 03-30459 (PM) and 03-30461 (PM) |
| **TRANSMISSION, INC. (f/k/a PG&E** | through 03-30464 (PM) and 03-30686 (PM) |
| **NATIONAL ENERGY GROUP, INC.),** *et al.* | *   through 03-30687 (PM) |
| | Chapter 11 |
| **Debtors.** | (Jointly Administered under |
| | *   Case No.: 03-30459 (PM)) |

\*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*       \*

**FIRST AMENDED PLAN OF LIQUIDATION FOR THE
ET DEBTORS AND THE QUANTUM DEBTORS**[*]

**Dated:  March 3, 2005**

WILLKIE FARR & GALLAGHER LLP
787 Seventh Avenue
New York, New York  10019-6099
(212) 728-8000

-and-

WHITEFORD, TAYLOR & PRESTON L.L.P
Seven Saint Paul Street, Suite 1400
Baltimore, Maryland 21202
(410) 347-8700

Attorneys for the Debtors and Debtors-in-Possession

---

[*]   The Energy Trading Debtors consist of: NEGT Energy Trading Holdings Corporation f/k/a PG&E Energy Trading Holdings Corporation; NEGT Energy Trading - Gas Corporation f/k/a PG&E Energy Trading - Gas Corporation; NEGT ET Investments Corporation f/k/a PG&E ET Investments Corporation; and NEGT Energy Trading - Power, L.P. f/k/a PG&E Energy Trading - Power, L.P.  The Quantum Debtors consist of: Quantum Ventures; and Energy Services Ventures, Inc. f/k/a PG&E Energy Services Ventures, Inc.

**IN THE UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)**

| | |
|---|---|
| In re: | * |
| | |
| **NATIONAL ENERGY & GAS** | *   Case No.: 03-30459 (PM) and 03-30461 (PM) |
| **TRANSMISSION, INC. (f/k/a PG&E** | through 03-30464 (PM) and 03-30686 (PM) |
| **NATIONAL ENERGY GROUP, INC.),** *et* | *   through 03-30687 (PM) |
| *al.* | Chapter 11 |
| | |
| **Debtors.** | (Jointly Administered under |
| | *   Case No.: 03-30459 (PM)) |

\*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*   \*

## FIRST AMENDED PLAN OF LIQUIDATION FOR THE ENERGY TRADING DEBTORS AND THE QUANTUM DEBTORS[1]

NEGT Energy Trading Holdings Corporation ("ET Holdings"), NEGT Energy

Trading - Gas Corporation ("ET Gas"), NEGT ET Investments Corporation ("ET Investments"),

NEGT Energy Trading - Power, L.P. ("ET Power"), Quantum Ventures ("Quantum") and

Energy Services Ventures, Inc. ("ESV") hereby jointly propose the following First Amended

Plan of Liquidation pursuant to section 1121(a), title 11, United States Code:

ARTICLE I

DEFINITIONS

1.1    "*Administrative Claim Bar Date*" means the date fixed pursuant to section 2.2 of

the Plan by which all Entities asserting Administrative Claims arising in the period from July 8,

2003 through the Confirmation Date, inclusive, must have filed proofs of such Administrative

---

[1]    The ET Debtors consist of: NEGT Energy Trading Holdings Corporation f/k/a PG&E Energy Trading Holdings Corporation; NEGT Energy Trading - Gas Corporation f/k/a PG&E Energy Trading - Gas Corporation; NEGT ET Investments Corporation f/k/a PG&E ET Investments Corporation; and NEGT Energy Trading - Power, L.P. f/k/a PG&E Energy Trading - Power, L.P.  The Quantum Debtors consist of: Quantum Ventures; and Energy Services Ventures, Inc. f/k/a PG&E Energy Services Ventures, Inc.

Claims or requests for payment of such Administrative Claims or be forever barred from asserting such Administrative Claims against the Debtors, the Liquidating Debtors or their property, or such other date by which any such Administrative Claim must be filed as may be fixed by order of the Bankruptcy Court.

      1.2     *"Administrative Claim"* means a Claim for payment of costs or expenses of administration specified in sections 503(b) and 507(a)(1) of the Bankruptcy Code, other than a Fee Claim.

      1.3     *"Affiliate"* means "affiliate" as defined in section 101(2) of the Bankruptcy Code.

      1.4     *"Allocated Affiliate Share"* means: (a) for Administrative Claims, Fee Claims, Priority Claims, or Priority Tax Claims with respect to which a particular Debtor is the sole primary obligor, the amount of such Claims; (b) for Administrative Claims, Fee Claims, Priority Claims, or Priority Tax Claims with respect to which multiple Debtors are primary obligors, an amount equal to, for each such Claim, the quotient of: (i) the amount of such Claims; *divided by* (ii) the number of Debtors primarily liable for such Claims; (c) with respect to the cost of administering the Liquidating Debtors, including, without limitation, fees and expenses of the Plan Administrator, the members of the Boards of Directors and, if any, the Third-Party Expert: (i) 25% of the amount of such fees and expenses for ET Holdings, ET Power and ET Gas; and (ii) 12.5% of the amount of such fees and expenses for ET Investments and ESV; and (d) with respect to each Secured Claim, a percentage equal to the quotient of: (i) the aggregate value of all collateral securing such Secured Claim; *divided by* (ii) the value of the applicable Debtor's interest in any such collateral.  With respect to subsection (c) hereof, in the event that any Debtor does not pay its Allocated Affiliate Share, the remaining Debtors will be jointly and severally liable to satisfy such obligation.  With respect to subsection (b) hereof, in the event that any

Debtor primarily liable does not pay its Allocated Affiliated Share, the other Debtors primarily liable will be jointly and severally liable to satisfy such obligation.

1.5     *"Allowed"* means a Claim: (a) either (i) proof of which has been timely filed with the Bankruptcy Court or has been deemed timely filed by a Final Order; or (ii) if not so filed, scheduled by the Debtors other than as disputed, contingent or unliquidated; and (b) allowed by a Final Order, by this Plan, or because no party in interest timely has filed an objection, filed a motion to equitably subordinate, or otherwise sought to limit recovery on such Claim.  An Allowed Claim shall not include interest accruing after the Petition Date on the amount of any Claim except as expressly provided herein.

1.6     *"Allowed [Class Designation/Type] Claim/Interest"* means a Claim that is Allowed in a specified class or of a specified type.

1.7     *"Available Cash"* means, collectively: (a) Class 3 Available Cash; (b) Class 4 Available Cash; (c) Class 5 Available Cash; (d) Class 6 Available Cash; and (e) Class 7 Available Cash.

1.8     *"Avoidance Actions"* means any actions or proceedings that may be instituted for the recovery of property pursuant to chapter 5 of the Bankruptcy Code (*e.g.*, 11 U.S.C. §§ 542, 544, 547, 548, 549, 550 or 553) or applicable state law, with respect to which the Debtors file a schedule of potential defendants with the Bankruptcy Court, no later than twenty (20) days before the commencement of the Confirmation Hearing.

1.9     *"Bankruptcy Code"* means title 11 of the United States Code (11 U.S.C. §§ 101 *et seq.*), as amended from time to time, as applicable to the Chapter 11 Cases.

1.10    "*Bankruptcy Court*" means the United States Bankruptcy Court for the District of Maryland (Greenbelt Division) or any other court or adjunct thereof exercising competent jurisdiction.

1.11    "*Bankruptcy Rules*" means the Federal Rules of Bankruptcy Procedure (Fed. R. Bankr. Proc. 1001 *et seq.*), as promulgated by the United States Supreme Court under section 2075 of title 28 of the United States Code, as amended from time to time, and as applicable to these cases, and any Local Rules of the Bankruptcy Court, as in effect on the Petition Date and as amended after the Petition Date and as applicable to the Chapter 11 Cases.

1.12    "*Boards of Directors*" means, collectively, the boards of directors, as of the Effective Date, for: (i) ET Holdings (which board shall also act with the authority of the general partner of ET Power); (ii) ET Gas; (iii) ET Investments; and (iv) ESV.

1.13    "*Business Day*" means any day other than Saturday, Sunday or "legal holiday" as such term is defined in Bankruptcy Rule 9006(a).

1.14    "*Cash*" means cash and cash equivalents, including but not limited to bank deposits, checks, and other similar items.

1.15    "*Chapter 11 Cases*" means these jointly administered cases under chapter 11 of the Bankruptcy Code concerning the ET Debtors, the Quantum Debtors and National Energy & Gas Transmission, Inc., jointly administered under Case No. 03-30459 (PM).

1.16    "*Claim*" means a claim against any Debtor, as such term is defined in 101(5) of the Bankruptcy Code.

1.17    "*Claims Estimation Order*" means one or more orders (which may include the Confirmation Order) entered by the Bankruptcy Court that: (a) establishes any reserves necessary

to allow for distributions under the Plan; and/or (b) sets the amount of any particular Claim for final allowance purposes pursuant to sections 105 and 502(c) of the Bankruptcy Code.

1.18    "*Class*" means a category of Claims or Interests as provided for in Article III of the Plan.

1.19    "*Class [ ] Available Cash*" means, as of any given Distribution Date, all Cash in possession of ET Holdings, ET Power, ET Gas, ET Investments, or ESV, as applicable, net of any Cash necessary to: (a) pay its Allocated Affiliate Share of fees and expenses of the members of the Boards of Directors and the Plan Administrator; (b) pay its Allocated Affiliate Share of the expenses associated with the liquidation of the Liquidating Debtors; (c) establish, supplement, or maintain, appropriate reserves in connection with the foregoing; and (d) fund its Allocated Affiliate Share of Distributions to holders of Administrative Claims, Fee Claims, Secured Claims, Priority Claims, and Priority Tax Claims (or, in the case of those of such Claims that are Disputed Claims, to establish appropriate reserves).

1.20    "*Class [ ] Claim*" means a Claim that is in a specified class.

1.21    "*Committee Director*" means the individual appointed by the ET Committee to serve on the Boards of Directors.

1.22    "*Confirmation Date*" means the date the Bankruptcy Court enters an order confirming the Plan.

1.23    "*Confirmation Hearing*" means the hearing to be held by the Bankruptcy Court to consider confirmation of the Plan pursuant to section 1129 of the Bankruptcy Code.

1.24    "*Confirmation Order*" means the order to be entered by the Bankruptcy Court confirming this Plan in accordance with the provisions of the Bankruptcy Code.

1.25    *"Debtors"* means, collectively, the ET Debtors and the Quantum Debtors, and their respective estates.

1.26    *"Designated Disputed Claim"* means a Disputed Claim: (a) having a face value against the Debtors greater than $3,000,000; (b) involving any past or present employee of any of the Debtors; or (c) involving any proceedings pending before the Federal Energy Regulatory Commission or identified in the Disclosure Statement under the heading "California Actions."

1.27    *"Disclosure Statement"* means the disclosure statement relating to the Plan (including any exhibits and schedules annexed thereto or referred to therein), as may be altered, amended, supplemented, or modified from time to time, filed by the Debtors pursuant to section 1125 of the Bankruptcy Code.

1.28    *"Disputed Claim"* means any Claim that is not an Allowed Claim as of the relevant date.

1.29    *"Distribution"* means a payment made to holders of Claims pursuant to the Plan.

1.30    *"Distribution Date"* means any date that is the Initial Distribution Date, an Interim Distribution Date, or the Final Distribution Date.

1.31    *"Effective Date"* means the first Business Day on which all conditions to effectiveness of the Plan, have been satisfied and on which no stay of the Confirmation Order is in effect.

1.32    *"Entity"* means "entity" as defined in section 101(15) of the Bankruptcy Code.

1.33    *"ESV"* means Energy Services Ventures, Inc.

1.34    *"ET Committee"* means the Official Committee of Unsecured Creditors of the ET Debtors, appointed on July 21, 2003, as such committee may be reconstituted from time to time.

-6-

1.35    *"ET Debtors"* means, collectively, ET Holdings, ET Gas, ET Investments, and ET Power, and their respective estates.

1.36    *"ET Director"* means the individual appointed by the stockholders of ET Holdings, ET Gas, and ET Investments to serve on the Boards of Directors.

1.37    *"ET Gas"* means NEGT Energy Trading - Gas Corporation.

1.38    *"ET Holdings"* means NEGT Energy Trading Holdings Corporation.

1.39    *"ET Investments"* means NEGT ET Investments Corporation.

1.40    *"ET Power"* means NEGT Energy Trading - Power, L.P.

1.41    *"Face Amount"* means, respecting a Claim:  (i) if the holder of such Claim has not filed a proof of claim by the applicable bar date and there is no Final Order fixing the allowed amount of such Claim, the amount of such Claim that is listed in the Schedules as undisputed, noncontingent and liquidated or, if no amount is listed, zero ($0) dollars; (ii) if the holder of such Claim has filed a proof of claim by the applicable bar date, the liquidated amount as stated in such proof of claim, or, if no liquidated amount is listed, then zero ($0) dollars unless such amount is allowed or estimated by order of the Bankruptcy Court; (iii) an amount fixed or estimated by order of the Bankruptcy Court; or (iv) in all other cases, zero ($0) dollars.

1.42    *"Federal Judgment Rate"* means the interest rate specified by section 1961 of title 28 of the United States Code as being applicable to civil judgments entered on the Petition Date.

1.43    *"Fee Claim"* means any Claim against the Debtors of a professional person employed under section 327 or 1103 of the Bankruptcy Code or of an indenture trustee seeking compensation, indemnification or reimbursement of expenses by the Bankruptcy Court in accordance with sections 328, 330 and/or 331 of the Bankruptcy Code, and/or which is entitled

to the priority pursuant to section 503(b)(2), 503(b)(3)(F), 503(b)(4) or 503(b)(5) of the Bankruptcy Code.

1.44   "*Final Distribution*" means the distribution to be made by the Plan Administrator after all of the Liquidating Debtors' assets have been reduced to Cash, abandoned or otherwise disposed of, and the Liquidating Debtors resolved all Disputed Claims and paid all Fee Claims approved by the Bankruptcy Court.

1.45   "*Final Distribution Date*" means the date upon which the Final Distribution occurs.

1.46   "*Final Order*" means an order, ruling or judgment, as entered by the Bankruptcy Court: (i) that has not been reversed, modified or amended, is not stayed; (ii) as to which the time to appeal from or to seek review or rehearing or petition for certiorari has expired; and (iii) that is no longer subject to review, reversal, modification or amendment; *provided, however*, that the possibility that a motion under Rule 60 of the Federal Rules of Civil Procedure, or any analogous rule under the Federal Rules, may be filed relating to such order or judgment shall not cause such order or judgment not to be a "Final Order."

1.47   "*General Unsecured Claim*" means any Claim against any of the Debtors, other than a Secured Claim, an Administrative Claim, a Fee Claim, a Priority Claim, a Priority Tax Claim, or a Subordinated Claim.

1.48   "*Impaired*" means any Claim or Interest that is impaired within the meaning of section 1124 of the Bankruptcy Code.

1.49   "*Initial Distribution Date*" means the date of the first distribution by the Plan Administrator or its designee to the holders of Allowed General Unsecured Claims which shall

take place no later than forty-five (45) days after the Effective Date or such later date as may be established by the Bankruptcy Court.

1.50    "*Interest*" means any ownership interest or right to acquire any ownership interest in any of the Debtors or any other equity security (as defined in the Bankruptcy Code) in any of the Debtors.

1.51    "*Interim Distribution Date*" means any date after the Initial Distribution Date on which the Plan Administrator determines that an interim distribution should be made to holders of Allowed General Unsecured Claims in light of, *inter alia*, resolutions of Disputed Claims, aggregate Avoidance Action recoveries, and the administrative costs of such a distribution.

1.52    "*Liquidating Debtors*" means the Debtors and their estates from and after the Effective Date.

1.53    "*NEGT*" means National Energy & Gas Transmission, Inc., a debtor in the Chapter 11 Cases.

1.54    "*Pendency Interest*" means interest accruing as of the Petition Date and prior to the Effective Date.

1.55    "*Petition Date*" means: (a) July 8, 2003 for the ET Debtors; and (b) July 29, 2003 for the Quantum Debtors.

1.56    "*Plan*" means this plan under chapter 11 of the Bankruptcy Code (including all exhibits and schedules annexed hereto), as the same may be altered, amended, or modified from time to time (after the Confirmation Date, such amendments or modifications being effective only if approved by order of the Bankruptcy Court).

1.57    "*Plan Administrator*" means the responsible officer, acting in his or her capacity as such, retained by the respective Liquidating Debtors to serve as the sole officer of each of the

Liquidating Debtors who shall, among other things, implement the Plan pursuant to its terms and the terms of the Confirmation Order.

1.58    *"Plan Administrator Agreement"* means the agreement between the Plan Administrator and the Debtors setting forth the terms of the Plan Administrator's employment.

1.59    *"Plan Supplement"* means the supplemental appendix to the Plan, filed prior to the Confirmation Hearing that may contain, among other things, the Plan Administrator Agreement, and the amended Charters and By-Laws for the Liquidating Debtors.

1.60    *"Priority Claim"* means any Claim to the extent entitled to priority in payment pursuant to section 507(a) of the Bankruptcy Code, other than an Administrative Claim, a Fee Claim, or a Priority Tax Claim.

1.61    *"Priority Tax Claim"* means any unsecured Claim, to the extent entitled to priority in payment under section 507(a)(8) of the Bankruptcy Code.

1.62    *"Pro Rata*" means:  (a) with respect to an Allowed Claim in all Classes other than Class 5, the same proportion that such Allowed Claim bears to: (i) the aggregate amount of Allowed Claims in the same Class as such Allowed Claim; plus (ii) the aggregate Face Amount of all Disputed Claims of such same Class (or amount to be used for these purposes as established by the Claims Estimation Order ), as reduced from time to time as and to the extent that such Disputed Claims become Allowed Claims or are disallowed or expunged; and (b) with respect to an Allowed Claim in Class 5, the same proportion that such Allowed Claim bears to: (i) the aggregate amount of Allowed Claims in Class 5 and Class 6 less the sum of $175,458,921; plus (ii) the aggregate Face Amount of all Disputed Claims of such Classes (or amount to be used for these purposes as established by the Claims Estimation Order ), as reduced from time to

time as and to the extent that such Disputed Claims become Allowed Claims or are disallowed or expunged.

1.63     *"Quantum Debtors"* means Quantum Ventures and Energy Services Ventures, Inc. and their respective estates.

1.64     *"Remaining Available Class 5 Cash"* means, at any given Distribution Date, the amount of Class 5 Available Cash that remains after all Pro Rata Distributions are paid to or reserved for Class 5 creditors.

1.65     *"Reporting Period"* has the meaning ascribed to it in section 8.11 of the Plan.

1.66     *"Schedules"* means the schedules, as amended from time to time, of assets and liabilities filed by the Debtors with the Bankruptcy Court in accordance with sections 521 and 1106(a)(2) of the Bankruptcy Code.

1.67     *"Secured Claim"* means any Claim, or portion thereof, against any of the Debtors to the extent such Claim is secured within the meaning of section 506(a) or 1111(b) of the Bankruptcy Code.

1.68     *"Subordinated Claim"* means a Claim asserted against any of the Debtors subject to subordination pursuant to section 510 of the Bankruptcy Code.

1.69     *"Third-Party Expert"* means an independent (as defined in Rule 10A-3(b)(1)(ii) of the Securities Exchange Act of 1934, as amended) third party selected by the applicable Board of Directors to resolve a deadlock between the members of such Board of Directors.

## ARTICLE II

## UNIMPAIRED AND UNCLASSIFIED CLAIMS

2.1     *Administrative Claims.*  Administrative Claims are unclassified under the Plan. Each holder of an Allowed Administrative Claim shall receive: (i) to the extent not already paid, Cash on the later of the Effective Date and the first Business Day after the date that is thirty (30)

calendar days after the date on which such Administrative Claim becomes an Allowed

Administrative Claim in the full amount of such Allowed Administrative Claim; (ii) to the extent

not yet due and payable, payment in accordance with the terms and conditions of the particular

transaction giving rise to the Administrative Claim; (iii) to the extent such Claims are

Administrative Claims of the United States Trustee for fees pursuant to 28 U.S.C. § 1930(a)(6),

Cash in accordance with the applicable schedule for payment of such fees; or (iv) treatment on

such other terms as may be mutually agreed upon in writing between the holder of such Allowed

Administrative Claim and the relevant Debtor, prior to the Effective Date, or the Plan

Administrator, on or after the Effective Date; *provided, however*, that interim and/or final

payment of Allowed Administrative Claims approved by the Bankruptcy Court shall be paid at

the time of and in accordance with such Bankruptcy Court approval.

2.2    *Administrative Claim Bar Date*.  ADMINISTRATIVE CLAIM REQUESTS

RESPECTING ADMINISTRATIVE CLAIMS THAT HAVE ARISEN OR WILL ARISE IN

THE PERIOD FROM THE PETITION DATE THROUGH THE CONFIRMATION DATE,

INCLUSIVE, MUST BE FILED AND SERVED PURSUANT TO THE PROCEDURES SET

FORTH IN THE CONFIRMATION ORDER AND/OR NOTICE OF ENTRY OF

CONFIRMATION ORDER, NO LATER THAN FORTY FIVE (45) DAYS AFTER THE

CONFIRMATION DATE (unless an earlier date is set by the Bankruptcy Court).

Notwithstanding anything to the contrary herein, no Administrative Claim request need be filed

for the allowance of any: (a) Fee Claims; or (b) fees of the United States Trustee arising under 28

U.S.C. § 1930.  Any Entities that are required to but fail to file such an Administrative Claim

request on or before the deadline referenced above shall be forever barred from asserting such

Claim against any of the Debtors, the Liquidating Debtors, or any of their respective property,

officers, or directors, and the holder thereof shall be enjoined from commencing or continuing

any action, employment of process or act to collect, offset or recover such Administrative Claim.

2.3     *Fee Claims*.  Fee Claims are unclassified under the Plan.  Each holder of an

Allowed Fee Claim shall receive, in Cash, to the extent not already paid, the amounts allowed by

the Bankruptcy Court: (a) on or as soon as practicable following the date upon which the

Bankruptcy Court order allowing such Allowed Fee Claim is issued; or (b) upon such other

terms as may be mutually agreed upon between the holder of such Allowed Fee Claim on one

hand, and the relevant Debtors on the other hand.  Any and all parties requesting allowance

and/or payment of a Fee Claim for any period ending on or before the Effective Date must file

and serve final applications therefor no later than forty-five (45) days after the Effective Date.

2.4     *Priority Tax Claims*.  Priority Tax Claims are unclassified under the Plan.  On the

later of the Effective Date or as soon as reasonably practicable thereafter and thirty (30) Business

Days after the date on which a Priority Tax Claim becomes an Allowed Claim, such Claim shall

be paid in full, in Cash; *provided, however*, that each Debtor shall have the option, exercisable

upon written notice to the relevant Priority Tax Claim holder sent prior to the Effective Date, to

pay any Priority Tax Claim over a period not longer than six (6) years from the date of

assessment of the applicable tax, with interest on the unpaid portion payable annually in arrears

at the rate of interest ordered by the Bankruptcy Court (or agreed to by the holder of the Claim

and the relevant Debtor).

## ARTICLE III

## CLASSIFICATION OF CLAIMS AND INTERESTS

For purposes of the Plan, Claims are classified as follows:

3.1     *Class 1 Claims*.  Class 1 contains all Secured Claims, with each such Claim

secured by different collateral to be a separate subclass for all purposes under the Plan.

-13-

3.2      *Class 2 Claims.*  Class 2 contains all Priority Claims.

3.3      *Class 3 Claims.*  Class 3 contains all General Unsecured Claims against ET Gas.

3.4      *Class 4 Claims.*  Class 4 contains all General Unsecured Claims against ET Investments.

3.5      *Class 5 Claims.*  Class 5 contains all General Unsecured Claims against ET Holdings.

3.6      *Class 6 Claims.*  Class 6 contains all General Unsecured Claims against ET Power.

3.7      *Class 7 Claims.*  Class 7 contains all General Unsecured Claims against ESV.

3.8      *Class 8 Claims.*  Class 8 contains all General Unsecured Claims against Quantum.

3.9      *Class 9 Claims.*  Class 9 contains all Subordinated Claims.

3.10      *Class 10  Interests.*  Class 10 contains all Interests in ET Gas.

3.11      *Class 11 Interests.*  Class 11 contains all Interests in ET Investments.

3.12      *Class 12 Interests.*  Class 12 contains all Interests in ET Holdings, ET Power, ESV and Quantum.

3.13      *Elimination of Classes for Voting Purposes.*  Any Class of Claims that is not occupied as of the date of the commencement of the Confirmation Hearing by an Allowed Claim or a Claim temporarily Allowed under Rule 3018 of the Bankruptcy Rules or as to which no vote is cast shall be deemed deleted from the Plan for purpose of voting on acceptance or rejection of the Plan by any such Class under section 1129(a)(8) of the Bankruptcy Code.

ARTICLE IV

TREATMENT OF CLASSES OF CLAIMS OR INTERESTS

4.1      *Class 1 - Secured Claims.*  Class 1 is Impaired.  Each Claim in Class 1 shall be treated as a separate subclass for voting and distribution purposes under the Plan.

-14-

(a)     *Election of Alternative Treatments.*  At the election of the Debtors or the Plan Administrator, as applicable, on or before the later of the Effective Date or as soon as reasonably practicable thereafter and thirty (30) Business Days after the date on which a Class 1 Claim becomes an Allowed Claim, such Claim shall be satisfied in full by either:

       (i)     reinstating the Claim, that is, leaving unaltered the legal, equitable, and contractual rights respecting such Claim in accordance with section 1124 of the Bankruptcy Code, including:  (A) curing all pre- and postpetition defaults other than defaults relating to the insolvency or financial condition of the Debtors or its status as a debtor under the Bankruptcy Code; and (B) reinstating the maturity date of the Claim;

       (ii)    paying such Claim in full, in Cash, in an amount equal to such Allowed Class 1 Claim on the Effective Date or as soon as reasonably practicable thereafter; or

       (iii)   transferring title to the property securing such Allowed Class 1 Claim to the holder of such Claim.  Within thirty (30) days after mailing by the Plan Administrator of notice of the election of this option (iii), the holder of an Allowed Class 1 Claim shall be entitled to amend in writing or file a proof of claim for any unsecured deficiency Claim respecting such Claim (to the extent such holder has recourse to a Debtor respecting such Class 1 Claim, and provided the holder has timely filed a proof of claim respecting such Class 1 Claim or whose Class 1 Claim was listed in the Schedules as nondisputed, noncontingent, and liquidated).  To the extent, if any, allowed, such deficiency claim shall be treated in Class 3, Class 4 and Class 5, as appropriate.

4.2     *Class 2 - Priority Claims.*  Class 2 is not Impaired.  On the later of the Effective Date or as soon as reasonably practicable thereafter and thirty (30) Business Days after the date on which a Class 2 Claim becomes an Allowed Class 2 Claim, such Claim shall be paid in full, in Cash.

4.3     *Class 3 - General Unsecured Claims against ET Gas.*  Class 3 shall be treated as Impaired under the Plan and, accordingly, will be given the right to vote on the Plan.  On the later of the Effective Date or as soon as reasonably practicable thereafter and thirty (30) Business Days after the date on which a Class 3 Claim becomes an Allowed Class 3 Claim, in full

settlement, satisfaction, and payment of all Allowed Class 3 Claims, each holder of an Allowed

Class 3 Claim shall receive Cash in an amount equal to one hundred (100) percent of its Allowed

Class 3 Claim plus Pendency Interest at the Federal Judgment Rate.  In the event that Class 3

votes to reject the Plan, the Debtors reserve their right to contend that such class is Unimpaired

and, accordingly, should be deemed to have accepted the Plan.

      4.4    *Class 4 - General Unsecured Claims against ET Investments*.  Class 4 shall be

treated as Impaired under the Plan and, accordingly, will be given the right to vote on the Plan.

On the later of the Effective Date or as soon as reasonably practicable thereafter and thirty (30)

Business Days after the date on which a Class 4 Claim becomes an Allowed Class 4 Claim, in

full settlement, satisfaction, and payment of all Allowed Class 4 Claims, each holder of an

Allowed Class 4 Claim shall receive Cash in an amount equal to one hundred (100) percent of its

Allowed Class 4 Claim plus Pendency Interest at the Federal Judgment Rate.  In the event that

Class 4 votes to reject the Plan, the Debtors reserve their right to contend that such class is

Unimpaired and, accordingly, should be deemed to have accepted the Plan.

      4.5    *Class 5 - General Unsecured Claims against ET Holdings.*  Class 5 is Impaired

and is entitled to vote on the Plan.  On the later of each Distribution Date or as soon as

reasonably practicable thereafter and thirty (30) Business Days after the date on which a Class 5

Claim becomes an Allowed Class 5 Claim, in full settlement, satisfaction, and payment of all

Allowed Class 5 Claims, each holder of an Allowed Class 5 Claim shall receive its Pro Rata

share of Class 5 Available Cash; *provided, however,* that if and to the extent that any Class 5

Claim is based upon ET Holdings's status as a general partner of ET Power, or on account of any

Claims arising from guaranties by ET Holdings of obligations of ET Power, then the Distribution

to be made to, or, in the case of a Disputed Claim, reserved for, the holder of such Class 5 Claim

-16-

shall be reduced by the amount of any Remaining Available Class 5 Cash received by, or, in the case of a Disputed Claim, reserved for, such holder (or its assigns) on account of its corresponding Allowed Class 6 Claim.

4.6     *Class 6 - General Unsecured Claims against ET Power.*  Class 6 is Impaired and is entitled to vote on the Plan.  On the later of each Distribution Date or as soon as reasonably practicable thereafter and thirty (30) Business Days after the date on which a Class 6 Claim becomes an Allowed Class 6 Claim, in full settlement, satisfaction, and payment of all Allowed Class 6 Claims, each holder of an Allowed Class 6 Claim shall receive its Pro Rata share of Class 6 Available Cash, as well as its corresponding ratable share of the Remaining Available Class 5 Cash.

4.7     *Class 7 - General Unsecured Claims against ESV.*  Class 7 is Impaired and is entitled to vote on the Plan.  On the later of each Distribution Date or as soon as reasonably practicable thereafter and thirty (30) Business Days after the date on which a Class 7 Claim becomes an Allowed Class 7 Claim, in full settlement, satisfaction, and payment of all Allowed Class 7 Claims, each holder of an Allowed Class 7 Claim shall receive its Pro Rata share of Class 7 Available Cash.

4.8     *Class 8 - General Unsecured Claims against Quantum.*  Class 8 shall receive no distributions under the Plan.  Class 8 is deemed to have rejected the Plan.

4.9     *Class 9 - Subordinated Claims.*  Class 9 is Impaired.  Class 9 Claims shall receive no distributions under the Plan.  Class 9 is deemed to have rejected the Plan.

4.10    *Class 10 - Interests in ET Gas.*  Class 10 is Impaired.  Holders of Interests in ET Gas shall receive all Class 3 Available Cash remaining after all Class 3 Allowed Claims have been paid in accordance with the Plan and all Disputed Claims in Class 3 have been reserved for.

-17-

Such Interests shall be retained until the dissolution of the respective Liquidating Debtors in accordance with the terms of the Plan, upon which dissolution the respective Interests shall be deemed canceled.

4.11     *Class 11 - Interests in ET Investments.*  Class 11 is Impaired.  Holders of Interests in ET Investments shall receive all Class 4 Available Cash remaining after all Class 4 Allowed Claims have been paid in accordance with the Plan and all Disputed Claims in Class 4 have been reserved for.  Such Interests shall be retained until the dissolution of the respective Liquidating Debtors in accordance with the terms of the Plan, upon which dissolution the respective Interests shall be deemed canceled.

4.12     *Class 12 - Other Interests.*  Class 12 is Impaired.  Subject to section 8.5 hereof, holders of Interests in ET Holdings, ET Power, ESV, and Quantum are not entitled to, and shall not receive, a Distribution on account of such Interests pursuant to the Plan.  Such Interests shall be retained until the dissolution of the respective Liquidating Debtors in accordance with the terms of the Plan, upon which dissolution the respective Interests shall be deemed canceled.


ARTICLE V

PROVISIONS FOR TREATMENT OF DISPUTED CLAIMS

5.1     *Prosecution of Disputed Claims.*  On and after the Effective Date, only the Liquidating Debtors shall have the right to object to Claims including, without limitation, those Claims that are not listed in the Schedules, are listed therein as disputed, contingent or unliquidated in amount, or are listed therein at a different amount than asserted in the proof of claim.  Subject to further extension by the Bankruptcy Court, the Liquidating Debtors shall file objections to the allowance of Claims on or before one hundred and twenty (120) days after the Effective Date (or such later deadline as the Bankruptcy Court may establish).  The respective

Liquidating Debtors may, at any time, request that the Bankruptcy Court estimate any contingent

or unliquidated Claim pursuant to section 105 and/or 502(c) of the Bankruptcy Code, regardless

of whether the Debtors previously objected to such Claim or whether the Bankruptcy Court has

ruled on any such objection.  The Bankruptcy Court shall retain jurisdiction to estimate any such

contingent or unliquidated Claim at any time during litigation concerning any objection to any

Claim, including during the pendency of any appeal relating to any such objection.  In the event

that the Bankruptcy Court estimates any contingent or unliquidated Claim, that estimated amount

shall constitute either the amount of such Claim or a maximum limitation on the amount of such

Claim, as determined by the Bankruptcy Court, to the extent permissible under the Bankruptcy

Code.  If the estimated amount constitutes a maximum limitation on the amount of such Claim,

the Liquidating Debtors may elect to pursue any supplemental proceedings to object to any

ultimate payment or distribution on such Claim.

      5.2     *Distribution on Disputed Claims*.  No partial payments and no partial distributions

shall be made with respect to a Disputed Claim until such Disputed Claim becomes an Allowed

Claim.  In the event, and to the extent, a Disputed Claim becomes an Allowed Claim after the

Effective Date, the holder of such Allowed Claim shall receive all payments and/or distributions

to which such holder is then entitled under the Plan.

      5.3     *Reserve for Disputed Claims*.  With respect to Claims to be paid by the Plan, the

Plan Administrator shall hold in reserve, for the benefit of each holder of a Disputed Claim, Cash

in an amount required by order of the Bankruptcy Court (including, without limitation, any

Claims Estimation Order) or, in the absence of such order, Cash equal to the distributions which

would have been made to the holder of such Disputed Claim, if it were an Allowed Claim in the

liquidated amount, if any, asserted on the Effective Date.  If and to the extent that a Disputed

Claim becomes an Allowed Claim, on the first Distribution Date that is at least thirty (30)

Business Days after such allowance, the Plan Administrator shall distribute to the holder thereof

the amount of Cash to which such holder is entitled under the provisions of this Plan.  If a

Disputed Claim is disallowed, in whole or in part, pursuant to a Final Order, on the first

Distribution Date that is at least thirty (30) Business Days after such disallowance, the Plan

Administrator shall: (a) first, reallocate Cash that had been reserved on account of such

disallowed Disputed Claim to the holders of then Allowed and Disputed Claims in such Class

(or, in the case of ET Gas and ET Investments, to the holders of Interests in such Debtor); and

(b) second, distribute to each holder of an Allowed Claim in such Class and allocate to the

reserves established for remaining Disputed Claims in such Class, Pro Rata, the Cash that has

been so reallocated to such Class in accordance with clause (a) of this section (or, in the case of

ET Gas and ET Investments, distribute such Cash to the holders of Interests in ET Gas or ET

Investments, as applicable).

     5.4   *Delivery of Distributions*.  Subject to Bankruptcy Rule 9010, all distributions to

any holder of an Allowed Claim shall be made at the address set forth on the Schedules filed

with the Bankruptcy Court or on the books and records of the Liquidating Debtors or their

agents, unless the Debtors or the Plan Administrator, as applicable, have been notified in writing

of a change of address, including, without limitation, by the filing of a proof of claim or

Administrative Claim request that contains an address for a holder of a Claim different from the

address reflected on such Schedule(s) for such holder.

ARTICLE VI

EXECUTORY CONTRACTS AND UNEXPIRED LEASES

6.1     *Rejection*.

(a)     *Leases and Contracts to be Rejected*.  On the Confirmation Date, but subject to the occurrence of the Effective Date, the Debtors, pursuant to section 365 of the Bankruptcy Code, shall reject all of their executory contracts and unexpired leases except those that:  (i) are the subject of motions to assume or reject pending on the Confirmation Date; (ii) were assumed or rejected before the Confirmation Date; (iii) are listed on Schedule 6.2 annexed hereto; or (iv) become the subject of a dispute over the amount or manner of cure and for which the Debtors make a motion, at any time, to reject such contract or lease based upon the existence of such dispute; *provided, however*, that the Debtors shall not be required to assume or reject any executory contract or unexpired lease with any party that is a debtor under the Bankruptcy Code unless and until such contract or lease has been assumed or rejected by such other party.

(b)     *Effect of Post-Confirmation Rejection*.  The entry by the Bankruptcy Court on or after the Confirmation Date of an order authorizing the rejection of an executory contract or unexpired lease shall result in such rejection being a prepetition breach under sections 365(g) and 502(g) of the Bankruptcy Code.

(c)     *Deadline to File Rejection Damage Claims*.  Each Entity who is a party to a contract or lease rejected under the Plan must file with the Bankruptcy Court and serve on the Plan Administrator, not later than thirty (30) days after the Effective Date, a proof of claim for damages alleged to arise from the rejection of the applicable contract or lease or be forever barred from filing a Claim, or sharing in distributions under the Plan, related to such alleged rejection damages.

6.2     *Assumption*.

(a)     *Leases and Contracts to be Assumed*.  Annexed hereto as Schedule 6.2 is a list of the executory contracts and unexpired leases deemed to be assumed by the Debtors under the Plan as of the Confirmation Date (but subject to the occurrence of the Effective Date) pursuant to section 365 of the Bankruptcy Code, and the cure amounts necessary for such assumptions.

(b)     *Deadline to Object to Cure Amounts*.  If prior to the Confirmation Date or such other date as the Bankruptcy Court may fix, a party to such an executory contract or unexpired lease listed on Schedule 6.2 hereto fails to file with the Bankruptcy Court and serve upon the attorneys for the Debtors an objection to the applicable cure amount listed on such Schedule, then such party shall be forever barred from asserting any additional or other amounts against the Debtors respecting such cure amount.

(c)     *Method of Cure*.  At the election of the Liquidating Debtors, any monetary defaults under each executory contract and unexpired lease to be assumed under this Plan shall be satisfied pursuant to section 365(b)(1) of the Bankruptcy Code, in one of the following ways: (a) by payment of the default amount in Cash within forty-five (45) days after the Effective Date or such longer period ordered by the Bankruptcy Court; or (b) on such other terms as may be agreed to by the parties to such executory contract or unexpired lease.  If a dispute occurs regarding:  (x) the cure amount; (y) the ability of the Liquidating Debtors to provide adequate assurance of future performance under the contract or lease to be assumed; or (z) any other matter pertaining to assumption, then the cure payments required by section 365(b)(1) of the Bankruptcy Code shall be made following the entry of a Final Order resolving the dispute and approving assumption.  Notwithstanding anything herein to the contrary, the Debtors shall retain their right to reject any executory contract or unexpired lease that is subject to a dispute

concerning amounts necessary to cure any defaults, until thirty (30) days following entry of a

Final Order establishing the cure amount.

ARTICLE VII

MEANS OF IMPLEMENTATION OF THE PLAN

7.1     *Dissolution of Quantum*.  Prior to the Effective Date, Quantum shall file

appropriate certificates of dissolution with the appropriate governmental authorities under

applicable law.  Any assets of Quantum in existence as of the Effective Date shall be distributed

in accordance with the rules of absolute priority.

7.2     *Transfer of Powers*.

(a)     *Directors and Officers*.  Immediately prior to the Effective Date, the authority,

power and incumbency of the persons then acting as directors and officers of the Debtors shall be

terminated and such directors and officers shall be deemed to have resigned.

(b)     *Post-Effective Date Management of the Liquidating Debtors*.  On the Effective

Date, each of the Boards of Directors will be comprised of: (i) the ET Director; and (ii) the

Committee Director.  The ET Director and the Committee Director may be removed from office

by and in the sole and absolute discretion of the stockholders of the respective ET Debtors (in the

case of the ET Director) or the ET Committee (in the case of the Committee Director).  A

resulting vacancy shall be filled by a replacement director elected by the stockholders of the

respective ET Debtors (in the case of the ET Director) or by the ET Committee (in the case of

the Committee Director).  The stockholders of the Liquidating Debtors shall vote their shares so

as to give effect to the ET Committee's right to appoint the Committee Director.

(c)     *Quorum and Voting:*  The presence of both the ET Director and the Committee

Director shall constitute a quorum for the transaction of business and any action by any of the

Boards of Directors shall require the unanimous vote or consent of both directors.  In the event

-23-

that the ET Director and the Committee Director are unable to agree upon and approve a

particular action, they shall attempt to resolve the deadlock in the following manner: (i) the two

directors shall use all reasonable, good faith efforts to select, as expeditiously as possible, a

Third-Party Expert; and (ii) the Third-Party Expert shall, at the expense of the Liquidating

Debtors, take such time and make such efforts as are necessary and appropriate in his or her

judgment to understand the proposed action under consideration and make a recommendation in

resolution of the deadlock.  Any such recommendation shall be made in writing and shall set

forth the reasons therefor.  Each of the directors shall vote for or against the proposed action

based on such recommendation, except that: (x) the applicable Board of Directors, by the

unanimous vote or consent of the ET Director and the Committee Director, may decide against

taking the proposed action, notwithstanding such recommendation by the Third-Party Expert;

and (y) the ET Director or the Committee Director shall not be required to provide any such vote

if such director believes, after consultation with counsel, that such vote could authorize actions

not consistent with applicable law or could constitute a violation of the fiduciary duties of such

director.  In such event, the ET Director or the Committee Director, as the case may be, may

decide against authorizing the proposed action.  The Third-Party Expert shall not under any

circumstances be deemed to be a director of the Liquidating Debtors but, for purposes of

assisting in the resolution of the deadlock, shall make a recommendation that it believes to be in

the best interests of the Liquidating Debtors and appropriate for action by the applicable Board

of Directors, taking into account the provisions of the Plan and applicable law.

(d)     *Board Approval Required for Certain Transactions.*  Unless otherwise ordered by

the Bankruptcy Court, the Liquidating Debtors shall not satisfy, settle or consent to the

allowance of any Designated Disputed Claim by a creditor against a Liquidating Debtor unless

the satisfaction, settlement or allowance of such Designated Disputed Claim shall have been approved by the applicable Board of Directors.

(e)     *Charter and Bylaw Amendments*.  The charter, bylaws and/or other constituent documents and agreements of each Liquidating Debtor shall be revised as necessary and appropriate to comport with the terms of the Plan.

(f)     *Plan Administrator*.  The Plan Administrator shall at all times serve at the direction of the Boards of Directors and in accordance with the terms of the Plan.  Without limiting the foregoing, the Plan Administrator shall have the primary duties of:

(i)      negotiating settlements with creditors;

(ii)     compromising or settling all Claims;

(iii)    making all Distributions of Cash pursuant to the Plan to holders of Allowed Claims entitled to receive Cash under the Plan, subject to approval of the applicable Board of Directors;

(iv)     objecting to Claims;

(v)      investing cash in a reasonable and prudent manner;

(vi)     entering into any agreement or executing any document required by or consistent with the Plan and perform all of the Liquidating Debtors' obligations thereunder;

(vii)    purchasing or creating and carrying all insurance policies and paying all insurance premiums and costs it deems necessary or advisable;

(viii)   prosecuting Avoidance Actions;

(ix)     implementing and/or enforcing all provisions of the Plan;

(x)      converting any remaining non-cash assets into cash in a manner consistent with the Plan and applicable law;

(xi)     at a time to be determined by the Boards of Directors, causing the dissolution of the Liquidating Debtors and seeking entry of a final decree of the Bankruptcy Court closing the Chapter 11 Cases;

(xii)    advising the Boards of Directors with regard to the foregoing; and

-25-

(xiii)   taking and performing such other actions and duties as are necessary or appropriate to implement the Plan pursuant to its terms and the terms of the Confirmation Order.

7.3     *Resignation, Death or Removal of Plan Administrator.*   The Plan Administrator may resign at any time subject to the terms and conditions of the Plan Administrator Agreement. The initial Plan Administrator shall serve for the term indicated in the Plan Administrator Agreement.   The Plan Administrator may be removed from office with or without cause by the Boards of Directors, subject to the terms of the Plan Administrator Agreement.   Following completion of the initial Plan Administrator's term, or in the event of the death, resignation, or removal of the Plan Administrator that occurs prior to the dissolution of the Liquidating Debtors pursuant to the Plan, the Boards of Directors shall appoint a new Plan Administrator.   The appointment of the successor Plan Administrator (or any successor thereto) shall be subject to approval of the Bankruptcy Court, and shall be on terms and conditions to be approved by the Bankruptcy Court.   No successor Plan Administrator hereunder shall in any event have any liability or responsibility for the acts or omissions of any of his or her predecessors.

7.4     *Governance Action*.   Subject to section 7.2(c) hereof, any action under the Plan to be taken by or required of the Boards of Directors shall be authorized and approved in all respects, without any requirement of further action by the directors, shareholders, or general partners of any of the Debtors or the Liquidating Debtors.

7.5     *Effectuating Documents and Further Transactions.*   The Debtors shall be authorized to execute, deliver, file, or record such documents, contracts, instruments, releases and other agreements and take such other action as may be necessary to effectuate and further evidence the terms and conditions of the Plan.

7.6     *Notice and Hearing on Tolling Agreement Claims.*   The Bankruptcy Court shall retain jurisdiction to hear any settlement and compromise of claims based upon tolling

-26-

agreements.  Any settlement and compromise shall proceed on a "negative notice" basis and shall afford parties in interest not less than twenty (20) days opportunity to object to the proposed action.  Unless otherwise directed by the Bankruptcy Court, no hearing on such motion shall be held unless an objection is timely filed thereto.

7.7     *Retention of Causes of Action*.  Except as expressly provided herein, on the Effective Date, the Debtors' rights in respect of existing and potential Avoidance Actions shall be preserved and become property of the Liquidating Debtors.  On the Effective Date, the Liquidating Debtors shall be authorized and empowered to commence and prosecute any and all causes of action that could have been asserted by the Debtors.  **All Avoidance Actions shall survive confirmation and the commencement or prosecution of avoidance actions shall not be barred or limited by any estoppel, whether judicial, equitable, or otherwise**.

7.8     *Revesting of Assets*.  Except as otherwise provided in this Plan, on the Effective Date, all property comprising the estates of the Debtors shall vest in the Liquidating Debtors, free and clear of all claims, liens, charges, encumbrances and interests of creditors and equity security holders (except: (a) to the extent of any valid right of setoff permitted by section 553 of the Bankruptcy Code; (b) to the extent that such claims, liens, charges, encumbrances and/or interests have been reinstated; or (c) as otherwise expressly provided herein).

# ARTICLE VIII

## DISTRIBUTIONS

8.1     *Distribution of Cash by Plan Administrator*.  All distributions of Cash pursuant to the Plan shall be made by the Liquidating Debtors or a duly appointed disbursing agent to the holders of Allowed Claims entitled to receive Cash under the Plan.  All distributions of Cash under the Plan may be made either by check or by wire transfer, at the option of the Liquidating

Debtors.  Except as otherwise provided in the Plan, all distributions of Cash shall be made on the later of the Effective Date (or, in the case of Available Cash, on the Initial Distribution Date and each subsequent Distribution Date) or the Business Day which is thirty (30) days after the date upon which such Claim becomes an Allowed Claim, or as soon thereafter as practicable; *provided, however,* that on the Effective Date, ET Holdings shall make a Pro Rata Distribution to ET Gas on account of any Allowed Claims of ET Gas against ET Holdings, if and to the extent necessary to permit ET Gas to satisfy its obligations to holders of Allowed Class 3 Claims under this Plan.

8.2     *Setoffs*.  The Liquidating Debtors may, but shall not be required to, set off or recoup, in accordance with applicable law, against any Allowed Claim and the distributions to be made pursuant to the Plan on account of such Claim, claims of any nature that the Liquidating Debtors may have against the holder of such Allowed Claim; *provided, however*, that neither the failure to effect such a setoff or recoupment nor the allowance of any Claim against the Liquidating Debtors shall constitute a waiver or release by the Liquidating Debtors of any claim that the Debtors or the Liquidating Debtors may possess against such holders.

8.3     *Unclaimed Property*.  If a Distribution under the Plan remains unclaimed twelve (12) months following the date of such Distribution, then the holder of the applicable Allowed Claim shall cease to be entitled to such Distribution and such Distribution shall be retained by the relevant Liquidating Debtor and treated as Available Cash.

8.4     *Distributions on Non-Business Days*.  Any payment or Distribution due on a day other than a Business Day shall be made, without interest, on the next Business Day.

8.5     *No Distribution in Excess of Allowed Amount of Claim*.  Notwithstanding anything to the contrary herein, no holder of an Allowed Claim shall receive, respecting such

Claim, any Distribution (of a value set forth herein) in excess of the allowed amount of such

Claim, plus Pendency Interest to the extent expressly provided for herein.  If, at any point, the

Distribution of the Remaining Available Class 5 Cash to holders of Class 6 Claims would cause

a holder of a Class 6 Claim to receive more than the allowed amount of such Claim, the excess

shall be distributed ratably to holders of Class 5 Claims.  Similarly, if at any point, all Allowed

Claims have been paid in full, and all Disputed Claims have been resolved and, to the extent

allowed, paid in full, then any residual Available Cash held by the respective Debtors shall be

distributed to the applicable holders of Interests in such Debtors.  Except as expressly provided

herein, no Claim shall be allowed to the extent that it is for postpetition interest.

8.6     *Disputed Payments*.  If any dispute arises as to the identity of the holder of an

Allowed Claim entitled to receive any Distribution under the Plan, the Liquidating Debtors may

retain such Distribution until its disposition is determined by a Final Order or written agreement

among the interested parties to such dispute and withhold from such Distribution an amount

equal to the fees and costs incurred by the Liquidating Debtors in resolving such dispute.

8.7     *Preservation of Insurance*.  Nothing in this Plan shall diminish or impair the

enforceability of any policies of insurance that may cover Claims against the Debtors or any

other Entity.

8.8     *Withholding Taxes*.  Any federal or state withholding taxes or other amounts

required to be withheld under any applicable law shall be deducted and withheld from any Plan

distributions.

8.9     *De Minimis Distributions*.  No Cash payment of less than $500 shall be required

to be made to the holder of any Claim until the Final Distribution Date for the relevant class.

8.10 *No Recourse*. No claimant shall have recourse to the Plan Administrator, the Boards of Directors or the Liquidating Debtors other than for the enforcement of rights or Distributions.

8.11 *Quarterly Reports*. Not later than forty-five (45) days following: (i) the last day of the third full calendar month following the Effective Date; and (ii) the last day of every third calendar month thereafter (each of (i) and (ii), a "Reporting Period"), the Liquidating Debtors shall file a report with the Bankruptcy Court that separately discloses, for the applicable Reporting Period: (a) compensation paid to the Plan Administrator; (b) any fees and expenses paid to members of the Boards of Directors; (c) amounts paid to the Liquidating Debtors' professionals; (d) amounts paid to ET Committee professionals; (e) amounts paid in satisfaction of other post-Effective Date expenses of the Liquidating Debtors; (f) the amounts of any Distributions paid to holders of Administrative Claims, Priority Claims, Priority Tax Claims, and Secured Claims; (g) the amount of any Distributions paid to holders in each Class of General Unsecured Claims; (h) the amounts held in reserve by the Plan Administrator on account of each of the foregoing as of the conclusion of the Reporting Period, including reserves for Disputed Claims; (i) the number and aggregate Face Amount of Disputed Claims compromised, adjudicated, or otherwise resolved during the Reporting Period; (j) the number and aggregate Face Amount of Disputed Claims remaining; and (k) such other information as the Liquidating Debtors may deem necessary or appropriate to keep the Bankruptcy Court and interested parties generally apprised of the status of Liquidating Debtors' cases.

ARTICLE IX

RELEASE, INDEMNIFICATION, ABANDONMENT,
AND SETTLEMENT OF CLAIMS

9.1     *Release of Securities.*  Each holder of any Claim shall surrender to the Debtors or

the Liquidating Debtors, as applicable, any note, instrument, document, certificate, subordinated

note, agreement, certificated security or other item, if any, evidencing such Claim.  No

Distribution hereunder shall be made to or on behalf of any holder of a Claim unless and until

such holder executes and delivers to the Debtors or the Liquidating Debtors such items described

above, or demonstrates non-availability of such items to the satisfaction of the Debtors or the

Liquidating Debtors, as the case may be, including requiring such holder (i) to post a lost

instrument or other indemnity bond, among other things and (ii) to hold the Debtors, the

Liquidating Debtors, and the Plan Administrator harmless in respect of such instrument or other

item described above and any Distributions made in respect thereof.  The Liquidating Debtors

may reasonably require the holder of such Claim to hold the Liquidating Debtors and the Plan

Administrator harmless up to the amount of any Distribution made in respect of such unavailable

note, instrument, document, certificate, subordinated note, agreement, certificated security or

other item evidencing such Claim.  Any such holder that fails to execute and deliver such release

of liens or other items described above or satisfactorily explain their non-availability to the Plan

Administrator within 180 days of the Effective Date shall be deemed to have no further claim

against the Liquidating Debtors or their property in respect of such Claim and shall not

participate in any Distribution hereunder, and the Distribution that would otherwise have been

made to such holder shall be treated as Unclaimed Property.

9.2     *Satisfaction of Claims and Interests.*  The treatment to be provided for respective Allowed Claims pursuant to this Plan shall be in full satisfaction, settlement, release and discharge of such respective Claims or Interests.

9.3     Release.  The following release shall be valid, binding, and enforceable:

**AS OF THE CONFIRMATION DATE, BUT SUBJECT TO THE OCCURRENCE OF THE EFFECTIVE DATE, NONE OF:  (i) THE PLAN ADMINISTRATOR, THE DEBTORS, THE LIQUIDATING DEBTORS, THEIR SUCCESSORS AND ASSIGNS; (ii) PRESENT DIRECTORS AND OFFICERS; (iii) FORMER DIRECTORS AND OFFICERS WHO HELD SUCH POSITION WITH THE DEBTORS AS OF OR SINCE THE PETITION DATE; AND (iv) AGENTS, ATTORNEYS, ADVISORS, FINANCIAL ADVISORS, INVESTMENT BANKERS AND EMPLOYEES OF THE DEBTORS, SHALL HAVE OR INCUR ANY LIABILITY TO ANY ENTITY FOR ANY CLAIM, OBLIGATION, RIGHT, CAUSE OF ACTION OR LIABILITY (INCLUDING, BUT NOT LIMITED TO, ANY CLAIMS ARISING OUT OF ANY ALLEGED FIDUCIARY OR OTHER DUTY AND THE AVOIDANCE OF PREFERENCES OR FRAUDULENT CONVEYANCES OR ANY GUARANTY ISSUED BY ANY OF THE DEBTORS), WHETHER KNOWN OR UNKNOWN, FORESEEN OR UNFORESEEN, EXISTING OR HEREAFTER ARISING, BASED IN WHOLE OR IN PART ON ANY ACT OR OMISSION, TRANSACTION OR OCCURRENCE FROM THE BEGINNING OF TIME THROUGH THE EFFECTIVE DATE IN ANY WAY RELATING TO THE DEBTORS; AND ALL CLAIMS BASED UPON OR ARISING OUT OF SUCH ACTIONS OR OMISSIONS SHALL BE FOREVER WAIVED AND RELEASED (OTHER THAN THE RIGHT TO ENFORCE THE DEBTORS' OR THE**

-32-

**LIQUIDATING DEBTORS' OBLIGATIONS UNDER THE PLAN);** *provided, however,* **THAT THIS SECTION SHALL HAVE NO EFFECT ON THE LIABILITY OF ANY ENTITY THAT OTHERWISE WOULD RESULT FROM ANY ACTION OR OMISSION TO THE EXTENT THAT SUCH ACTION OR OMISSION IS DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED WILLFUL MISCONDUCT.**

**THE RELEASE DESCRIBED ABOVE SHALL BE ENFORCEABLE AS A MATTER OF CONTRACT AGAINST ANY HOLDER OF A CLAIM TIMELY NOTIFIED OF THE PROVISIONS OF THE PLAN.  CLAIMANTS OF THE DEBTORS SHALL BE ENJOINED FROM COMMENCING OR CONTINUING ANY ACTION, EMPLOYMENT OF PROCESS OR ACT TO COLLECT, OFFSET OR RECOVER ANY CLAIM THAT IS RELEASED AS PROVIDED HEREIN.**

9.4 *Postconfirmation Activity*.  As of the Effective Date, the Liquidating Debtors may conclude the wind-down of their businesses (including by operating the Liquidating Debtors' businesses to the limited extent reasonably necessary or appropriate to effectuate such wind-down), and settle and compromise claims or interests without supervision of the Bankruptcy Court free of any restrictions of the Bankruptcy Code or Bankruptcy Rules, other than those restrictions expressly imposed by the Plan and Confirmation Order.  Without limiting the foregoing, the Liquidating Debtors may pay any charges they incur for taxes, professional fees, disbursements, expenses, or related support services after the Confirmation Date without any application to the Bankruptcy Court.

9.5 *Survival of Certain Indemnification Obligations*.  The obligations of the Debtors to indemnify individuals who serve or served after the Petition Date as the Debtors' respective directors, officers, agents, employees, representatives, and others, including (without limitation)

-33-

professional persons retained by the Debtors, pursuant to the Debtors' respective certificates of

incorporation, by-laws, applicable statutes and preconfirmation agreements in respect of all

present and future actions, suits and proceedings against any of such officers, directors, agents,

employees, representatives, and others, including (without limitation) professional persons

retained by the Debtors, based upon any act or omission related to service with, for or on behalf

of the Debtors on or before the Effective Date as such obligations were in effect at the time of

any such act or omission, shall not be discharged or impaired by confirmation or consummation

of this Plan, but shall survive unaffected by the releases contemplated by this Plan and shall be

performed and honored by the Liquidating Debtors regardless of such confirmation and

consummation.

       9.6    *Limitation on Liability Regarding Chapter 11 Activities*.  NONE OF THE

DEBTORS, THE LIQUIDATING DEBTORS, THE PLAN ADMINISTRATOR, THE ET

COMMITTEE, OR THEIR RESPECTIVE OFFICERS, DIRECTORS, MANAGERS,

EMPLOYEES, MEMBERS OR AGENTS (EACH ACTING IN SUCH CAPACITY), OR ANY

PROFESSIONAL PERSONS EMPLOYED BY ANY OF THEM WILL HAVE OR INCUR

ANY LIABILITY TO ANY ENTITY FOR ANY ACTION TAKEN OR OMITTED TO BE

TAKEN IN CONNECTION WITH OR RELATED TO THE FORMULATION,

PREPARATION, DISSEMINATION, IMPLEMENTATION, CONFIRMATION, OR

CONSUMMATION OF THE PLAN, THE DISCLOSURE STATEMENT, ANY CONTRACT,

RELEASE, OR OTHER AGREEMENT OR DOCUMENT CREATED OR ENTERED INTO,

OR ANY OTHER ACTION TAKEN OR OMITTED TO BE TAKEN IN CONNECTION

WITH THE PLAN OR THE CHAPTER 11 CASES, AND ALL CLAIMS BASED UPON OR

ARISING OUT OF SUCH ACTIONS OR OMISSIONS WILL BE FOREVER WAIVED AND

RELEASED; *provided, however,* THAT NOTHING HEREIN SHALL AFFECT THE

LIABILITY OF ANY ENTITY THAT OTHERWISE WOULD RESULT FROM ANY

ACTION OR OMISSION TO THE EXTENT THAT SUCH ACTION OR OMISSION IS

DETERMINED IN A FINAL ORDER TO HAVE CONSTITUTED WILLFUL

MISCONDUCT.

## ARTICLE X

## MODIFICATION OF THE PLAN

10.1    The Debtors may alter, amend, or modify the Plan under section 1127 of the

Bankruptcy Code.  The Debtors may make any non-material modifications to the Plan at any

time prior to the Effective Date.  After the Effective Date, the Liquidating Debtors may institute

proceedings in the Bankruptcy Court to remedy any defect or omission or reconcile any

inconsistencies in the Plan, the Disclosure Statement, or the Confirmation Order, or to address

such matters as may be necessary to carry out the purposes and effects of the Plan.

Notwithstanding any reference herein to the forms of documents to be filed with the Bankruptcy

Court prior to the Confirmation Hearing, and without limiting the preceding portions of this

Article X, the Debtors may make any non-material changes to such forms prior to the Effective

Date.

10.2    *Revocation of the Plan.*  The Debtors reserve the right to revoke or withdraw the

Plan prior to the Confirmation Date.  If the Debtors revoke or withdraw the Plan, or if

confirmation of the Plan does not occur, then the Plan and related Disclosure Statement shall be

null and void, and nothing contained therein shall:  (i) constitute a waiver or release of any

Claims by or against, or liens in property of, the Debtors; or (ii) serve as an admission of fact or

conclusion of law or otherwise prejudice in any manner the rights of the Debtors in any further

proceedings involving the Debtors.

ARTICLE XI

CONDITIONS TO CONFIRMATION AND EFFECTIVE DATE

11.1     *Conditions to Confirmation.*  The following are conditions precedent to confirmation of the Plan:

(a)     The Bankruptcy Court shall have entered the Confirmation Order.

11.2     *Conditions to Effective Date.*  The Plan may not be consummated unless each of the conditions set forth below has been satisfied:

(a)     The Confirmation Order shall have been entered and not be the subject of any judicial stay.

(b)     The Debtors shall have sufficient funds on hand to satisfy due and outstanding Administrative Claims, Fee Claims, Priority Tax Claims and Priority Claims.

11.3     *Effect of Nonoccurrence of the Conditions to Effective Date.*  If each of the conditions to the occurrence of the Effective Date has not been satisfied on or before the first Business Day that is more than 179 days after the Confirmation Date (or by such later date as the Debtors propose and the Bankruptcy Court approves, after notice and a hearing), upon motion by any party in interest, the Confirmation Order may be vacated by the Bankruptcy Court; *provided, however*, that notwithstanding the filing of such a motion, the Confirmation Order shall not be vacated if each of the conditions to the Effective Date is satisfied before the Bankruptcy Court enters an order granting the relief requested in such motion.  If the Confirmation Order is vacated pursuant to this section, then the Plan shall be null and void in all respects, and nothing contained in the Plan shall:  (a) constitute a waiver or release of any Claims against, liens on property of the Debtors; or (b) prejudice in any manner the rights of the Debtors, including (without limitation) the right to seek further extensions of the exclusivity periods under section 1121(d) of the Bankruptcy Code, which exclusivity periods shall be deemed to have been extended to the date

-36-

twenty (20) days after the date of entry of any order vacating the Confirmation Order, subject to the rights of any party to seek to shorten the exclusivity periods after notice and hearing.

ARTICLE XII

ADMINISTRATIVE PROVISIONS

12.1    *Retention of Jurisdiction*.  Notwithstanding confirmation of the Plan or occurrence of the Effective Date, the Bankruptcy Court shall retain jurisdiction for the following purposes:

(a)    Determination of the allowability of Claims against, or the administrative expenses of, the Debtors, and the validity, extent, priority, and nonavailability of consensual and nonconsensual liens and other encumbrances;

(b)    Determination of any of the Debtors' tax liability pursuant to section 505 of the Bankruptcy Code;

(c)    Approval, pursuant to section 365 of the Bankruptcy Code, of all matters related to the assumption, assumption and assignment, or rejection, of any executory contract or unexpired lease of the Debtors;

(d)    Resolution of controversies and disputes regarding the enforcement or interpretation of the Plan, the Confirmation Order, or the Bankruptcy Court's orders that survive confirmation of the Plan pursuant to the Plan or other applicable law;

(e)    Implementation of the provisions of the Plan, and entry of orders in aid of confirmation and consummation of the Plan and enforcing settlements or orders entered during the Chapter 11 Cases or as part of the Plan, including, without limitation, appropriate orders to protect the Liquidating Debtors, their officers and directors and the Plan Administrator from actions by creditors of the Debtors and resolution of disputes and controversies regarding property of the Liquidating Debtors;

-37-

(f)    Modification of the Plan pursuant to section 1127 of the Bankruptcy Code;

(g)    Commencement and adjudication of any causes of action that arose preconfirmation or in connection with the implementation of the Plan, including Avoidance Actions and other actions against third parties brought or to be brought by the Debtors, the Liquidating Debtors, or other successors of the Debtors as the representative of the Debtors' estates, or a party in interest (as a representative of the Debtors' estates);

(h)    Entry of a Final Order closing the Chapter 11 Cases;

(i)    Resolution of disputes concerning Disputed Claims, Claims for disputed distributions and recharacterization or equitable subordination of Claims;

(j)    Resolution of any disputes concerning any release under the Plan of a nondebtor or the injunction under the Plan, or in the Confirmation Order against acts, employment of process, or actions against such nondebtor;

(k)    Resolution of any disputes concerning whether an Entity had sufficient notice of, among other things: (i) the Chapter 11 Cases; (ii) the applicable Claims' bar date; (iii) the hearing on the approval of the Disclosure Statement as containing adequate information; or (iv) the hearing on confirmation of the Plan for the purpose of determining whether a Claim is discharged hereunder;

(l)    Issuance of injunctions, granting and implementation of other orders, or taking such other actions as may be necessary or appropriate to restrain interference by any Entity with respect to consummation or enforcement of the Plan;

(m)    Resolution of controversies and disputes regarding settlement agreements, orders, injunctions, judgments, and other matters entered or approved by the Bankruptcy Court in

connection with any adversary proceeding, discovery, or contested matter in the Chapter 11 Cases;

(n)     Correction of any defect, cure of any omission or reconcile any inconsistency in the Plan, the Confirmation Order, organizational documents of the Liquidating Debtors or any other documents relating to the Plan, as may be necessary to carry out the purposes or intent of the Plan;

(o)     Adjudication of any pending adversary proceeding, or other controversy or dispute, in the Chapter 11 Cases for the Debtors, which arose pre-confirmation and over which the Bankruptcy Court had jurisdiction prior to confirmation of the Plan;

(p)     Entry and implementation of such orders as may become necessary or appropriate if the Confirmation Order is for any reason modified, stayed, reversed, revoked, or vacated; and

(q)     Determination of any other matters that may arise in connection with or related to the Plan, the Disclosure Statement, the Confirmation Order or any contract, instrument, release, or other agreement or document created in connection with the Plan or Disclosure Statement.

12.2     *Successors and Assigns*.  The rights, benefits, and obligations of any Entity named or referred to in the Plan shall be binding upon, and shall inure to the benefit of, the heir, executor, administrator, successor, or assign of such Entity.

12.3     *Severability*.  Should any provision in the Plan be determined to be unenforceable following the Confirmation Date, such determination shall in no way limit or affect the enforceability and operative effect of any and all other provisions of the Plan; provided that the Plan, as modified, meets the requirements of the Bankruptcy Code, including, without limitation, section 1127 of the Bankruptcy Code.

12.4     *Governing Law*.  Except to the extent the Bankruptcy Code, Bankruptcy Rules, other federal laws apply, or as otherwise expressly provided in the Plan, the rights and obligations arising under the Plan shall be governed by the laws of the State of New York without giving effect to principles of conflicts of law.

12.5     *ET Committee*.

(a)     As of the Effective Date, the duties of the ET Committee shall terminate except as to: (i) any appeal or motion for reconsideration of the Confirmation Order; (ii) objections to Fee Claims; and (iii) the removal of the Committee Director and the appointment of a replacement Committee Director.

(b)     Upon the entry of a Final Order closing the Chapter 11 Cases for the Liquidating Debtors, the duties of the ET Committee shall terminate for all purposes.

12.6     *Application of Bankruptcy Code section 1146(c)*.  The issuance, transfer, or exchange of a security, or the making or delivery of an instrument of transfer under the Plan shall be entitled to the tax treatment provided by sections 1146(c) of the Bankruptcy Code and each recording or other agent of any governmental office shall record any such documents of issuance, transfer, or exchange without any further direction or order from the Bankruptcy Court.

12.7     *Ratification*.  All fees payable pursuant to section 1930 of title 28, United States Code, due and payable through the Effective Date shall be paid by the Debtors on or before the Effective Date and amounts due thereafter shall be paid by the Plan Administrator in the ordinary course.

12.8     *Continuation of Injunctions and Stays*.  Unless otherwise provided, all injunctions or stays ordered in the Chapter 11 Cases, pursuant to section 105 of the Bankruptcy Code or

-40-

otherwise, and extant on the Confirmation Date shall remain in full force and effect unless or until subsequently modified or terminated.

12.9    *Undefined Terms*.  Any term used herein that is not defined herein shall have the meaning ascribed to any such term used in the Bankruptcy Code and/or the Bankruptcy Rules, if used therein.

12.10   *Interpretation.* The words "herein," "hereof," "hereto," "hereunder," and others of similar inference refer to the Plan as a whole and not to any particular section, subsection, or clause contained in the Plan unless otherwise specified herein. The word "including" shall mean including, without limitation. The headings in the Plan are only for convenience of reference and shall not limit or otherwise affect the provisions of the Plan.

Dated:  March 3, 2005

Respectfully submitted,

NEGT Energy Trading Holdings Corporation

By: _R.W. Barron_____
    President

NEGT Energy Trading - Gas Corporation

By: _R.W. Barron_____
    President

NEGT Energy Trading – Power, L.P.

By:  NEGT Energy Trading Holdings Corporation,
     its General Partner
     _R.W. Barron_____
     President

NEGT ET Investments Corporation

By: _R.W. Barron_____
    President

-42-

Quantum Ventures


By: _P. Chrisman Iribe_____

      President


Energy Services Ventures, Inc.


By: _P. Chrisman Iribe_____

      President